JONES DAY
Richard H. Engman
Scott J. Friedman
Ross S. Barr
Lauren M. Buonome
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Proposed Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re                                                        :  Chapter 11
                                                             :
556 Holding LLC, *et al.*,                                   :  Case No. 10-14267 (ALG)
                                                             :
                    Debtors.                                 :  (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**NOTICE OF HEARING ON THE**
**MOTION OF DEBTORS, PURSUANT TO SECTIONS 105 AND 363 OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004, FOR**
**THE ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO**
**SELL THE BUILDING, LAND AND OTHER PROPERTY LOCATED AT**
**556 WEST 22ND STREET FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**INTERESTS AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      A hearing on the Motion of Debtors, Pursuant to Sections 105 and 363 of

the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, for the Entry of an Order

(I) Authorizing the Debtors to Sell the Building, Land and Other Property Located at

556 West 22nd Street Free and Clear of All Liens, Claims, Interests and Encumbrances and

(II) Granting Related Relief (the "Motion") shall be held before the Honorable Allan L. Gropper,

United States Bankruptcy Judge, in Room 617 of the United States Bankruptcy Court, Alexander

Hamilton Custom House, One Bowling Green, New York, New York 10004, on

**November 8, 2010 at 10:00 a.m. (ET)**.

2.	Objections, if any, to the relief sought in the Motion, must be made:

(a) in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in

accordance with General Order M-242 (General Order M-242 and the User's Manual for the

Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for

the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by

all other parties in interest, with the Bankruptcy Court (with a hard-copy to the Judge's

chambers); and (b) shall be served in accordance with General Order M-182, upon (i) the Office

of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004,

Attn.: Paul Schwartzberg, Esq.; and (ii) Jones Day, 222 East 41st Street, New York, New York

10017, Attn.: Richard H. Engman, Esq. and Ross S. Barr, Esq.; so that they are **actually**

**received** by such parties no later than **4:00 p.m. (ET) on November 1, 2010**

(the "Objection Deadline").  Unless objections are received by the Objection Deadline, the relief

may be granted as requested in the Motion.

Dated:  October 15, 2010
	New York, New York

Respectfully submitted,

/s/ Richard H. Engman
JONES DAY
Richard H. Engman
Scott J. Friedman
Ross S. Barr
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

JONES DAY
Richard H. Engman
Scott J. Friedman
Ross S. Barr
Lauren M. Buonome
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Proposed Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                 :
In re                         :    Chapter 11
                 :
556 Holding LLC, et al.,[1]    :    Case No. 10-14267 (ALG)
                 :
           Debtors    :    (Jointly Administered)
                 :
-------------------------------------------------------------x

**MOTION OF DEBTORS, PURSUANT TO SECTIONS 105 AND 363 OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004, FOR**
**THE ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO**
**SELL THE BUILDING, LAND AND OTHER PROPERTY LOCATED AT**
**556 WEST 22ND STREET FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**INTERESTS AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE:

          The above-captioned debtors-in-possession (collectively, the "Debtors") hereby

move the Court for the entry of an order, pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order authorizing and

approving (a) the sale of any and all of Debtor 556 Holding LLC's (the "Seller") right, title and

---

[1]      The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): 556 Holding LLC (3732) and KDMJ Realty, Inc. (4578). The address of the Debtors is 556 West 22nd Street, New York, NY 10011.

interest in and to the real property, building and certain personal property and other interests located at 556 West 22nd Street, New York, New York (collectively, the "Property") to Albanese Development Corporation (the "Purchaser") free and clear of liens, claims, interests and encumbrances thereon (the "Sale Transaction") and (b) granting other relief related thereto. In support of this Motion, the Debtors respectfully state as follows:

## Background

1. On August 6, 2010 (the "Petition Date"), the Debtors commenced cases under chapter 11 of the Bankruptcy Code in this Court.[2] By an order entered on the Petition Date, the Debtors' chapter 11 cases were consolidated for procedural purposes only and administered jointly. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Jurisdiction

2. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

3. By this Motion, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, the Debtors seek the entry of an order, in substantially the form attached hereto as Exhibit A (the "Sale Order"), (a) authorizing the Debtors' entry into and approving the terms and conditions of the purchase agreement attached hereto as Exhibit B

---

[2] Background information regarding, among other things, the Debtors' business and the reasons for the commencement of these chapter 11 cases is contained in the Declaration of Dorothea Keeser Pursuant to Local Bankruptcy Rule 1007-2 (Docket No. 3) (the "Keeser Declaration"), which was filed on the Petition Date.

(together with the exhibits thereto, the "Purchase Agreement"), including the sale of the Property

to the Purchaser free and clear of liens, claims, interests and encumbrances and (b) granting

certain other related relief.  As further described below, the value of the consideration provided

to the Debtors under the Purchase Agreement exceeds $20,500,000.00; including the rent-free

right to possess the Property until December 31, 2011 (worth in excess of $1,200,000) and cash

consideration totaling $19,350,000.00 (the "Purchase Price"), which, importantly, is more than

sufficient to satisfy all claims against the Debtors in cash and in full.

## Facts Relevant to this Motion

### *The Property and the Mortgage Thereon*

4. The Seller and West 22nd Street Properties LLC (the "Lender") are parties

to that certain loan agreement, dated as of February 4, 2008 (the "Loan Agreement"), the

obligations under which are secured by a mortgage on the Property and an assignment of leases

(together with the Loan Agreement and other related documents, the "Loan Documents").  In

connection with the Seller's entry into the Loan Agreement, the Seller executed an amended,

restated and consolidated promissory note in favor of the Lender in the purported principal

amount of $11,067,809.84.[3]

5. The Seller was not able to repay the amounts due under the Loan

Documents on January 1, 2009, the maturity date under the Loan Agreement.  Although the Loan

Agreement contemplated that it could be extended for one year in exchange for an extension fee

equal to 1% of the amount then outstanding, the Loan Agreement was not extended and the

Lender declared the loan to be in default.  Thereafter, in exchange for a forbearance fee equal to

---

[3] The actual amount of loan proceeds funded by the Lender at the time the promissory note was issued, however, was $8,913,534.19, which was used as follows: the refinance of existing indebtedness totaling $8,180,809.71, payment of a commitment fee to the Lender of $221,356.20, payment of the Lender's legal fees of $179,151.99, title charges of $178,486.59, a mortgage loan brokerage fee of 121,356.20, various expenses of the Lender totaling $17,420.00, and the Debtors' legal fees of $14,953.50.

3% of the amount then outstanding and pursuant to the terms of that certain forbearance agreement dated April 21, 2009 (the "Forbearance Agreement"), the Lender agreed to forbear from exercising remedies with respect to the Loan from January 2, 2009 through the earlier of July 1, 2010 or the occurrence of an event of default under the Forbearance Agreement. Together with the execution of the Forbearance Agreement, the Lender required that the Seller execute and deliver into escrow a deed in lieu of foreclosure (the "Deed in Lieu"), a stipulated judgment of foreclosure, and an assignment of lease.

6.     As described in greater detail in the Keeser Declaration, which was filed on the Petition Date, these chapter 11 cases were commenced because of the expiration of the forbearance period and the Debtors' concern that the Lender may attempt to enforce its remedies in a way that would be destructive to the value of the Debtors' estate. To avoid such risk, the Debtors commenced these chapter 11 cases in order to ensure an opportunity to pursue and effect a value-maximizing transaction that would not only pay the Lender in full, but also provide a benefit to all other stakeholders of the Debtors.

***The Initial Sale Process***

7.     Prior to the commencement of these chapter 11 cases, the Debtors had received two informal offers and were in discussions with two other parties regarding sale or refinance transactions that would enable the Debtors to repay the Lender in full and allow the Debtors a period of time to continue using the Property as the home of the Chelsea Art Museum (the "Museum"), a non-profit organization that is charged only nominal rent by the Debtors. The Debtors believed that each potential bidder was credible and had the financial resources to close a transaction within a short period of time. Nevertheless, the Lender refused to agree to any extension of the forbearance period nor any other option that did not involve the Debtors'

agreement to either vacate Property immediately or cause the Museum to begin paying substantial, if not market, rent.  The Debtors did not believe that the Museum's financial condition would permit it to continue operations under such circumstances and therefore commenced these chapter 11 cases to stay the Lender's ability to exercise its remedies in a way that, in all likelihood, would be destructive to the value of the Debtors' estate.

8.    After commencing these chapter 11 cases, the Debtors have continued their intensive pursuit of a value-preserving, but nevertheless expeditious, sale or refinance transaction.  In that regard, the Debtors and their professionals met with approximately 13 parties throughout August and September, 2010, six of whom provided the Debtors with written expressions of interest, all of which involved a proposed sale transaction that would have provided sufficient value to satisfy the Lender's claims in full.

9.    On or around September 13, 2010, the Debtors received an expression of interest in the form of a term sheet for a refinance transaction coupled with a "put" option that would allow the Debtors to require the bidder to purchase the Property for $20 million.  This proposed transaction was extremely attractive to the Debtors because, if consummated, it would not only provide the Debtors with sufficient funds to pay all of their allowed claims in full, but it would also provide them with the opportunity to retain control of the Property while they determined the viability of their continued ownership versus the option to "put" the Property to the bidder for $20 million (the "Refinance Transaction").

10.    The Refinance Transaction, however, was extremely complicated.  In particular, under the Refinance Transaction, the Debtors would be required to execute, among other things, (a) an easement to agree not to expand their air rights, (b) a put option providing that they could sell the Property back to the refinance lender (the "Refinance Lender") at any

time for $20 million after an initial period of renovation, (c) a master lease of the Property to the Refinance Lender, and (d) subleases whereby the Refinance Lender would sublease (i) the Property back to the Debtors for the current space occupied by the Museum, and (ii) other floors and the roof to an event planner that occupies the building next to the Debtors.

***The Lift Stay Motion and the Stay Stipulation***

11.     At the same time that the Debtors were working with the Refinance Lender in an effort to turn its term sheet into a binding commitment to consummate the Refinance Transaction, the Lender's motion for relief from the automatic stay (Docket No. 14) required the Debtors' attention as it was scheduled for hearing on September 17, 2010.  Despite the Debtors' delivery to the Lenders of each of the above-described expressions of interests and general efforts to keep the Lender informed of the progress of its sale efforts, the Lender was unwilling to withdraw or adjourn its motion in the absence of significant concessions by the Debtors.

12.     In order to avoid any unnecessary confrontations that could distract from the central task at hand – the pursuit of a value-maximizing transaction, the Debtors agreed to the entry of a stipulated order (the "Stay Stipulation") under which the Debtors agreed to the lifting of the automatic stay if they were not successful in their efforts to negotiate and enter into a committed refinance or sale transaction on or before October 7, 2010 (the "Stay Period").  The Stay Stipulation was approved by this Court on October 7, 2010 (Docket No. 29).

13.     After agreeing to the Stay Stipulation, the Debtors continued their diligent efforts to finalize and document the proposed Refinance Transaction as well their frequent updates to the Lender regarding their progress.  Within weeks of receiving the initial term sheet, the Debtors and the Refinance Lender had completed initial drafts of each of the many

documents that would be necessary to close the very complicated Refinance Transaction. On October 4, 2010, the Debtors sent each of the following 18 draft agreements to the Lender: a Master Lease Agreement, two Sublease Agreements, a Put-Call Option Agreement, a Note Consolidation Agreement, a Mortgage Consolidation Agreement, a Loan Agreement, an Environmental Indemnity Agreement, a Payment Guaranty, a Compliance Agreement (Guarantor), Section 255 Affidavits, an Assignment of Leases and Rents, a Carve-Out Guaranty, a Borrower's Certificate, a Gap Note, a Gap Mortgage, a Declaration of Restriction and Easement, a Compliance Agreement (Borrower), and a License Agreement. The Lender, however, never provided any comments, formal or informal, to any of the foregoing transaction documents.

14. On October 6, 2010, one day prior to the expiration of the Stay Period, the Debtors received a very attractive and unexpected expression of interest to acquire the property for $28 million pursuant to a sale transaction that would close prior to November 15, 2010. As this amount was substantially in excess of any other offer or expression of interest that had been previously received, it warranted consideration by the Debtors notwithstanding the advanced stage of the negotiations surrounding the Refinance Transaction. Because the Stay Period was scheduled to expire the next day, the Debtors and the proposed bidder contacted the Lender to request an extension of the Stay Period through and including October 12, 2010 (the "Extended Stay Period"). The Lender granted such request.

15. Unfortunately, on October 10, 2010, the proposed bidder informed the Debtors that its offer had been based on a miscalculation of the value of the associated air rights and, accordingly, it needed to withdraw its $28 million offer. As a result, the Debtors immediately turned their attention back to Refinance Transaction and also continued to update

the Lender on all progress in regards to both transactions throughout this time. The next shoe dropped on the morning of October 12, the last day of the Extended Stay Period, when the Refinance Lender for the first time expressed hesitation regarding certain deal points that it had previously indicated were not problematic. The Debtors cannot be sure whether the Refinance Lender's new found concerns were genuine or, knowing that the Extended Stay Period was about to expire, they were leverage for seeking pricing concessions because the Debtors immediately reached out to the Purchaser, who had previously expressed an interest in the Property at $18 million, to see if (a) the Purchaser would now be willing to raise the value of its offer and (b) how quickly it could sign a purchase agreement and fund a $2 million deposit. The Purchaser responded that it would increase its offer and that it would be ready to execute a purchase agreement and fund the deposit within two days at most.

16. With the Extended Stay Period ending in hours, the Debtors contacted the Lender that evening to explain that (a) the Refinance Lender was not ready to execute the Refinance Transaction documents, although the Debtors still hoped that it soon would be, (b) the Purchaser, who the Lender knew and had been in contact with, had indicated a willingness to document and fund the deposit for a $20.5 million sale transaction within 2 days, and (c) the Debtors would of course continue to frequently update the Lender as to their progress on both potential transactions.

17. After two tireless days, on October 14, 2010, the Debtors and the Purchaser executed the Purchase Agreement and the Purchaser deposited the $2 million Deposit with the Escrow Agent (as such terms are defined in the Purchase Agreement). As noted above, consummation of the Purchase Agreement, which contains no financial, diligence or other

material contingency, will provide the Debtors with sufficient cash to pay all allowed claims against their estates in full.

***The Lender Seeks a Windfall***

18.     Despite having been continuously updated with the status of the Debtors' sale efforts, the Lender notified the Debtors on October 14, 2010 that it had filed the Deed in Lieu with the New York City Department of Finance Office of the City Register (the "City Register") on October 13, 2010.  As described in greater detail below, neither the Debtors' granting nor the Lender's recording of the Deed in Lieu effected a transfer of the fee interest in the Property to the Lender.  Accordingly, the Debtors are proceeding with the Sale Transaction in an effort to maximize the value of their estates for the benefit of all stakeholders therein, not just the Lender.

*The Purchase Agreement*

19.    The principal terms of the Purchase Agreement are summarized below:[4]

| | |
|---|---|
| Acquired Assets | Any and all of the Seller's right, title and interest in and to the real property and the building located thereon commonly known by the street address 556 West 22nd Street, New York, New York, and also together with all of the Seller's right, title and interest in and to any other improvements, fixtures, machinery and equipment attached or appurtenant thereto and all rights and privileges pertaining thereto, including all of the Seller's right, title and interest in and to all rights-of-way and easements. |
| Purchase Price | $19,350,000 |
| Deposit | $2,000,000 |
| Closing Conditions | The Sale Transaction is conditioned on, in addition to certain customary and usual conditions, (a) entry of an order approving the Break-Up Fee, (b) entry of the Sale Order and (c) the Purchaser's receipt of a commitment (subject to customary terms and conditions) from the Title Company to issue the Title Policy to the Purchaser in accordance with the Purchase Agreement. |
| Post-Closing Occupancy | From the Closing Date until December 31, 2011 (the "Term"), the Seller, and any person or entity currently deriving any real property interest from Seller, shall be entitled to occupy the Premises pursuant to the terms and conditions of the lease agreement to be executed at Closing (the "Lease Agreement") at no cost to the Seller. |
| Post-Closing Payment | A portion of the Purchase Price in the amount of $4,350,000 shall not be paid at the Closing and shall be deferred and paid to the Seller upon the Seller's compliance with Seller's obligations under the Lease Agreement to vacate and surrender possession at the end of the Term, and cause any Designated Occupant to vacate and surrender possession, of the Property to Purchaser in accordance with the terms of the Lease Agreement. |

---

[4]    This chart is intended for summary purposes only and in the event of any inconsistency between this summary and the Purchase Agreement, the Purchase Agreement shall govern.  Capitalized terms not otherwise defined in the summary shall have the meanings given to them in the Purchase Agreement.

| Break-Up Fee | The Purchaser shall be entitled to a break-up fee in an amount equal to the sum of $580,500 (the "Break-Up Fee"). The Break-Up Fee shall have administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code. The Break-Up Fee shall be paid to Purchaser, without further order of the Court, at the closing of the sale of the Property to a buyer other than Purchaser. |
|---|---|
| Personal Guaranty | Contemporaneous with the execution of the Purchase Agreement, Dorothea Keeser shall execute and deliver to the Purchaser a personal guaranty, pursuant to which Dorothea Keeser will agree to pay the Break-Up Fee in the event that Seller does not consummate the Purchase Agreement with Purchaser (whether or not Seller's obligation to pay the Break-Up Fee is approved by the Court). |
| "As-is" Sale | The Purchaser shall take title to the Property on an "as is," "where is" basis. |
| Payment of Brokerage Commissions | Payment of any brokerage commissions to Capin & Associates, Inc. will be made by the Purchaser. |

***Notice of the Proposed Sale***

20.     The Debtors will provide notice of the proposed sale of the Property by serving this Motion on the following parties: (a) counsel to the Lender; (b) the Debtors' unsecured creditors, as identified in the Debtors' chapter 11 petitions; (c) any party who has asserted a lien against the Property that is shown in the title commitment that has been obtained for the Property; (d) any party who has expressed an interest to the Debtors in purchasing the Property; (e) those parties that have filed notices of appearance under Bankruptcy Rule 2002 in these cases; (f) the Internal Revenue Service; (g) the U.S. Environmental Protection Agency; and (h) the Attorney General for the State of New York. The Debtors submit that providing notice of the sale in this manner is reasonable and will adequately apprise interested parties of the sale of the Property, while avoiding the costs associated with having the Debtors serve this Motion on parties who are not likely to be directly impacted by the sale of the Property.

## Extraordinary Provision Under the Guidelines

21. The following items in the Purchase Agreement and the Sale Order which may be considered extraordinary under the Guidelines for the Conduct of Asset Sales (General Order M-331):

(a) <u>Private Sale</u>. As described above, the Purchase Agreement and Sale Order contemplate the private sale of the Property. As described elsewhere in this Motion, the Debtors believe that a private sale is appropriate under the circumstances.

(b) <u>Use of Proceeds</u>. The Purchase Agreement provides for the payment of portions of the Purchase Price (collectively, the "<u>Creditor Payments</u>") at Closing (a) to the Lender, in an amount equal to the Payoff Amount (as defined in the Purchase Agreement) and (b) to DC Beteiligung GmbH ("<u>DCB</u>"), in an amount equal to $425,000. Because, as described above, the Debtors believe that the $19.35 million Purchase Price for the Property will provide them with more than sufficient cash to pay all allowed claims against their estates in full, the Lender and DCB are certainly not receiving higher distributions on account of their claims than will any of the Debtors' other creditors. Further, the Lender's security interests cover substantially all of the Property, which liens and security interests would attach to the proceeds of the Sale Transaction absent the payment to the Lender at Closing. Accordingly, there is no harm to the Debtors, their estates or any stakeholder therein through the provision of the Creditor Payments at Closing.

(c) <u>Waiver of Bankruptcy Rule 6004(h) Stay</u>. The proposed form of Sale Order seeks a waiver of the 14-day stay imposed under Bankruptcy Rule 6004(h). As described in greater detail in the Stay Stipulation, the principal amount of the Loan remains outstanding and has been accruing and will continue to accrue interest from and after July 2, 2010 at the default rate of 20%. The Debtors seek to close the Sale Transaction and payoff the Loan as soon as permissible under applicable law in order to minimize the accrual of interest on the Loan. The Debtors submit that relief from this rule is appropriate under the circumstances to minimize such accrual of additional interest.

## Basis for Relief Requested

***Approval of the Sale of the Property is Appropriate***
***and in the Best Interests of the Debtors' Estates and Creditors***

22. Under section 363 of the Bankruptcy Code, a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of

the court after notice and a hearing.  See 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in the

Second Circuit have found that the decision to sell assets outside the ordinary course of business

should be based upon the sound business judgment of the debtor and where that judgment has a

reasonable basis, that judgment should ordinarily be deferred to by a court in determining

whether to approve a proposed transaction.  See Licensing By Paolo, Inc. v. Sinatra (In re

Gucci), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate

may be conducted if a good business reason exists to support it."); Comm. of Equity Security

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re

Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Comm. of Asbestos-Related Litigants v.

Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)

("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct.").

        23.      Courts typically consider the following four factors in determining

whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists

for the sale, (b) whether adequate and reasonable notice of the sale was given to interested

parties, (c) whether the sale will produce a fair and reasonable price for the property and

(d) whether the parties have acted in good faith.  See, e.g., In re Weatherly Frozen Food Group,

Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); In re Delaware & Hudson Ry. Co., 124 B.R.

169, 176 (D. Del. 1991).

24.    Here, each of the four factors have been satisfied.  Selling the Property now through the Sale Transaction allows the Debtors to, among other things, (a) promptly monetize these assets in a value-maximizing transaction the Debtors believe will allow them to pay all allowed claims against their estates in full, (b) stop the accrual of additional default interest under the Loan and (c) retain possession of the Property through December 31, 2011 for the benefit of the Museum, its art-enthusiast patrons and New York City's art culture.

25.    Second, as discussed above, the Debtors will provide adequate and reasonable notice of the proposed sale of the Property.  See, e.g., Folger Adam Security Inc. v. DeMatteis/MacGregor, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"); In re WBQ Partnership, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("'notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property'") (quoting In re Karpe, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).

26.    Third, as described above, the Property has been thoroughly marketed. While many section 363 sales are conducted under competitive bidding procedures, there is no requirement in section 363 of the Bankruptcy Code to do so.  In fact, Bankruptcy Rule 6004(f) specifically contemplates private sales with the statement that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."

27.    Courts have noted that private sales are appropriate under section 363 in certain circumstances.  See In re Bakalis, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is

conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction"). Accordingly, courts in this District have approved private sales of assets when the general standards for approval under section 363 of the Bankruptcy Code are satisfied. See, e.g., In re Old Carco LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Nov. 12, 2009) (order approving the sale of one of the debtors' assembly plants by private sale); In re Wellman, Inc., Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sale of one of the debtors' facilities' by private sale, not subject to higher and better offers); In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft").

28.     Given (a) the thorough marketing of the Property over an extended period of time, (b) the lack of any other better and achievable offer, (c) the significant cash Purchase Price being offered by the Purchaser and (d) post-Closing occupancy being provided by Purchaser, the Debtors believe that it is unlikely that an overbid process will generate higher and better offers for the Property.

29.     As to the fourth factor, the Debtors and the Purchaser are proceeding in good faith. The Purchaser is not an insider of the Debtors and the transaction was negotiated in good faith and only entered into after arms'-length negotiations.

30.     For all of these reasons, the sale of the Property as requested herein should therefore be approved.

***Sale of the Property Free and Clear of Liens, Claims and Encumbrances***

31.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1)  applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  In addition, a court may authorize the sale of a debtor's assets free and clear of any liens, claims or encumbrances under section 105 of the Bankruptcy Code.  See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

32.     The Debtors believe that one or more the standards in section 363(f) will be satisfied to permit the Property to be sold free and clear of any liens, claims or encumbrances. Importantly, the Purchase Price being paid for the Property exceeds the amount of the Lender's secured claims therein regardless of whether the Debtors' or the Lender's calculation thereof is

used.[5]  Given that the Debtors are not aware of any liens on the Property other than those of the Lender, the Debtors may sell the Property free and clear of the Lender's liens under section 363(f)(3) of the Bankruptcy Code because the Lender's "interest is a lien and the price at which [the P]roperty is to be sold is greater than the aggregate value of all liens on such [P]roperty . . . ."  11 U.S.C. § 363(f)(3).  Second, as discussed above, because the exact amount of the Lender's secured claim in the Property is in bona fide dispute, the Debtors may sell the Property free and clear of such claim under section 363(f)(4) of the Bankruptcy Code.  11 U.S.C. § 363(f)(4); see also Stay Stipulation, at Recitals, ¶ 2.

### *The Recording by the Lender of the Deed in Lieu Has No Effect on the Sale Transaction*

33.  On October 13, 2010, the Lender filed the Deed in Lieu with the City Register, and the Deed in Lieu was recorded on October 14, 2010.  The Lender has informed the Debtors of the Lender's belief that it took title to the Property as of October 13, 2010.

34.  Notwithstanding the recording of the Deed in Lieu, no transfer of the fee simple interest in the Property has occurred; the Debtors still own the Property.  The Debtors executed the Deed in Lieu over 18 months ago in connection with their entry into the Forbearance Agreement.  The Deed in Lieu was held in escrow to be released (a) to the Debtors upon repayment of amounts owed to the Lender or (b) to the Lender upon an Event of Default, as defined in the Forbearance Agreement or the Loan Documents.  There can be no question whatsoever that the Deed in Lieu was given to secure a debt.

35.  On this point, N.Y. Real Property Law § 320 provides (emphasis added):

---

[5]  As disclosed in the Stay Stipulation, the Debtors and the Lender disagree about the amount of the Lender's secured claim, and have agreed to make good faith efforts to resolve any disputes they may have regarding same.  As disclosed in the Purchase Agreement, the Debtors believe that the Lender's allowed secured claim will be approximately $12.6 million as of the closing of the Sale Transaction.  The Debtors anticipate that the Lender will assert a claim for approximately $14.2 million as of the closing – approximately $13 million as of July 30, 2010, plus interest at the 20% default rate thereafter, plus $400,000 in transfer taxes.  The Debtors reserve their rights to dispute such amount.

-17-

> A deed conveying real property, which, by any other written instrument, appears to be intended only as a security in the nature of a mortgage, although an absolute conveyance in terms, **must be considered a mortgage**; and the person for whose benefit such deed is made, **derives no advantage from the recording thereof**, unless every writing, operating as a defeasance of the same, or explanatory of its being desired to have the effect only of a mortgage, or conditional deed, is also recorded therewith, and at the same time.

36.     Thus, any deed given to secure a debt, no matter what its form or structure, creates no more than a mortgage.  Leonia Bank v. Kouri, 772 N.Y.S.2d 251, 216-17 (N.Y. App. Div. 2004).  As noted by the Leonia Bank court:

> Section 320 codifies the common law as enunciated in cases for over a century.  It is an established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money.  The facts agreed upon show that there was a mortgage; for a deed, although absolute on its face, when given as security only, is a mortgage by operation of law.

Leonia Bank, 772 N.Y.S. 2d at 217 (internal quotations and citations omitted).

37.     The Lender's recording of the Deed in Lieu is ineffective to extinguish the Debtors' interest in the Property.  To do so, the Lender is required to proceed by foreclosure and sale.  Id. at 217-218 ("The holder of a deed given as security must proceed in the same manner as any other mortgagee – by foreclosure and sale – to extinguish the mortgagor's interest"); Basile v. Erhal Holding Corp., 538 N.Y.S.2d 831, 833 (N.Y. App. Div. 2nd Dep't 1989), lv. denied 551 N.Y.S.2d 905 (N.Y. 1989).

38.     In Basile, the borrower mortgaged its property and thereafter sought to declare the mortgage null and void.  Id.  The parties resolved that action by entering into a stipulation of settlement in open court, whereby the borrower agreed to execute a mortgage and a deed in lieu of foreclosure which would not be recorded so long as the borrower performed under the mortgage.  Id.  Subsequently, the borrower defaulted and the lender recorded the deed in lieu.  Id.  The lender moved for an order declaring that borrower's right of redemption had been

extinguished, and the borrower moved for an order directing the mortgagee to accept a check and for the lender to deliver a satisfaction of the mortgage and deed to the property.  Id.

39.     The Appellate Division ruled for the borrower, holding that the attempted waiver of the borrower's right of redemption was ineffective, and that the lender's "**sole** remedy is to institute an action in foreclosure."  Id. (emphasis added).  Here, like in Basile, the recording of the Deed in Lieu did not extinguish the Debtors' interest in the Property.  To the contrary, the Debtors continue to own the fee interest in and may sell the Property.

***Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)***

40.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order.  See Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  As noted above, the principal amount of the Loan remains outstanding and has been accruing and will continue to accrue interest from and after July 2, 2010 at the default rate of 20%.  Waiving the 14-day stay under Bankruptcy Rule 6004(h) is necessary to permit the Debtors to minimize the accrual of interest by closing the proposed Sale Transaction as soon as possible after the entry of the Sale Order.

**Notice**

41.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been given to:  (a) counsel to the Lender; (b) the Debtors' unsecured creditors, as identified in the Debtors' chapter 11 petitions; (c) any party who has asserted a lien in the Property that is shown in the title commitment that has been obtained for the Property; (d) any party who has expressed an interest to the Debtors in purchasing the Property; (e) those

parties that have filed notices of appearance under Bankruptcy Rule 2002 in these cases; (f) the Internal Revenue Service; (g) the U.S. Environmental Protection Agency; and (h) the Attorney General for the State of New York.  The Debtors submit that no other or further notice need be provided.

## **Prior Request**

42.      No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court:  (i) enter the Sale Order in substantially the form attached hereto as <u>Exhibit B</u>; and (ii) grant such other and further relief to the Debtors as the Court may deem proper.


Dated:  October 15, 2010
       New York, New York

Respectfully submitted,


 _/s/ Richard H. Engman_____ _
Richard H. Engman
Scott J. Friedman
Ross S. Barr
Lauren M. Buonome
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

PROPOSED ATTORNEYS FOR DEBTORS

# EXHIBIT A

**[Purchase Agreement]**

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of the Effective Date (as defined in Section 1.2 below), by and between **556 HOLDING LLC**, a New York limited liability company, having an address at 556 West 22nd Street, New York, New York 10001 ("Seller"), and **ALBANESE DEVELOPMENT CORPORATION**, a New York corporation, having an address at 1050 Franklin Avenue, Garden City, New York 11530 ("Purchaser").

Seller is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 6, 2010, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-14267-alg). Seller and Purchaser are entering into this Agreement subject to the approval by the Bankruptcy Court.

In consideration of the mutual promises, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.1** Agreement of Purchase and Sale. Subject to the terms and conditions hereinafter set forth, on the Closing Date (as defined in Section 1.2 below), Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, any and all of Seller's right, title and interest in and to the real property more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "Land"), together with the building located thereon (the "Building") commonly known by the street address **556 West 22nd Street, New York, New York,** and also together with all of Seller's right, title and interest in and to any other improvements, fixtures, machinery and equipment attached or appurtenant thereto and all rights and privileges pertaining thereto, including all of Seller's right, title and interest in and to all rights-of-way and easements (collectively with the Land and Building, the "Property"). No service contracts, warranties, guaranties, licenses, permits or other tangible (movable) or intangible personal property are included with the sale of the Property.

**Section 1.2** Certain Definitions.

"Break-Up Fee Order" means an Order of the Bankruptcy Court approving the Break-Up Fee in form and substance acceptable to Purchaser.

"Business Day" means any day other than a Saturday, Sunday or holiday of a bank in New York.

"Closing" shall have the meaning prescribed to such term in Section 4.1 below.

"Closing Date" means a date mutually agreed to by Seller and Purchaser, but in no event later than November 15, 2010, as to which date time is of the essence.

"Closing Surviving Provisions" means the rights, liabilities and obligations set forth in Sections 1.6, 1.7, 3.3, 4.4, 7.1, 10.1, 10.4, 10.6, 10.7, 10.8, 10.9, 10.10, 10.11, 10.12, 10.13, 10.14, 10.15, 10.16, 10.17 and Articles V, VI, VIII and IX and any other provisions that, pursuant to their terms, expressly survive the Closing.

"Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, any successor statute and any regulations or guidance promulgated thereunder.

"Deed-in-Lieu of Foreclosure" means that certain deed dated October 13, 2010 by Seller, as grantor, and West 22nd Street Owner, LLC, as grantee, purporting to convey all of Seller's right, title and interest in and to the Property to grantee, which was recorded in the New York City Register's Office on October 14, 2010 as CRFN: 2010000343750.

"Effective Date" means October 14, 2010.

"Environmental Laws" means all federal, state, and local laws, statutes, ordinances and regulations, now or hereafter in effect, related to the protection of human health, safety, the environment and natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. Sections 136, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901, et seq.), the Toxic Substances Control Act, as amended (42 U.S.C. Sections 7401, et seq.), the Clean Air Act, as amended (42 U.S.C. Sections 7401, et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. Section 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. Sections 651, et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. Sections 300f, et seq.), any state or local counterpart or equivalent of any of the foregoing and any federal, state or local transfer of ownership notification or approval statutes.

"Escrow Agent" means the Title Company (defined below).

"Hazardous Materials" means those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any other substance regulated by an Environmental Law.

"Loan Payoff Amount" means the amount required to pay off the loan, in full, from Seller's creditor, West 22nd Street Properties, LLC, a Delaware limited liability company ("Creditor") on the Closing Date, which debt payoff amount, as of the Closing Date is estimated to be $12,600,000.

"Related Documents" means all documents and instruments executed and/or delivered by Seller and/or Purchaser in connection with or pursuant to the Closing of the transaction contemplated by this Agreement, including, without limitation, the Deed and FIRPTA Certificate.

2

"Release" means any release, presence, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of a Hazardous Material into the indoor or outdoor environment.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement in form and substance acceptable to Purchaser.

"Termination Order" means an Order of the Bankruptcy Court terminating or voiding the Deed-in-Lieu of Foreclosure.

"Title Company" means Stewart Title Insurance Company.

**Section 1.3**    Purchase Price.  Seller is to sell, and Purchaser is to purchase, the Property for the sum of NINETEEN MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($19,350,000.00) (the "Purchase Price")  The Purchase Price includes interest on the portion of the Purchase Price that is deferred pursuant to Section 1.7 and Section 1.8.

**Section 1.4**    Payment of Purchase Price.  Except as provided in Section 1.5, Section 1.7 and Section 1.8 below, the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be payable in full at the Closing in cash by wire transfer of immediately available federal funds (i) to Creditor, in an amount equal to the Loan Payoff Amount, (ii) to DC Beteiligung GmbH ("DCB"), in an amount equal to $425,000 and pursuant to wiring instructions to be provided by Seller and (iii) the remaining amount to Seller or as Seller may direct by written notice.  Any payment made by wire transfer shall not be deemed to have been made, and transfer of title to the Property shall not occur, until the payment is received by Creditor, DCB and/or Seller, as applicable.

**Section 1.5**    Deposit.  On the Effective Date and simultaneously with the execution of this Agreement, Purchaser shall deposit with Escrow Agent the sum of TWO MILLION AND 00/100 DOLLARS ($2,000,000.00) (the "Deposit"), in the form of a certified check payable to the order of Escrow Agent or by wire transfer of immediately available federal funds to an account designated by Escrow Agent.  Failure to make such deposit by such time shall render this Agreement null and void and of no further force and effect, unless Seller, in its sole discretion, allows for later payment of the Deposit in writing.  Escrow Agent shall hold the Deposit in an interest bearing account in accordance with the provisions of Article IX.  All interest and income earned on the Deposit shall become part of the Deposit.  Absent Seller's failure to meet "Seller's Obligations at Closing" under Section 4.2 below, termination of this Agreement by Purchaser for breach by Seller, or termination of this Agreement by Purchaser under Section 1.8 below, the Deposit is non-refundable to Purchaser.

**Section 1.6**    Designation of Certifying Person.  In order to assure compliance with the requirements of Section 6045 of the Code and any related reporting requirements of the Code, the parties hereto agree as follows:

(a)    Escrow Agent agrees to assume all responsibilities for information reporting required under Section 6045(e) of the Code, and Seller and Purchaser hereby designate Escrow Agent as the certifying person to be responsible for all information reporting under Section 6045(e) of the Code.

3

(b)     Seller and Purchaser each hereby agree (i) to provide to Escrow Agent all information and certifications regarding such party, as reasonably requested by Escrow Agent or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and (ii) to provide to Escrow Agent such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by Escrow Agent), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to Escrow Agent is correct.

(c)     The provisions of this Section 1.6 shall survive the Closing.

**Section 1.7**     Occupancy after the Closing.  During the period commencing on the Closing Date and ending on December 31, 2011 (the "Term"), Seller, and any person or entity as of the Effective Date deriving any real property interest from Seller (a "Designated Occupant"), shall be entitled to occupy the Premises pursuant to the terms and conditions of a lease agreement (the "Lease Agreement") that will be executed and delivered by Seller and Purchaser at the Closing and that shall set forth the following terms and conditions:

(a)     (i)     Seller shall not pay any rent.

(ii)     Seller and any Designated Occupant shall only be permitted to use the Property as a museum, for museum related events and for any other lawful purpose.

(iii)     Seller shall pay all real estate taxes, assessments, water charges and sewer rents, and any interest or penalties with respect thereto, and all charges for public and private utilities (including, without limitation, gas, electricity, light, heat, air-conditioning, power and telephone and other internet, data and communication services) of any kind and nature whatsoever which at any time prior to or during the Term may be assessed, levied, imposed upon or used in connection with the Property.

(iv)     Seller shall reimburse Purchaser for the costs and expenses incurred by Purchaser, from time to time, to obtain and maintain the property insurance that Purchaser is required to obtain and maintain in accordance with the purchase money mortgage described in Section 1.8 below to be made by Purchaser, as mortgagor, to Seller, as mortgagee, provided, however, the amount of the reimbursement shall not exceed the premium that would be charged for insurance coverage substantially equivalent to the insurance coverage described in the Certificate of Property Insurance attached hereto as Exhibit B.

(v)     Seller shall be required to continue and maintain during the Term, at Seller's cost and expense, the commercial general liability insurance and other coverages described, and having the limits of liability set forth, in the Certificate of Property Insurance attached hereto as Exhibit B.

(vi)     Seller shall not make any alterations, improvements or additions to the Property without Purchaser's prior written consent, which shall not be unreasonably withheld.

4

(vii)     Seller shall keep and maintain the Property in good and safe order and condition, and make all repairs therein and thereon to keep the same in good and safe order and condition; provided, however, Seller shall have no liability to make any repairs to the Property for any damages thereto caused by Purchaser or its employees, agents, architects, engineers, appraisers, lenders, prospective lenders, investors, representatives and contractors (including, but not limited to any environmental consultants of Purchaser) (collectively, "Purchaser's Representatives").

(viii)     Seller shall maintain the Property free and clear of all violations in connection with the use of the Property by Seller, the Designated Occupant and their respective employees, agents, invitees, licensees, guests or contractors; provided, however, Seller shall have no liability to correct any violations issued with respect to the Property caused by any condition created by Purchaser or any of Purchaser's Representatives.

(ix)     Purchaser and Purchaser's Representatives shall be permitted to enter and to have access to the Property at all reasonable times, upon at least two (2) days prior notice, for the purpose of (i) examining and inspecting the same, (ii) taking measurements thereof, (iii) performing any environmental testing and/or remediation, (iv) making any necessary repairs thereto that Purchaser is obligated to perform or has the right to perform under the Lease, (v) performing any work therein that may be necessary by reason of Seller's failure to perform any maintenance, repairs or other work or Seller's failure to comply with Seller's obligations under the Lease, and (vi) performing any necessary investigations, tests, or complying with any requirements of any governmental authority that Purchaser is obligated to comply with. In addition, Purchaser and Purchaser's Representatives shall be permitted to enter the Property and to have access to the basement at the Property at all reasonable times, upon at least two (2) days prior notice, for the purpose of taking soil borings and/or performing any other environmental testing and/or sampling and for performing any environmental remediation work that may be required in Purchaser's judgment or that may be required by any governmental authority or any lender, prospective lender, or investor.     Purchaser and Purchaser's Representatives shall conduct such access in a manner so as not to unreasonably interfere with Seller's or the Designated Occupant's business conducted at the Property.     Purchaser shall protect, defend, indemnify and save harmless Seller from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses, imposed upon, incurred by or asserted against Seller by reason of any negligent act or omission of Purchaser or any of Purchaser's Representatives performed or omitted in connection with any such access to the Property herein permitted, including, without limitation, any court costs and reasonable litigation expenses.     Purchaser shall, prior to entering the Property pursuant to this paragraph, provide to Seller a certificate of insurance evidencing that Purchaser maintains commercial general liability insurance in type, form and amount comparable to the coverages maintained by Seller on Exhibit B attached hereto.

(x)     Seller shall not use, store, maintain or permit any Hazardous Material to be used, stored, maintained or located on, in, or about the Property in a manner that violates any Environmental Laws.  Seller shall protect, defend, indemnify and save harmless Purchaser from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses, imposed upon, incurred by or asserted against Purchaser by reason of Seller's failure to comply with this obligation, including, without limitation, the costs and expenses of any remedial action, reasonable legal and consultant fees, investigation and

5

laboratory fees, court costs and reasonable litigation expenses. Any amounts payable by Seller pursuant to this provision shall be paid to Purchaser, as additional rent, within thirty (30) days following Purchaser's demand. The obligation of Seller to indemnify Purchaser pursuant to this provision shall survive the expiration of the Term or the termination of the Lease.

(xi)     If the Property is destroyed or damaged in whole or in part by fire or other casualty and the reasonably estimated costs of restoration exceeds the sum of $500,000, Purchaser shall have the right in its sole and absolute discretion to elect to either (i) restore, repair and rebuild the Property or (ii) terminate the Lease Agreement, in which event Purchaser shall have no obligation to restore, repair or rebuild the Property or any portion thereof or to pay any of the costs or expenses thereof and Seller shall have no claim against Purchaser for its election not to do so. If the Property is damaged in part by fire or other casualty and the reasonably estimated costs of restoration is equal to or less than the sum of $500,000, Purchaser shall use the property insurance proceeds for the Property to restore, repair and rebuild the Property.

(xii)     If all or any portion of the Property is taken, whether permanently or temporarily, for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain or by agreement between Purchaser, Seller and those authorized to exercise such right, such that Seller is unable to continue its business at the Property, the Lease and the term hereby granted, shall terminate and expire on the date of such taking. Purchaser shall have no obligation to repair, alter, replace, restore or rebuild the Property or any portion thereof or to pay any of the costs or expenses thereof and Seller shall have no claim against Purchaser for its election not to do so.

(xiii)     Seller shall not by operation of law or otherwise (i) assign, sell, transfer or otherwise dispose of, in whole or in part, the Lease or the estate created hereby or, (ii) mortgage, pledge, encumber or otherwise hypothecate the Lease in any manner whatsoever. Notwithstanding anything to the contrary contained in this paragraph, any Designated Occupant may remain in possession of the Property or a portion thereof until the expiration of the Term or the accelerated termination of the Lease and Seller may sublet the Property for a term not extending beyond the Term with Purchaser's prior written consent, which shall not be unreasonably withheld.

(xiv)     The Lease Agreement shall contain such other usual, reasonable and customary terms and provisions as are commonly included in triple net leases, entered into in an arms length transaction, covering properties that are substantially similar to the Property and that are located in the City of New York, including a provision for the payment of Delay Damages as described in paragraph (b) of this Section.

(b)     Seller acknowledges that Purchaser intends to substantially renovate or demolish the Building at the end of the Term and that Purchaser will suffer substantial damages if Seller and any Designated Occupant fail to vacate the Property in accordance with the terms of the Lease Agreement at the end of the Term, and agrees that to secure Seller's performance of its obligations under the Lease Agreement, including, but not limited to, the obligation to vacate and surrender possession, and cause any Designated Occupant to vacate and surrender possession, of the Property by December 31, 2011: (i) a portion of the Purchase Price in the amount of FOUR MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($4,350,000.00)

6

(the "Post-Closing Payment") shall not be paid to Seller at the Closing and shall be deferred and paid to Seller upon Seller's compliance with Seller's obligations under the Lease Agreement to vacate and surrender possession, and cause any Designated Occupant to vacate and surrender possession, of the Property to Purchaser in accordance with the terms of the Lease Agreement and (ii) Seller shall pay to Purchaser as liquidated damages the amount of $5,500 per day for each day that Seller or any Designated Occupant fails to vacate and surrender possession of the Property to Purchaser in accordance with the provisions of the Lease Agreement (the aggregate amount payable by Seller by reason of any such failure is herein referred to as "Delay Damages"), it being agreed that the exact amount of Purchaser's damages in the event of Seller's and any Designated Occupant's failure to vacate the Property might be impossible to ascertain and the Delay Damages are fair and reasonable and are not a penalty. Purchaser may offset against the Post-Closing Payment, the amount of any Delay Damages payable by Seller pursuant to this Section and any other amounts payable by Seller to Purchaser pursuant to the provisions of the Lease Agreement (the amount of such offset is herein referred to as the "Offset Amount"). Purchaser shall deliver in escrow to Escrow Agent at the Closing either, at Purchaser's option: (i) a Letter of Credit in an amount equal to the Post-Closing Payment or (ii) a guaranty (in form reasonably acceptable to Seller and Purchaser) for the payment of the Post-Closing Payment executed by Christopher V. Albanese and Russell C. Albanese, to secure Purchaser's obligation hereunder to pay the Post-Closing Payment (the "Post-Closing Collateral"). The Post-Closing Collateral shall be held in escrow by Escrow Agent until Purchaser shall pay to Seller the Post-Closing Payment (as the same may be reduced by any Offset Amount), and upon the payment of the same the Escrow Agent shall promptly return the Post-Closing Collateral to Purchaser. If Purchaser shall fail to pay to Purchaser the Post-Closing Payment (as the same may be reduced by any Offset Amount) within ten (10) days after the date that the same is due and payable to Seller pursuant to this paragraph, Escrow Agent is authorized to deliver the Post-Closing Collateral to Seller.

(c)     The provisions of this Section 1.7 shall survive the Closing.

**Section 1.8**     Bankruptcy Provisions.

(a)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, in the event that Seller does not consummate the transactions contemplated by this Agreement with Purchaser and Seller closes a sale of the Property to a buyer other than Purchaser, Purchaser shall be entitled to a break-up fee in an amount equal to the sum of $580,500.00 (the "Break-Up Fee"). The Break-Up Fee shall have administrative expense priority under Bankruptcy Code sections 503(b) and 507(a)(2). The Break-Up Fee shall be paid to Purchaser, without further order of the Bankruptcy Court, at the closing of the sale of the Property by Seller to a buyer other than Purchaser.

(b)     Seller acknowledges and agrees that (a) the approval of the Break-Up Fee is an integral part of this Agreement, (b) in the absence of Seller's obligation to pay the Break-Up Fee and its agreement to request that the Break-Up Fee shall have administrative expense priority under Bankruptcy Code sections 503(b) and 507(a)(2), Purchaser would not have entered into this Agreement, (c) the entry of Purchaser into this Agreement is necessary for preservation of the estate of Seller and is beneficial to Seller and (d) the Break-Up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of this transaction.

NYI-4314476v2

(c)     No later than three business days following the execution of this Agreement, Seller shall, at its sole cost and expense, file a motion with the Bankruptcy Court seeking approval of the Agreement, including approval of the Break-Up Fee, and seeking a court order terminating or voiding the Deed-in-Lieu of Foreclosure. Seller agrees that it will promptly take such actions as are necessary to obtaining (i) entry of the Break-Up Fee Order and the Sale Order and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (ii) entry of the Termination Order. In the event the entry of the Break-Up Fee Order, Sale Order and/or Termination Order shall be appealed, the Seller shall use best efforts to defend against such appeal.

(d)     Purchaser shall have the right to terminate this Agreement if the Break-Up Fee Order, Sale Order and Termination Order are not entered within 30 days from the Effective Date of this Agreement by delivery of written notice to Seller. If this Agreement is terminated in accordance with the foregoing sentence, Purchaser shall receive the prompt return of the Deposit, together with all accrued interest thereon from Escrow Agent.

**Section 1.9**     Personal Guaranty of Purchaser Obligations.  Contemporaneous with the execution of this Agreement, Dorothea Keeser shall execute and deliver to Purchaser a personal guaranty, pursuant to which Dorothea Keeser will agree to pay the Break-Up Fee in the event that Seller does not consummate the transactions contemplated by this Agreement with Purchaser and Seller closes a sale of the Property to a buyer other than Purchaser whether or not Seller's obligation to pay the Break-Up Fee is approved by the Bankruptcy Court.

ARTICLE II
TITLE AND SURVEY

**Section 2.1**     Title.  Seller agrees to convey and Purchaser agrees to acquire such title to the Property as the Title Company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to (collectively, the "Permitted Exceptions"): (a) the matters shown on the survey of the Property dated October 8, 2010, prepared by Lovell Earl B & Belcher SP Inc  (the "Existing Survey"), (b) the permitted exceptions to title set forth on Exhibit D attached hereto and (c) such other matters as the Title Company shall be willing, without special premium, to omit as exceptions to coverage.  Subject to entry of the Sale Order and except with respect to the Permitted Exceptions and as provided in Section 2.4 hereof, Seller shall convey the Property to Purchaser free and clear of all liens and encumbrances thereon to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

**Section 2.2**     Disclaimer Regarding Title Matters.  Except as expressly set forth herein, nothing contained in this Agreement shall be construed as (a) a representation of the state of title to the Property that a current title report would disclose or matters that would be disclosed by a current survey, or (b) an agreement or obligation that Seller bring any action or proceeding or otherwise incur any expense to render title to the Property insurable or marketable.

**Section 2.3**     Conveyance of Title.  At Closing, Seller shall convey and transfer to Purchaser, and Purchaser shall accept, fee simple title to the Property, subject only to the Permitted Exceptions, by execution and delivery of the Deed (as defined in Section 4.2(a)) by Seller to Purchaser.

8

**Section 2.4**     Assignment of Existing Mortgage.  At the request of Purchaser, Seller shall cooperate with Purchaser to cause the Creditor to assign to any lender providing financing to Purchaser, the existing notes and mortgages encumbering the Property in consideration of such lender's payment to the Creditor of the Loan Payoff Amount, in which event Purchaser shall receive a credit against the portion of Purchase Price payable at Closing for the Loan Payoff Amount and the lien of the existing notes and mortgages encumbering the Property shall constitute a Permitted Exception hereunder.

ARTICLE III

ACCESS TO PROPERTY, ETC

**Section 3.1**     Access.  On or after the Effective Date, Purchaser and its agents shall be permitted to enter upon the Property at reasonable times, upon at least two (2) days prior notice, to examine and take measurements of the Property.

**Section 3.2**     Insurance.  Purchaser shall, at all times prior to the Closing Date maintain commercial general liability insurance in type, form and amount reasonably satisfactory to Seller, naming its agents and Seller as additional insureds and covering all personal injury and property damage claims arising out of Purchaser and its agents exercising the access rights reserved under Section 3.1 above.

**Section 3.3**     Indemnity.  Purchaser agrees to protect, indemnify, defend (with counsel acceptable to Seller) and hold Seller, its parents, subsidiaries and affiliates, and their respective officers, directors, shareholders, employees, agents, successors and assigns (collectively, the "Indemnified Parties"), harmless from and against any claim for liens, liabilities, losses, costs, expenses (including reasonable attorneys' fees), damages or injuries suffered or incurred by any of the Indemnified Parties arising out of, resulting from, relating to or connected with Purchasers' or its agents' exercise of the access rights reserved under this Article 3, including the acts or omissions of Purchaser and/or any other Purchaser Parties or their respective agents, employees, consultants, affiliates or representatives or contractors at the Property prior to Closing.

ARTICLE IV

CLOSING; CLOSING ADJUSTMENTS AND COSTS; CONDITIONS

**Section 4.1**     Time and Place.  The consummation of the transactions contemplated hereby (the "Closing") shall be held on the Closing Date at the offices of Seller's attorneys, Jones Day at 222 E. 41st Street, New York, New York or at the offices of the attorney for any lender providing financing to Purchaser.  At the Closing, Seller and Purchaser shall perform the obligations set forth in, respectively, Section 4.2 and Section 4.3, the performance of which obligations shall be concurrent conditions.

**Section 4.2**     Seller's Obligations at Closing.  At the Closing, Seller shall do the following:

(a)     deliver to Purchaser a duly executed bargain and sale deed with covenants against grantor's acts (the "Deed") in the form of Exhibit E attached hereto and made a part hereof;

9

(b)     deliver to Purchaser a non-foreign certificate (the "FIRPTA Certificate") in the form of Exhibit F attached hereto and made a part hereof duly executed by Seller; and

(c)     if requested by any lender providing financing to Purchaser, execute and deliver to Purchaser with respect to the Lease Agreement a subordination, non-disturbance and attornment agreement among Seller, Purchaser and Purchaser's lender, in the form reasonably requested by Purchaser's lender (the "SNDA");

(d)     execute and deliver to Purchaser, the Lease Agreement;

(e)     deliver to Purchaser such evidence as the Title Company and/or Purchaser may reasonably require as to the authority of the person or persons executing documents on behalf of Seller; and

(f)     deliver to the Title Company such additional documents as the Title Company may reasonably require as being customary, and in form reasonably satisfactory to Seller, to consummate the transaction contemplated in this Agreement.

**Section 4.3**     Purchaser's Obligations at Closing.     At the Closing, Purchaser shall do the following:

(a)     direct the Escrow Agent to pay the proceeds of the Deposit to Seller;

(b)     subject to the provisions of Section 1.7 above, pay to Seller and Creditor, as applicable pursuant to Section 1.4, the balance of the Purchase Price, which amount shall be increased or decreased by prorations and adjustments as herein provided, plus any other fees, costs, expenses and other amounts set forth as Purchaser's obligations on the Closing Statement;

(c)     if requested by any lender providing financing to Purchaser, execute and deliver to Seller the SNDA;

(d)     execute and deliver to Seller, the Lease Agreement;

(e)     deliver to Seller such evidence as the Title Company and/or Seller may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(f)     deliver such additional documents as shall be reasonably required by Seller or the Title Company to consummate the transaction contemplated by this Agreement.

**Section 4.4**     Closing Statement.

(a)     In connection with the Closing, Escrow Agent shall prepare a settlement statement (the "Closing Statement") reflecting the Purchase Price, Deposit and all credits, prorations, fees and other costs contemplated hereby.

(b)     Seller shall pay for (i) the fees of any counsel representing Seller in connection with this transaction; (ii) the cost to record any lien releases required hereunder; (iii) any transfer taxes, including sales tax, New York State Real Estate Transfer Tax and New

10

York City Real Property Transfer Tax; (iv) one half of any escrow charges imposed by Escrow Agent in connection with its obligations hereunder; and (v) all other closing costs incurred by Seller in connection with this transaction and any other charges or fees customarily paid by a seller in the location where the Property is located, except as expressly required to be paid by Purchaser under this Section. Purchaser shall pay for (A) the fees of any counsel representing Purchaser in connection with this transaction; (B) the fees for recording the Deed and the purchase money mortgage described in Section 1.8 hereof; (C) the base premium for the Title Policy and any fees or premiums for extended coverage or any modifications or endorsements to the Title Policy requested by Purchaser (other than any special premium payable by Seller pursuant to Section 2.1 hereof); (D) one half of any escrow charges imposed by Escrow Agent in connection with its obligations hereunder and (E) all other closing costs incurred by Purchaser in connection with this transaction and any other charges or fees customarily paid by a purchaser in the location where the Property is located, except as expressly required to be paid by Seller under this Section.

(c)     The provisions of this Section 4.4 shall survive the Closing.

**Section 4.5**     Conditions Precedent to Obligation of Purchaser. The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)     Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement;

(b)     Purchaser shall have received a commitment (subject to customary terms and conditions) from the Title Company to issue the Title Policy to Purchaser in accordance with the terms hereof.

(c)     The Break-Up Fee Order shall have been entered by the Bankruptcy Court and not be subject to any stay or appeal and the time for an appeal has expired;

(d)     The Sale Order and Termination Order shall have been entered by the Bankruptcy Court and not be subject to any stay or appeal and the time for an appeal has expired;

(e)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date; and

(f)     Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

**Section 4.6**     Conditions Precedent to Obligation of Seller. The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)     Seller and Creditor, as applicable, shall have received the payments contemplated in Sections 4.3(a) and (b) above;

11

(b)    The Sale Order and Termination Order shall have been entered by the Bankruptcy Court and not be subject to any stay or appeal and the time for an appeal has expired;

(c)    All of the representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects as of the Effective Date; and

(d)    Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the Closing Date.

ARTICLE V
REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 5.1**    Representations and Warranties of Seller. Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date:

(a)    Organization and Authority. Seller has been duly organized and is in good standing under the laws of the State of New York. Seller has the full right and authority to enter into this Agreement and to transfer all of the Property and to consummate or cause to be consummated the transaction contemplated by this Agreement.  The person signing this Agreement on behalf of Seller is authorized to do so.

(b)    Non-Foreign Status. Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980.

(c)    Agreement Binding.  This Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights and by general principles of equity (whether applied in a proceeding at law or in equity).

(d)    The representations and warranties set forth in this Section 5.1 shall survive the Closing.

**Section 5.2**    Knowledge Defined.  References to the "knowledge" of Seller shall refer only to the current actual knowledge of Dorothea Keeser, President of Seller's managing member. There shall be no personal liability on the part of Dorothea Keeser as a result of any representation or warranties made herein.

**Section 5.3**    Representations and Warranties of Purchaser. Purchaser hereby makes the following representations and warranties to Seller as of the Effective Date:

(a)    Pending Actions. To Purchaser's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually materially interfere with the consummation of the transaction contemplated by this Agreement.

(b)    Organization and Authority of Purchaser. Purchaser has been duly organized and is in good standing under the laws of the State of New York. Purchaser has the

12

full right and authority to enter into this Agreement, to purchase all of the Property and to consummate or cause to be consummated the transaction contemplated by this Agreement. The person signing this Agreement on behalf of Purchaser is authorized to do so.

(c)     Agreement Binding.    This Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with the terms hereof, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights and by general principles of equity (whether applied in a proceeding at law or in equity).

(d)     The representations and warranties set forth in this Section 5.3 shall survive the Closing.

## ARTICLE VI
## RISK OF LOSS

**Section 6.1**    Casualty and Property Insurance.    If any casualty or other event shall occur prior to the Closing Date causing loss or damage to the Premises or any portion thereof (other than as set forth in Section 6.2 below) and the reasonably estimated costs of restoration is equal to or greater than the sum of $1,000,000, Purchaser shall have the option upon written notice to Seller of either (i) terminating this Agreement (ii) or proceeding with the Closing in which event this Agreement shall remain in full force and effect and Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to the proceeds of any claims and insurance policies Seller may have received or be entitled to receive as a result of such loss or damage. Purchaser shall exercise its option herein set forth within 30 days of the date that Seller gives written notice to Purchaser of the occurrence of such casualty or other event. If Purchaser elects to terminate this Agreement as herein provided, Purchaser shall have the right to receive the prompt return of the Deposit, together with all accrued interest thereon, and upon the payment thereof to Purchaser, neither party shall have any further obligations to the other hereunder. If any casualty or other event shall occur prior to the Closing Date causing loss or damage to the Premises or any portion thereof (other than as set forth in Section 6.2 below) and the reasonably estimated costs of restoration is less than the sum of $1,000,000, Seller and Purchaser shall proceed with the Closing as described in clause (ii) above. With respect to any such casualty or other event, the provisions of this Section 6.1 shall be construed as an express provision in lieu of the provisions of Section 5-1311 of the General Obligations Law of the State of New York ("Section 5-1311"), which the parties agree shall be inapplicable to any such casualty or other event.

**Section 6.2**    Condemnation.    The provisions of Section 5-1311 shall apply to the sale and purchase provided for in this Agreement solely with respect to a taking by eminent domain affecting the Property or any portion thereof. For purposes of this Section 6.2, the term "material part" as used in Section 5-1311, shall mean a taking which is reasonably likely to impair Purchaser's ability to develop the entire Property into a luxury residential condominium building (any such taking, a "Material Taking"), and the term "immaterial part" as used in Section 5-1311, shall mean a taking which is not a Material Taking.

**Section 6.3**    Survival.    The provisions of this Article VI shall survive the Closing.

13

## ARTICLE VII
## COMMISSIONS

**Section 7.1** Brokerage Commissions. The parties (i) represent and warrant that they have not dealt with any real estate broker in connection with this transaction who has claimed or may have the right to claim a commission in connection with this transaction other than Capin & Associates, Inc. (the "Broker"); and (ii) shall indemnify and defend each other against any costs, claims or expenses, including attorney's fees and disbursements, arising out of the breach on their respective parts of the foregoing representation and warranty. Purchaser shall pay Broker any commission earned pursuant to a separate agreement to be made between Purchaser and Broker. The representations, warranties and obligations of the parties in this Section 7.1 shall survive the Closing.

## ARTICLE VIII
## DISCLAIMERS AND WAIVERS

**Section 8.1** No Reliance on Documents. Except as expressly stated herein, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered or given by Seller or its brokers (if any), agents or representatives to Purchaser in connection with the transaction contemplated hereby. Purchaser acknowledges and agrees that all materials, data and information delivered or given by Seller to Purchaser in connection with the transaction contemplated hereby are provided to Purchaser as a convenience only and that any reliance on or use of such materials, data or information by Purchaser shall be at the sole risk of Purchaser, except as otherwise expressly stated herein. Except as expressly stated herein, neither Seller, nor any affiliate of Seller, nor the person or entity which prepared any report or reports delivered by Seller to Purchaser, shall have any liability to Purchaser for any inaccuracy in or omission from any such reports.

**Section 8.2** AS-IS SALE; DISCLAIMERS. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY RELATED DOCUMENT, PURCHASER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO (a) the habitability, merchantability or fitness for a particular purpose or as to the current or future physical or structural condition or value of the Property or its suitability for rehabilitation or renovation; (b) the current or future condition and operating state of any and all machinery or equipment in the Property; (c) the income, expenses, use, operation or any other matter or thing affecting or relating to the Property or title thereto or the transactions contemplated hereby; (d) the current or future real estate tax liability, assessment or valuation of the Property; (e) the potential qualification of the Property for any and all benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (f) the compliance of the Property in its current or any future state with local, state or federal laws, ordinances or governmental regulations; or (g) the environmental condition of the Property or the compliance of the Property with Environmental Laws or any Release or absence of Hazardous Materials, in, on, above, beneath at, to or from the Property.

14

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY RELATED DOCUMENT, PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS." PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, AND PURCHASER EXPRESSLY WAIVES, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO MADE OR FURNISHED BY SELLER, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR ANY RELATED DOCUMENT. PURCHASER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PROPERTY IS BEING SOLD "AS-IS."

**Section 8.3** Release. Purchaser expressly waives, releases and discharges Seller, and any entity or person which at any time directly or indirectly controlled or was controlled by Seller, from any and all suits, claims, demands, cause of action, damages (including, but not limited to, consequential damages), losses, costs and expenses of any kind, whether known or unknown, relating to or arising at any time out of the Property, and based on (a) any Environmental Law; (b) the Release of any Hazardous Materials; or (c) any environmental conditions whatsoever in, on, above, beneath, at, to, under or in the vicinity of the Property.

**Section 8.4** Survival of Disclaimers. The provisions of this Article VIII shall survive the Closing or any earlier termination of this Agreement.

ARTICLE IX
ESCROW AGENT

**Section 9.1** Deposit. Escrow Agent will hold the Deposit in escrow in an interest-bearing account of the type generally used by Escrow Agent for the holding of escrow funds until the earlier of (a) the Closing or (b) the termination of this Agreement in accordance with any right hereunder. If this Agreement is terminated by Purchaser or Seller under Article 4, due to Purchaser's or Seller's failure to meet their respective obligations under Article 4, the Deposit will be paid by Escrow Agent to the party entitled thereto, but in the event the Seller is entitled to the Deposit, the Escrow Agent will release the Deposit directly to the Creditor for the Seller's behalf. If the Closing occurs, the Deposit will be released directly to the Creditor for the Seller's behalf, and Purchaser shall receive a credit against the Purchase Price in the initial amount of the Deposit.

**Section 9.2** Escrow Agent Liability. Escrow Agent shall not be liable to any party for any act or omission, except for bad faith, gross negligence or willful misconduct, and the parties agree to indemnify Escrow Agent and hold Escrow Agent harmless from any and all claims, damages, losses or expenses arising in connection herewith. The parties acknowledge that Escrow Agent is acting solely as stakeholder for their mutual convenience. In the event Escrow Agent receives written notice of a dispute between the parties with respect to the

15

Deposit, Escrow Agent shall not be bound to release and deliver the Deposit to either party but may either (a) continue to hold the Deposit until otherwise directed in a writing signed by all parties hereto or (b) deposit the Deposit with the clerk of any court of competent jurisdiction. Upon such deposit, Escrow Agent will be released from all duties and responsibilities hereunder. Escrow Agent shall have the right to consult with separate counsel of its own choosing and shall not be liable for any action taken, suffered or omitted by it in accordance with the advice of such counsel. Escrow Agent shall be fully protected in acting in accordance with any written instructions given to it hereunder and believed by it to have been signed by the proper parties.

Section 9.3    Legal Proceedings.  Escrow Agent shall not be required to defend any legal proceeding which may be instituted against it with respect to the Deposit, the Property or the subject matter of this Agreement unless Escrow Agent is requested to do so by Purchaser or Seller and is indemnified to its satisfaction against the cost and expense of such defense. Escrow Agent shall not be required to institute legal proceedings of any kind and shall have no responsibility for the genuineness or validity of any document or other item deposited with it or the collectability of any check delivered in connection with this Agreement.

Section 9.4    Survival.  The provisions of this Article IX shall survive the Closing or any earlier termination of this Agreement.

ARTICLE X
MISCELLANEOUS

Section 10.1    Acceptance of Deed.  Except to with respect to the Closing Surviving Provisions, the acceptance of the Deed by Purchaser shall be deemed full compliance by Seller of all of the Seller's obligations under this Agreement

Section 10.2    Assignment.  The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.  Purchaser may assign its rights under this Agreement without Seller's consent.  In no event shall any assignment of this Agreement release or discharge Purchaser from any liability or obligation occurring hereunder.

Section 10.3    TIME OF THE ESSENCE.  **TIME IS OF THE ESSENCE WITH RESPECT TO ALL TIME PERIODS AND DATES FOR PERFORMANCE SET FORTH IN THIS AGREEMENT.**  In the event the date on or by which Purchaser or Seller is required to take any action under the terms of this Agreement is not a Business Day, the action shall be taken on or by, as applicable, the next succeeding Business Day.

Section 10.4    Notices.  Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, or (c) legible facsimile or other electronic transmission, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith.  Notices shall be deemed given upon receipt or refusal to accept delivery, or in the case of the facsimile or other electronic transmission, on the date such transmission is received.  Any notice received or refused on a day that is not a Business Day or after 5:00 p.m. local time on any day shall be deemed to have been delivered on the following Business Day.  The terms and provisions of this

16

Section 10.4 shall survive the Closing. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

If to Seller:   556 Holding LLC
                556 West 22nd Street
                New York, New York 10001
                Attention: Dorothea Keeser
                Telephone No.: (212) 255-0719
                Facsimile No.: (212) 255-2368

with copies to: Jones Day
                222 East 41st Street
                New York, New York 10017-6702
                Attention: Thomas Bark, Esq.
                Telephone No.: (212) 326-7815
                Facsimile No.: (212) 755-7306

If to Purchaser: Albanese Development Corporation
                1050 Franklin Avenue
                Garden City, New York 11530
                Attention: Christopher V. Albanese
                Telephone No.: (516) 746-6000
                Facsimile No.: (516) 746-0580

with copies to: Albanese & Albanese LLP
                1050 Franklin Avenue
                Garden City, New York 11530
                Attention: Arthur L. Colozzi, Esq.
                Telephone No.: (516) 248-7000
                Facsimile No.: (516) 747-7777

If to Escrow Agent: Stewart Title Insurance Company
                300 East 42nd Street, Floor 10
                New York, NY   10017
                Attention: Paul Bugoni, Esq.
                Telephone No.: (800) 433-0014
                Facsimile No.: (646) 525-3589

**Section 10.5**   Modifications.  This Agreement cannot be changed orally, and any waiver, discharge or modification shall be effective only if it is in writing and is signed by the party or parties against whom enforcement of such waiver, discharge or modification is sought.

**Section 10.6**   Entire Agreement.  This Agreement, including the exhibits and schedules hereto, contains the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

17

**Section 10.7** <u>Further Assurances</u>. Each party agrees that it will execute and deliver such other documents and take such other action, whether prior or subsequent to the Closing, as may be reasonably requested by the other party to consummate the transaction contemplated by this Agreement. The provisions of this Section 10.7 shall survive the Closing.

**Section 10.8** <u>Counterparts</u>. This Agreement may be executed in counterparts, all such executed counterparts shall constitute the same agreement, and the signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

**Section 10.9** <u>Severability</u>. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any party hereunder; provided further that to the extent Seller's obligation to pay the Break-Up Fee is approved by the Bankruptcy Court, such obligation will remain in full force and effect notwithstanding the termination or invalidity of this Agreement...

**Section 10.10** <u>Applicable Law</u>. This Agreement and the Related Documents shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflicts of law principles. This Section 10.10 shall survive the Closing or any earlier termination of this Agreement.

**Section 10.11** <u>Third-Party Beneficiary</u>. Except with respect to the obligations to make payments to Creditor contained in Sections 1.4 and 9.1 and to DCB in Section 1.4, this Agreement and the Related Documents are and will be for the benefit of Seller, Purchaser and Escrow Agent only and, subject to the provisions of Section 10.2 above, are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or the Related Documents.

**Section 10.12** <u>Captions</u>. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section hereof.

**Section 10.13** <u>Construction</u>. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that any normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

**Section 10.14** <u>Recordation</u>. The Seller agrees to cooperate with Purchaser to enable Purchaser to record a memorandum or notice of this Agreement and shall within four (4) days after the Effective Date execute and deliver to Purchaser such memorandum or notice in recordable form and such other documents required in connection therewith by the New York City Register in order to record the same. The memorandum or notice shall contain such information as is required by the New York Real Property Law and shall be in such form as is reasonably acceptable to Seller and Purchaser.

18

**Section 10.15** Waiver of Jury Trial. Seller and Purchaser hereby waive trial by jury in any action, proceeding or counterclaim brought by any party against another party on any matter arising out of or in any way connected with this Agreement. The terms and provisions of this Section 10.15 shall survive the Closing or any earlier termination of this Agreement.

**Section 10.16** Attorneys' Fees. In the event any dispute between the parties hereto regarding this Agreement or any Related Documents should result in litigation, the prevailing party in such litigation shall be reimbursed for all reasonable costs, including, without limitation, reasonable attorneys' fees. The terms of this Section 10.16 shall survive the Closing or any earlier termination of this Agreement.

**Section 10.17** Confidentiality. Each party agrees that, except as otherwise set forth in this Agreement or required by law or legal process, until Closing, it shall keep the contents of this Agreement and any information related to the transaction contemplated hereby confidential (except that Purchaser and Seller may disclose such data and information to their respective employees, lenders, consultants, accountants and attorneys, provided that such persons agree to treat such data and information confidentially). The provisions of this Section 10.17 shall survive the Closing or any earlier termination of this Agreement.

**Section 10.18** Default. If Seller shall fail or refuse to close title and otherwise consummate the transactions contemplated hereby and perform its obligations as required by the terms of this Agreement, then Purchaser shall have the right to require specific performance. If Purchaser shall default in the performance of its obligation under this Agreement to purchase the Property, the sole remedy of Seller shall be to terminate this Agreement and retain the proceeds of the Deposit and any interest and other income thereon as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

19

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:

556 HOLDING LLC, a New York limited liability company

By:    KDMJ Realty Inc., a New York Corporation, its managing member

By: _Dorothea Keeser_

Name: Dorothea Keeser

Title:  President

PURCHASER:

Albanese Development Corporation, a New York corporation

By: _Christopher V. Albanese_

Name:  Christopher V. Albanese

Title:  Principal

AGREED TO AND ACCEPTED
ESCROW AGENT:
Stewart Title Insurance Company

By: _____
Name: _____
Title: _____

[Signature Page]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:

556 HOLDING LLC, a New York limited liability company

By:   KDMJ Realty Inc., a New York Corporation, its managing member


By: _Dorothea Keeser_
Name: Dorothea Keeser
Title:  President


PURCHASER:

Albanese Development Corporation, a New York corporation

By: _Christopher V. Albanese_
Name:  Christopher V. Albanese
Title:  Principal


AGREED TO AND ACCEPTED
ESCROW AGENT:
Stewart Title Insurance Company

By: _Paul Bigoni_
Name: Paul Bigoni, Counsel

## EXHIBIT A

### Legal Description of the Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 22nd Street with the easterly side of 11th Avenue as said easterly side of 11th Avenue is shown on the State of New York Appropriation Map recorded in Reel 2836 page 631 and as described in the Notice of Appropriation recorded in Reel 2836 page 628; and

RUNNING THENCE easterly along the southerly side of West 22nd Street, 100 feet;

THENCE southerly and parallel with the said easterly side of 11th Avenue, 98 feet 8 inches to the center line of the block;

THENCE westerly parallel with the southerly side of West 22nd Street and along the center line of the block, 95 feet 3 inches to the said side of 11th Avenue;

THENCE northwesterly along the said easterly side of 11th Avenue, the following two (2) courses and distances:

(1)     On a line forming an angle on its northerly side with the preceding course of 110 degrees 27 minutes 29 seconds, a distance of 13.59 feet; and

(2)     On a line forming an angle on its easterly side with the preceding course of 159 degrees 32 minutes 31 seconds, a distance of 86.07 feet to the corner aforesaid, the point of BEGINNING.

# EXHIBIT B

Insurance Certificate

[SEE ATTACHED]

# _ACORD_ CERTIFICATE OF PROPERTY INSURANCE

| | DATE |
|---|---|
| | 08/16/2010 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| INTEGRO INSURANCE BROKERS 1 STATE STREET PLAZA, 9TH FL NEW YORK, NY 10004 ATTN: CARMEL FAUCI | **COMPANIES AFFORDING COVERAGE** |
| | COMPANY A  THE TRAVELERS INDEMNITY CO. OF AMERICA |
| **INSURED** | COMPANY B |
| CHELSEA ART MUSEUM KDMJ REALTY 556 HOLDING LLC 556 W 22ND STREET NEW YORK, NY 10011 | COMPANY C |
| | COMPANY D |

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|
| A | X PROPERTY | 660-4372L541TIA10 | 05/31/2010 | 05/31/2011 | X | BUILDING | $ 14,000,000 RC |
| | CAUSES OF LOSS | | | | X | PERSONAL PROPERTY | $ 250,000 |
| | BASIC | | | | | BUSINESS INCOME | $ |
| | BROAD | | | | | EXTRA EXPENSE | $ |
| | SPECIAL | | | | | BLANKET BUILDING | $ |
| | EARTHQUAKE | | | | | BLANKET PERS PROP | $ |
| | FLOOD | | | | | BLANKET BLDG & PP | $ |
| | | | | | X | DEDUCTIBLE | $ 10,000 |
| | | | | | | | $ |
| | INLAND MARINE | | | | | | $ |
| | TYPE OF POLICY | | | | | | $ |
| | | | | | | | $ |
| | CAUSES OF LOSS | | | | | | $ |
| | NAMED PERILS | | | | | | $ |
| | OTHER | | | | | | $ |
| | CRIME | | | | | | $ |
| | TYPE OF POLICY | | | | | | $ |
| | | | | | | | $ |
| | BOILER & MACHINERY | | | | | | $ |
| | | | | | | | $ |
| | OTHER | | | | | | |

### LOCATION OF PREMISES/DESCRIPTION OF PROPERTY

### SPECIAL CONDITIONS/OTHER COVERAGES

MORTGAGEE/LOSS PAYEE UNDER PROPERTY POLICY # 660-4372L541TIA10: HRC FUND IV REIT LLC, ISAOA

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| HRC FUND IV REIT LLC AND ITS SUCCESSORS &/OR ASSIGNS 250 PARK AVENUE SOUTH, FL 3 NEW YORK, NY 10003 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE |

ACORD 24 (1/95)    © ACORD CORPORATION 1995

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 08/16/2010

| PRODUCER | THIS CERTIFICATION IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|

**PRODUCER**
INTEGRO INSURANCE BROKERS
1 STATE STREET PLAZA, 9TH FL
NEW YORK, NY 10004
ATTN: CARMEL FAUCI

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: THE TRAVELERS INDEMNITY CO. OF AM | |
| INSURER B: THE TRAVELERS INDEMNITY CO. | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

**INSURED**
CHELSEA ART MUSEUM
KDMJ REALTY 556 HOLDING LLC
556 W 22ND STREET
NEW YORK, NY 10011

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS MADE ☐ OCCUR | 6604372L541TIA10 | 05/31/2010 | 05/31/2011 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | $ |
| A | X | **AUTOMOBILE LIABILITY** ☐ ANY AUTO ☐ ALL OWNED AUTOS X SCHEDULED AUTOS ☐ HIRED AUTOS X NON-OWNED AUTOS X COMP. $0 DED X COLLISION $100 DED | BA4710L06110SEL | 05/31/2010 | 05/31/2011 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC / AUTO ONLY: AGG | $ / $ |
| B | X | **EXCESS/UMBRELLA LIABILITY** X OCCUR ☐ CLAIMS MADE ☐ DEDUCTIBLE ☐ RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | $ 10,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| A | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | IHUB7071Y01410 | 05/31/2010 | 05/31/2011 | ☐ WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| | | **OTHER** | | | | | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| AS ADDITIONAL INSURED: HRC FUND IV REIT LLC AND ITS SUCCESSORS 7/OR ASSIGNS 250 PARK AVENUE SOUTH, FL 3 NEW YORK, NY 10003 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

Clear All

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statment on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

## EXHIBIT C

Intentionally Omitted

## EXHIBIT D

### Permitted Exceptions

1.      Notice of Appropriation Route 9A Reconstruction Project recorded March 15, 1999 in Reel 2836 page 628.

2.      Title by Filing, Acquisition of Property Route 9A Map No. 13 Parcel No. 15 recorded March 15, 1999 in Reel 2836 page 631.

3.      Caretaker's Apartment Declaration made by Dorothea Keeser dated February 12, 2001, recorded February 14, 2001 in Reel 3239 page 522.

4.      The rights of Seller and any Designated Occupants to remain in possession of the Property pursuant to the terms of the Lease Agreement.

## EXHIBIT E

Form of Deed With Covenant Against Grantor's Acts

THIS INDENTURE, made as of the ___ day of [    ], Two Thousand and Ten

BETWEEN **556 HOLDING LLC**, a New York limited liability company, having an address at 556 West 22nd Street, New York, New York 10001, party of the first part, and **[Purchaser]**, a New York limited liability company, having an address at c/o Albanese Development Corporation, 1050 Franklin Avenue, Garden City, New York 11530, party of the second part

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL, that certain plot, piece or parcel of land, situate, lying and being in the City, County and State of New York, being more fully bounded and described as set forth on Schedule A annexed hereto and forming a part hereof.

Said premises being known as and by the street address 556 West 22nd Street (a/k/a 154 11th Avenue), New York, New York.

Being and intended to be the same premises conveyed to the party of the first part by deed dated and record in the New York County Clerk's Office on                    in Liber      at Page           .

TOGETHER with strips, gores and easements, if any, next to and adjoining the above-described premises.

SUBJECT to the encumbrances and exceptions set forth on Schedule B, annexed hereto and forming a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the premises have been encumbered in any way except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of the indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF

556 Holding, a New York limited liability company

By: KDMJ Realty, Inc., a New York corporation, its managing member

By: _____

Name:  Dorothea Keeser
Title:  President

STATE OF NEW YORK          )
                                                    ss:

COUNTY OF NEW YORK   )

On the [   ] day of [       ] in the year [      ] before me, the undersigned a notary public in and for said state, personally appeared Dorothea Keeser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
                              Notary Public

My commission expires:

_____

BARGAIN AND SALE DEED
WITHOUT COVENANT

556 HOLDING LLC

TO

[Purchaser]

SECTION 3
BLOCK 693
LOT 64
COUNTY OR TOWN          New York
STREET ADDRESS          556 West 22nd Street
                        New York, New York  10001

TAX BILLING ADDRESS     556 West 22nd Street
                        New York, New York  10001

RETURN BY MAIL TO:

Arthur L. Colozzi, Esq.
ALBANESE & ALBANESE LLP
1050 Franklin Avenue
Garden City, NY 11530

Schedule A

Legal Description of the Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 22nd Street with the easterly side of 11th Avenue as said easterly side of 11th Avenue is shown on the State of New York Appropriation Map recorded in Reel 2836 page 631 and as described in the Notice of Appropriation recorded in Reel 2836 page 628; and

RUNNING THENCE easterly along the southerly side of West 22nd Street, 100 feet;

THENCE southerly and parallel with the said easterly side of 11th Avenue, 98 feet 8 inches to the center line of the block;

THENCE westerly parallel with the southerly side of West 22nd Street and along the center line of the block, 95 feet 3 inches to the said side of 11th Avenue;

THENCE northwesterly along the said easterly side of 11th Avenue, the following two (2) courses and distances:

(1)     On a line forming an angle on its northerly side with the preceding course of 110 degrees 27 minutes 29 seconds, a distance of 13.59 feet; and

(2)     On a line forming an angle on its easterly side with the preceding course of 159 degrees 32 minutes 31 seconds, a distance of 86.07 feet to the corner aforesaid, the point of BEGINNING.

Schedule B

1.      Notice of Appropriation Route 9A Reconstruction Project recorded March 15, 1999 in Reel 2836 page 628.

2.      Title by Filing, Acquisition of Property Route 9A Map No. 13 Parcel No. 15 recorded March 15, 1999 in Reel 2836 page 631.

3.      Caretaker's Apartment Declaration made by Dorothea Keeser dated February 12, 2001, recorded February 14, 2001 in Reel 3239 page 522.

4.      The rights of Seller and any Designated Occupants to remain in possession of the Property pursuant to the terms of the Lease Agreement.

## EXHIBIT F

### FOREIGN INVESTORS REAL PROPERTY
### TAX ACT CERTIFICATION AND AFFIDAVIT

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform [Purchaser], a New York limited liability company (the "Transferee") that withholding tax is not required upon disposition of a U.S. real property interest by 556 HOLDING, LLC, a New York limited liability company (the "Transferor"), the undersigned hereby certifies the following on behalf of the Transferor:

Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and any regulations, promulgated in connection therewith);

The U.S. employer identification number of Transferor is _____.

Transferor has an address at 556 West 22nd Street, New York, New York 10001.

The address of the subject property is 556 West 22nd Street, New York, New York 10001.

Transferor understands that this Certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have the authority to sign this document on behalf of Transferor.

[            ], 2010.

556 HOLDING LLC

By: KDMJ Realty, Inc., a New York
corporation, its managing member

By:_____

Name: Dorothea Keeser
Title:  President

**EXHIBIT B**

**[Proposed Sale Order]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                               :

In re                              :     Chapter 11
                               :

556 Holding LLC, et al.,[1]        :     Case No. 10-14267 (ALG)
                               :

               Debtors      :     (Jointly Administered)
                               :
------------------------------------------------------------x

### ORDER (I) AUTHORIZING THE DEBTORS TO SELL THE BUILDING, LAND AND OTHER PROPERTY LOCATED AT 556 WEST 22ND STREET FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "<u>Motion</u>")[2] of the above-captioned debtors-in-possession (collectively, the "<u>Debtors</u>") for the entry of an order, pursuant to sections 105 and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"): (i) authorizing the sale of any and all of Debtor 556 Holding LLC's (the "<u>Seller</u>") right, title and interest in and to the real property, building and certain personal property and other interests located at 556 West 22nd Street, New York, New York (collectively, the "<u>Property</u>") to Albanese Development Corporation (the "<u>Purchaser</u>") free and clear of liens, claims, interests and encumbrances thereon (the "<u>Sale Transaction</u>") and (b) granting other relief related thereto; the Court having conducted a hearing on the Motion (the "<u>Hearing</u>") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; the Court having reviewed and considered, among other things, the Motion and the exhibits thereto, the Purchase

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): 556 Holding LLC (3732) and KDMJ Realty, Inc. (4578). The address of the Debtors is 556 West 22nd Street, New York, NY 10011.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

Agreement and the arguments of counsel made, and the evidence proffered or adduced, at the Hearing;

## I.   FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[3]

### Jurisdiction, Final Order and Statutory Predicates

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      The Court has jurisdiction over this matter and over the property of the Debtors, including the Property to be sold, transferred or conveyed pursuant to the Purchase Agreement, and the Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), the parties may consummate the transactions provided for under the terms and conditions of the Purchase Agreement immediately upon entry of this Order.

### Notice of the Motion

D.      As evidenced by the affidavits of service filed with the Court:  (1) proper, timely, adequate and sufficient notice of the Motion and the Hearing have been provided under the particular circumstances by the service of the Motion as described therein; and (2) no other or further notice of the Motion, or of the entry of this Order is necessary or shall be required.

---

[3]      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See Fed. R. Bankr. P. 7052.

## Good Faith

E.     The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and court decisions thereunder, and is entitled to the protections of section 363(m) of the Bankruptcy Code.  The Purchase Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind.  Neither the Seller nor the Purchaser have engaged in any conduct that would cause or permit the Sale Transaction or any part of the transactions contemplated by the Purchase Agreement to be avoidable under section 363(n) of the Bankruptcy Code.

## Business Judgment

F.     The Debtors have been actively marketing the Property from before the commencement of these chapter 11 cases and have contacted numerous potential buyers as part of this process.  After the Petition Date, the Debtors requested that each known potential buyer then expressing an interest in the Property submit its highest and best offer.  After reviewing the various expressions of interest made for the Property, the Debtors, in an exercise of their sound business judgment, determined that the Purchaser's offer for the Property is the highest and best firm offer for the Property and constitutes full and adequate consideration and reasonably equivalent value for the Property.  Moreover, the terms and conditions proposed by the Purchaser were favorable to the Debtors, reflected access to committed financing and indicated that the Purchaser was ready to consummate a purchase of the Property without delay.

G.     The Property is encumbered by the liens securing the Debtors' obligations under (a) that certain Loan Agreement, dated as of February 4, 2008 (the "Loan") by and among the Seller, as borrower, and West 22nd Street Properties LLC (the "Lender"), as assignee and (b) that certain Forbearance Agreement, dated as of April 21, 2009 (the "Forbearance Agreement"), by and among the Seller and the Lender.  The principal amount of the Loan remains outstanding and

has been accruing and will continue to accrue interest from and after July 2, 2010 at the default rate of 20%.

H.    The Debtors have reviewed the sale process for the Property with the Lender, including indications of interest received from other parties and other relevant facts. [Having been fully informed on these matters, the Lender has indicated to the Debtors that it consents to the (1) sale of the Property under the terms of the Purchase Agreement, and (2) consummation of the sale of the Property to Purchaser without an auction to avoid any delay and costs associated therewith.]

I.    The decision of the Debtors to enter into the Purchase Agreement, which provides for the private sale of the Property to the Purchaser, represents an exercise of the Debtors' sound business judgment. Among other things, the Debtors have determined in their business judgment that, under the current circumstances, the benefits of consummating a prompt private sale of the Property on the terms and conditions embodied in the Purchase Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property, particularly where the Debtors have fully marketed the Property over an extended period of time and have no agreement to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process. Accordingly, under the circumstances, the private sale of the Property on the terms and conditions set forth in the Purchase Agreement maximizes the value of the Property for the Debtors' estates.

**Validity of Transfer**

J.    Prior to the transactions contemplated under the Purchase Agreement, the Property is the property of the Debtors' estates and title thereto is vested in the Debtors' estates notwithstanding the recording of the Deed in Lieu by the Lender. The Deed in Lieu is security

for the Debtors' debts to the Lender.  The recording of the Deed in Lieu does not deprive the Seller of its interests in the Property.

K.      The Seller has full power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the sale of the Property has been duly and validly authorized by all necessary corporate authority by the Seller to consummate the transactions contemplated by the Purchase Agreement.  No consents or approvals, other than as may be expressly provided for in the Purchase Agreement, are required by the Seller to consummate such transactions.

## Section 363(f) of the Bankruptcy Code is Satisfied

L.      The Seller shall sell the Property free and clear of all liens, claims, interests and encumbrances of any kind or nature whatsoever (collectively, the "Interests") because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  [The Lender has consented to the proposed sale of the Property hereunder, pursuant to section 363(f)(2) of the Bankruptcy Code.] The Purchase Price for the Property is well in excess of the amount of the Lender's secured claims therein under any calculation thereof, the Seller may sell the Property free and clear of the Lender's interests therein under section 363(f)(3) of the Bankruptcy Code.  Moreover, other holders, if any, of Interests who did not object, or who withdrew their objections, to the sale of the Property and the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  [Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.]

**Retention of Jurisdiction**

M.     It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Purchase Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Purchase Agreement.

**II.     CONCLUSIONS OF LAW:**

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The relief requested in the Motion is granted in its entirety, subject to the terms and conditions contained herein.

**Approval of Sale**

2.     The Purchase Agreement (including all exhibits affixed thereto), a copy of which is attached as Exhibit A hereto, and the transactions contemplated thereby are hereby approved. Pursuant to sections 105 and 363 of the Bankruptcy Code, the Seller is authorized to perform its obligations under the Purchase Agreement.

3.     The Purchaser is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

4.     The Seller shall be, and hereby is, authorized to perform under, consummate and implement the terms of the Purchase Agreement together with any and all additional instruments and documents that may be necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Order and the sale of the Property contemplated thereby including, without limitation, the execution of any deeds, assignments and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to

possession any or all of the Property, as may be necessary or appropriate to the performance of the Seller's obligations as contemplated by the Purchase Agreement, without any further corporate action by the Seller or order of this Court.

5.      The sale of the Property and the consideration provided by the Purchaser under the Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.      Effective as of the closing of the Sale Transaction (the "Closing"), the sale of the Property by the Seller to the Purchaser shall constitute a legal, valid and effective transfer of the Property notwithstanding any requirement for approval or consent by any person and shall vest Purchaser with all right, title and interest of the Debtors in and to the Property.

## Transfer of Property Free and Clear

7.      Pursuant to sections 105 and 363 of the Bankruptcy Code, except to the extent specifically provided otherwise in the Purchase Agreement or this Order, the sale of the Property shall vest Purchaser with all right, title and interest in and to the Property free and clear of any and all Interests, with all such Interests and any other liabilities and claims to attach only to the net proceeds of the sale with the same priority, validity, force and effect, if any, as they now have in or against the Property, subject to all claims and defenses the Debtors may possess with respect thereto.  Following the date of the Closing (the "Closing Date"), no holder of any Interest in the Property shall interfere with the Purchaser's use and enjoyment of the Property based on or related to such Interest.

8.      On or before the Closing Date, all parties holding Interests of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Interests of any kind against the Property, as such Interests may have

been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Interests in or against the Property shall not have delivered to the Seller prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all such Interests that the person or entity has with respect to the Property, the Seller is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Property prior to the Closing, and the Purchaser is authorized to execute and file such documents after the Closing; provided, however, that nothing in this paragraph shall authorize the Seller to execute or file documents on behalf of any governmental entity.

9.     Except to the extent expressly provided otherwise in the Purchase Agreement or this Order, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, all debt security holders; equity security holders; governmental, tax and regulatory authorities; lenders; parties to or beneficiaries under any benefit plan; any claimant asserting a products liability claim; trade and other creditors asserting or holding an Interest of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Property, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Property to the Purchaser, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interest or other liability against the Purchaser or any of its affiliates or subsidiaries. For the avoidance of doubt, the foregoing shall not prevent the Debtors or their successors or permitted assigns from

pursuing claims, if any, against the Purchaser and/or its successors and assigns in and only in accordance with the terms of the Purchase Agreement.

## **Additional Provisions**

10.     Subject to the terms of the Purchase Agreement, the Purchase Agreement may be modified, amended or supplemented by agreement of the Seller and the Purchaser without further action or order of the Court; provided, however, that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or modify the express terms of this Order.

11.     The failure specifically to include in this Order any particular provisions of the Purchase Agreement or any related agreement shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Seller and the Purchaser that the Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing.  To the extent that any provisions of this Order conflict with the terms and conditions of the Purchase Agreement, the terms and conditions of this Order shall govern and control.

12.     This Order and the Purchase Agreement shall be binding upon and govern the acts of all Persons and entities, including, without limitation, the Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any trustee hereinafter appointed for the Debtors' estates, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property.  Each and every federal, state and local governmental agency, unit or department are hereby directed to accept this Order

as sole and sufficient evidence of the transfer of title of the Property to the Purchaser, and such

agency, unit or department may rely upon this Order in consummating the transactions

contemplated by the Purchase Agreement.

13. This Order may be recorded by the Purchaser in any registry or government

office.

14. Pursuant to Bankruptcy Rule 6004(h), this Order shall be effective immediately

upon entry.

15. This Court retains jurisdiction to interpret, implement and enforce the terms and

provisions of this Sale Order, including to compel delivery of the Property, to protect the

Purchaser against any Interest and to enter any orders under sections 105 or 363 (or other

applicable provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property

to the Purchaser.

Dated: November_____, 2010
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

NYI-4316484v3