# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of the Effective Date (as defined in Section 1.2 below), by and between **556 HOLDING LLC**, a New York limited liability company, having an address at 556 West 22nd Street, New York, New York 10001 ("Seller"), and **ALBANESE DEVELOPMENT CORPORATION**, a New York corporation, having an address at 1050 Franklin Avenue, Garden City, New York 11530 ("Purchaser")..

Seller is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 6, 2010, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 10-14267-alg). Seller and Purchaser are entering into this Agreement subject to the approval by the Bankruptcy Court.

In consideration of the mutual promises, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.1**      Agreement of Purchase and Sale.  Subject to the terms and conditions hereinafter set forth, on the Closing Date (as defined in Section 1.2 below), Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, any and all of Seller's right, title and interest in and to the real property more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "Land"), together with the building located thereon (the "Building") commonly known by the street address **556 West 22nd Street, New York, New York,** and also together with all of Seller's right, title and interest in and to any other improvements, fixtures, machinery and equipment attached or appurtenant thereto and all rights and privileges pertaining thereto, including all of Seller's right, title and interest in and to all rights-of-way and easements (collectively with the Land and Building, the "Property").  No service contracts, warranties, guaranties, licenses, permits or other tangible (movable) or intangible personal property are included with the sale of the Property.

**Section 1.2**      Certain Definitions.

"Business Day" means any day other than a Saturday, Sunday or holiday of a bank in New York.

"Closing" shall have the meaning prescribed to such term in Section 4.1 below.

"Closing Date" means a date mutually agreed to by Seller and Purchaser, but in no event later than the date (the "Outside Date") which is ten (10) Business Days after the Resolution Date, as to which Outside Date time is of the essence.

"Closing Surviving Provisions" means the rights, liabilities and obligations set forth in Sections 1.6, 1.7, 3.3, 4.4, 7.1, 10.1, 10.4, 10.6, 10.7, 10.8, 10.9, 10.10, 10.11, 10.12,

10.13, 10.14, 10.15, 10.16, 10.17 and Articles V, VI, VIII and IX and any other provisions that, pursuant to their terms, expressly survive the Closing.

"Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, any successor statute and any regulations or guidance promulgated thereunder.

"Deed-in-Lieu of Foreclosure" means that certain deed dated October 13, 2010 by Seller, as grantor, and West 22nd Street Owner, LLC, as grantee, purporting to convey all of Seller's right, title and interest in and to the Property to grantee, which was recorded in the New York City Register's Office on October 14, 2010 as CRFN: 2010000343750.

"Effective Date" means November 10, 2010.

"Environmental Laws" means all federal, state, and local laws, statutes, ordinances and regulations, now or hereafter in effect, related to the protection of human health, safety, the environment and natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. Sections 136, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901, et seq.), the Toxic Substances Control Act, as amended (42 U.S.C. Sections 7401, et seq.), the Clean Air Act, as amended (42 U.S.C. Sections 7401, et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. Section 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. Sections 651, et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. Sections 300f, et seq.), any state or local counterpart or equivalent of any of the foregoing and any federal, state or local transfer of ownership notification or approval statutes.

"Escrow Agent" means the Title Company (defined below).

"Hazardous Materials" means those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any other substance regulated by an Environmental Law.

"Related Documents" means all documents and instruments executed and/or delivered by Seller and/or Purchaser in connection with or pursuant to the Closing of the transaction contemplated by this Agreement, including, without limitation, the Deed and FIRPTA Certificate.

"Release" means any release, presence, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of a Hazardous Material into the indoor or outdoor environment.

"Resolution Date" means the later of (i) the date that the Sale Order and Termination Order shall have been entered by the Bankruptcy Court and not be subject to any stay or appeal and the time for an appeal has expired or (ii) if the Sale Order and/or Termination

NYI-4323934v2
AA\116676v12

Order entered by the Bankruptcy Court is appealed, the date that all appeals are exhausted and the Sale Order and/or Termination Order appealed are/is affirmed by the appellate court.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement in form and substance acceptable to Purchaser.

"Termination Order" means an Order of the Bankruptcy Court terminating or voiding the Deed-in-Lieu of Foreclosure.

"Title Company" means Stewart Title Insurance Company.

**Section 1.3**     Purchase Price. Seller is to sell, and Purchaser is to purchase, the Property for the sum of NINETEEN MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($19,350,000.00) (the "Purchase Price"). The Purchase Price includes interest on the portion of the Purchase Price that is deferred pursuant to Section 1.7.

**Section 1.4**     Payment of Purchase Price. Except as provided in Section 1.5, Section 1.7 and Section 1.8 below, the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be payable in full at the Closing in cash by wire transfer of immediately available federal funds (i) to Creditor, in an amount equal to $10,817,809.84, (ii) to DC Beteiligung GmbH ("DCB"), in an amount equal to $425,000 and pursuant to wiring instructions to be provided by Seller and (iii) in satisfaction of the Seller's costs and expenses to the entities and in the amounts stated on the Closing Statement and (iv) with the remaining amount to be held by the Escrow Agent pending further order of the Bankruptcy Court. Any payment made by wire transfer shall not be deemed to have been made, and transfer of title to the Property shall not occur, until the payment is received by Creditor, DCB and/or Seller, as applicable.

**Section 1.5**     Deposit. On the Effective Date and simultaneously with the execution of this Agreement, Purchaser shall deposit with Escrow Agent the sum of TWO MILLION AND 00/100 DOLLARS ($2,000,000.00) (the "Deposit"), in the form of a certified check payable to the order of Escrow Agent or by wire transfer of immediately available federal funds to an account designated by Escrow Agent, the receipt of which is hereby acknowledged. Failure to make such deposit by such time shall render this Agreement null and void and of no further force and effect, unless Seller, in its sole discretion, allows for later payment of the Deposit in writing. Escrow Agent shall hold the Deposit in an interest bearing account in accordance with the provisions of Article IX. All interest and income earned on the Deposit shall become part of the Deposit. Absent Seller's failure to meet "Seller's Obligations at Closing" under Section 4.2 below, termination of this Agreement by Purchaser for breach by Seller, or termination of this Agreement by Purchaser under Section 1.8 below, the Deposit is non-refundable to Purchaser.

**Section 1.6**     Designation of Certifying Person. In order to assure compliance with the requirements of Section 6045 of the Code and any related reporting requirements of the Code, the parties hereto agree as follows:

(a)     Escrow Agent agrees to assume all responsibilities for information reporting required under Section 6045(e) of the Code, and Seller and Purchaser hereby designate

3

Escrow Agent as the certifying person to be responsible for all information reporting under Section 6045(e) of the Code.

(b)     Seller and Purchaser each hereby agree (i) to provide to Escrow Agent all information and certifications regarding such party, as reasonably requested by Escrow Agent or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and (ii) to provide to Escrow Agent such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by Escrow Agent), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to Escrow Agent is correct.

(c)     The provisions of this Section 1.6 shall survive the Closing.

**Section 1.7**     Occupancy after the Closing.

(a)     During the period commencing on the Closing Date and ending on December 31, 2011 (the "Term"), Seller, and any person or entity as of October 14, 2010 deriving any real property interest from Seller (a "Designated Occupant"), shall be entitled to occupy the Premises pursuant to the terms and conditions of a lease agreement (the "Lease Agreement") that will be executed and delivered by Seller and Purchaser at the Closing in the form attached hereto as Exhibit B.  As of the date hereof, Seller has identified the following persona as Designated Occupants: (i) the Chelsea Art Museum, (ii) Contemporary Conservation, LTD., (iii) Designers & Agents, Inc. and (iv) Dorothea Keeser.

(b)     Seller acknowledges that Purchaser intends to substantially renovate or demolish the Building at the end of the Term and that Purchaser will suffer substantial damages if Seller and any Designated Occupant fail to vacate the Property in accordance with the terms of the Lease Agreement at the end of the Term, and agrees that to secure Seller's performance of its obligations under the Lease Agreement, including, but not limited to, the obligation to vacate and surrender possession, and cause any Designated Occupant to vacate and surrender possession, of the Property by December 31, 2011: (i) a portion of the Purchase Price in the amount of FOUR MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($4,350,000.00) (the "Post-Closing Payment") shall not be paid to Seller at the Closing and shall be deferred and paid to Seller upon Seller's compliance with Seller's obligations under the Lease Agreement to vacate and surrender possession, and cause any Designated Occupant to vacate and surrender possession, of the Property to Purchaser in accordance with the terms of the Lease Agreement and (ii) Seller shall pay to Purchaser as liquidated damages the amount of $5,500 per day for each day that Seller or any Designated Occupant fails to vacate and surrender possession of the Property to Purchaser in accordance with the provisions of the Lease Agreement (the aggregate amount payable by Seller by reason of any such failure is herein referred to as the "Delay Damages"), it being agreed that the exact amount of Purchaser's damages in the event of Seller's and any Designated Occupant's failure to vacate the Property might be impossible to ascertain and the Delay Damages are fair and reasonable and are not a penalty.  Purchaser may offset against the Post-Closing Payment, the amount of any Delay Damages payable by Seller pursuant to this Section and any other amounts payable by Seller to Purchaser pursuant to the provisions of the Lease Agreement (the amount of such offset is herein referred to as the "Offset Amount").

4

Purchaser shall deliver in escrow to Escrow Agent at the Closing either, at Purchaser's option: (i) a Letter of Credit in an amount equal to the Post-Closing Payment or (ii) a guaranty (in form reasonably acceptable to Seller and Purchaser) for the payment of the Post-Closing Payment executed by Christopher V. Albanese and Russell C. Albanese, to secure Purchaser's obligation hereunder to pay the Post-Closing Payment (the "Post-Closing Collateral"). The Post-Closing Collateral shall be held in escrow by Escrow Agent until Purchaser shall pay to Seller the Post-Closing Payment (as the same may be reduced by any Offset Amount), and upon the payment of the same the Escrow Agent shall promptly return the Post-Closing Collateral to Purchaser. If Purchaser shall fail to pay to Purchaser the Post-Closing Payment (as the same may be reduced by any Offset Amount) within ten (10) days after the date that the same is due and payable to Seller pursuant to this paragraph, Escrow Agent is authorized to deliver the Post-Closing Collateral to Seller.

(c)     If any lease or other occupancy agreement entered into between Seller and any of the Designated Occupants prior to the Closing Date (the "Designated Occupant Agreement") remains in full force and effect after the Closing Date, then Seller shall deliver to Purchaser at Closing, with respect to each such Designated Occupant and at Seller's sole cost and expense, enter in a written agreement(s) (each, a "Modification Agreement") among Seller, the Designated Occupant and Purchaser, that modifies the particular Designated Occupant Agreement to provide that: (i) the term of the Designated Occupant Agreement shall end and expire fully and completely as of the expiration of the Term or the sooner termination of the Lease Agreement; (ii) the Designated Occupant Agreement, as so modified, and all right, title and interest of the Designated Occupant in accordance therewith, is in all respects subject and subordinate to the Lease Agreement; (iii) neither the Modification Agreement nor the Designated Occupant Agreement may be altered, modified, amended, restated, extended or renewed without Purchaser's prior written consent in each instance and that any modification, amendment, restatement or extension entered into in violation of this provision shall be null and void and without any force or effect; and (iv) notwithstanding that Purchaser is a party to the Modification Agreement, Purchaser shall neither have nor be deemed to have any responsibility, obligation or liability whatsoever under the Designated Occupant Agreement or the Modification Agreement. Notwithstanding the foregoing: (A) Seller shall not be obligated to deliver the Modification Agreement with Contemporary Conservation, LTD. at Closing, but shall deliver the same to Purchaser as soon as reasonably practicable, but in no event later than the expiration of the Term and, (B) Seller shall have no obligation to deliver any Modification Agreement with Designers & Agents, Inc.

(d)     In connection with the Seller's dispute with the Creditor, Purchaser agrees to accelerate payment of a portion of the Post-Closing Payment upon resolution of the dispute and determination of amount owed by Seller to Creditor, up to $500,000.00, to cover any amount due to the Creditor that is not covered by the Purchaser's payments made at Closing (the "Accelerated Payment"). If an Accelerated Payment is made, then the Post-Closing Payment will be reduced by such amount.

(e)     The provisions of this Section 1.7 shall survive the Closing.

**Section 1.8**     Bankruptcy Provisions.

5

(a)     No later than three business days following the execution of this Agreement, Seller shall, at its sole cost and expense, file a motion with the Bankruptcy Court seeking approval of the Agreement and seeking a court order terminating or voiding the Deed-in-Lieu of Foreclosure.  Seller agrees that it will promptly take such actions as are necessary to obtaining (i) entry of the Sale Order and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (ii) entry of the Termination Order.  In the event the entry of the Sale Order and/or Termination Order shall be appealed, the Seller shall use best efforts to defend against such appeal.

(b)     If the Resolution Date does not occur on or before May 15, 2011, then Purchaser shall have the right to terminate this Agreement by delivery of written notice to Seller.  If this Agreement is terminated in accordance with the foregoing sentence, Purchaser shall receive the prompt return of the Deposit, together with all accrued interest thereon from Escrow Agent.

ARTICLE II
TITLE AND SURVEY

**Section 2.1**     Title.  Seller agrees to convey and Purchaser agrees to acquire such title to the Property as the Title Company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to (collectively, the "Permitted Exceptions"): (a) the matters shown on the survey of the Property dated October 8, 2010, prepared by Lovell Earl B & Belcher SP Inc (the "Existing Survey"), (b) the permitted exceptions to title set forth on Exhibit C attached hereto and (c) such other matters as the Title Company shall be willing, without special premium, to omit as exceptions to coverage.  Subject to entry of the Sale Order and except with respect to the Permitted Exceptions and as provided in Section 2.4 hereof, Seller shall convey the Property to Purchaser free and clear of all liens and encumbrances thereon to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

**Section 2.2**     Disclaimer Regarding Title Matters.  Except as expressly set forth herein, nothing contained in this Agreement shall be construed as (a) a representation of the state of title to the Property that a current title report would disclose or matters that would be disclosed by a current survey, or (b) an agreement or obligation that Seller bring any action or proceeding or otherwise incur any expense to render title to the Property insurable or marketable.

**Section 2.3**     Conveyance of Title.  At Closing, Seller shall convey and transfer to Purchaser, and Purchaser shall accept, fee simple title to the Property, subject only to the Permitted Exceptions, by execution and delivery of the Deed (as defined in Section 4.2(a)) by Seller to Purchaser.

**Section 2.4**     Assignment of Existing Mortgage.  At the request of Purchaser, Seller shall cooperate with Purchaser to cause the Creditor to assign to any lender providing financing to Purchaser, the existing notes and mortgages encumbering the Property in consideration of such lender's payment to the Creditor of $10,817,809.84 and delivery to the Escrow Agent of $3,182,190.16, in which event Purchaser shall receive a $14,000,000.00 credit against the portion of Purchase Price payable at Closing and the lien of the existing notes and mortgages encumbering the Property shall constitute a Permitted Exception hereunder.

6

## ARTICLE III
## ACCESS TO PROPERTY, ETC

**Section 3.1** <u>Access</u>. On or after the Effective Date, Purchaser and its agents shall be permitted to enter upon the Property at reasonable times, upon at least two (2) days prior notice, to examine and take measurements of the Property.

**Section 3.2** <u>Insurance</u>. Purchaser shall, at all times prior to the Closing Date maintain commercial general liability insurance in type, form and amount reasonably satisfactory to Seller, naming its agents and Seller as additional insureds and covering all personal injury and property damage claims arising out of Purchaser and its agents exercising the access rights reserved under Section 3.1 above.

**Section 3.3** <u>Indemnity</u>. Purchaser agrees to protect, indemnify, defend (with counsel acceptable to Seller) and hold Seller, its parents, subsidiaries and affiliates, and their respective officers, directors, shareholders, employees, agents, successors and assigns (collectively, the "<u>Indemnified Parties</u>"), harmless from and against any claim for liens, liabilities, losses, costs, expenses (including reasonable attorneys' fees), damages or injuries suffered or incurred by any of the Indemnified Parties arising out of, resulting from, relating to or connected with Purchasers' or its agents' exercise of the access rights reserved under this Article 3, including the acts or omissions of Purchaser and/or any other Purchaser Parties or their respective agents, employees, consultants, affiliates or representatives or contractors at the Property prior to Closing.

## ARTICLE IV
## CLOSING; CLOSING ADJUSTMENTS AND COSTS; CONDITIONS

**Section 4.1** <u>Time and Place</u>. The consummation of the transactions contemplated hereby (the "<u>Closing</u>") shall be held on the Closing Date at the offices of Seller's attorneys, Jones Day at 222 E. 41st Street, New York, New York or at the offices of the attorney for any lender providing financing to Purchaser. At the Closing, Seller and Purchaser shall perform the obligations set forth in, respectively, Section 4.2 and Section 4.3, the performance of which obligations shall be concurrent conditions.

**Section 4.2** <u>Seller's Obligations at Closing</u>. At the Closing, Seller shall do the following:

(a) deliver to Purchaser a duly executed bargain and sale deed with covenants against grantor's acts (the "<u>Deed</u>") in the form of <u>Exhibit D</u> attached hereto and made a part hereof;

(b) deliver to Purchaser a non-foreign certificate (the "<u>FIRPTA Certificate</u>") in the form of <u>Exhibit E</u> attached hereto and made a part hereof duly executed by Seller; and

(c) if requested by any lender providing financing to Purchaser, execute and deliver to Purchaser with respect to the Lease Agreement a subordination, non-disturbance and attornment agreement among Seller, Purchaser and Purchaser's lender, in the form reasonably requested by Purchaser's lender (the "<u>SNDA</u>");

7

(d)　　execute and deliver to Purchaser, the Lease Agreement;

(e)　　deliver to Purchaser a fully executed Modification Agreement from each Designated Occupant as required pursuant to Section 1.7(c);

(f)　　deliver to Purchaser such evidence as the Title Company and/or Purchaser may reasonably require as to the authority of the person or persons executing documents on behalf of Seller; and

(g)　　deliver to the Title Company such additional documents as the Title Company may reasonably require as being customary, and in form reasonably satisfactory to Seller, to consummate the transaction contemplated in this Agreement.

**Section 4.3**　　Purchaser's Obligations at Closing.  At the Closing, Purchaser shall do the following:

(a)　　direct the Escrow Agent to pay the proceeds of the Deposit to Seller;

(b)　　subject to the provisions of Section 1.7 above, pay to Seller and Creditor, as applicable pursuant to Section 1.4, the balance of the Purchase Price, which amount shall be increased or decreased by prorations and adjustments as herein provided, plus any other fees, costs, expenses and other amounts set forth as Purchaser's obligations on the Closing Statement;

(c)　　if requested by any lender providing financing to Purchaser, execute and deliver to Seller the SNDA;

(d)　　execute and deliver to Seller, the Lease Agreement;

(e)　　deliver to Seller such evidence as the Title Company and/or Seller may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(f)　　deliver such additional documents as shall be reasonably required by Seller or the Title Company to consummate the transaction contemplated by this Agreement.

**Section 4.4**　　Closing Statement.

(a)　　In connection with the Closing, Escrow Agent shall prepare a settlement statement (the "Closing Statement") reflecting the Purchase Price, Deposit and all credits, prorations, fees and other costs contemplated hereby.

(b)　　Seller shall pay for (i) the fees of any counsel representing Seller in connection with this transaction; (ii) the cost to record any lien releases required hereunder; (iii) any transfer taxes, including sales tax, New York State Real Estate Transfer Tax and New York City Real Property Transfer Tax; (iv) one half of any escrow charges imposed by Escrow Agent in connection with its obligations hereunder; and (v) all other closing costs incurred by Seller in connection with this transaction and any other charges or fees customarily paid by a seller in the location where the Property is located, except as expressly required to be paid by Purchaser under this Section.  Purchaser shall pay for (A) the fees of any counsel representing

NYI-4323934v2
AA\116676v12

Purchaser in connection with this transaction; (B) the fees for recording the Deed and any assignment of the existing notes and mortgages encumbering the Property as provided pursuant to Section 2.4 hereof; (C) the base premium for the Title Policy and any fees or premiums for extended coverage or any modifications or endorsements to the Title Policy requested by Purchaser (other than any special premium payable by Seller pursuant to Section 2.1 hereof); (D) one half of any escrow charges imposed by Escrow Agent in connection with its obligations hereunder and (E) all other closing costs incurred by Purchaser in connection with this transaction and any other charges or fees customarily paid by a purchaser in the location where the Property is located, except as expressly required to be paid by Seller under this Section.

(c)     The provisions of this Section 4.4 shall survive the Closing.

**Section 4.5**     Conditions Precedent to Obligation of Purchaser.     The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)     Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement;

(b)     Purchaser shall have received a commitment (subject to customary terms and conditions) from the Title Company to issue the Title Policy to Purchaser in accordance with the terms hereof.

(c)     The Sale Order and Termination Order shall have been entered by the Bankruptcy Court and not be subject to any stay or appeal and the time for an appeal has expired;

(d)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date; and

(e)     Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

**Section 4.6**     Conditions Precedent to Obligation of Seller.  The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)     Seller and Creditor, as applicable, shall have received the payments contemplated in Sections 4.3(a) and (b) above;

(b)     The Sale Order and Termination Order shall have been entered by the Bankruptcy Court and not be subject to any stay or appeal and the time for an appeal has expired;

(c)     All of the representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects as of the Effective Date; and

9

(d)     Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the Closing Date.

ARTICLE V
REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 5.1**     Representations and Warranties of Seller.  Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date:

(a)     Organization and Authority.  Seller has been duly organized and is in good standing under the laws of the State of New York.  Seller has the full right and authority to enter into this Agreement and to transfer all of the Property and to consummate or cause to be consummated the transaction contemplated by this Agreement.   The person signing this Agreement on behalf of Seller is authorized to do so.

(b)     Non-Foreign Status.  Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980.

(c)     Agreement Binding.   This Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights and by general principles of equity (whether applied in a proceeding at law or in equity).

(d)     The representations and warranties set forth in this Section 5.1 shall survive the Closing.

**Section 5.2**     Knowledge Defined.  References to the "knowledge" of Seller shall refer only to the current actual knowledge of Dorothea Keeser, President of Seller's managing member.  There shall be no personal liability on the part of Dorothea Keeser as a result of any representation or warranties made herein.

**Section 5.3**     Representations and Warranties of Purchaser.   Purchaser hereby makes the following representations and warranties to Seller as of the Effective Date:

(a)     Pending Actions.   To Purchaser's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually materially interfere with the consummation of the transaction contemplated by this Agreement.

(b)     Organization and Authority of Purchaser. Purchaser has been duly organized and is in good standing under the laws of the State of New York.  Purchaser has the full right and authority to enter into this Agreement, to purchase all of the Property and to consummate or cause to be consummated the transaction contemplated by this Agreement.  The person signing this Agreement on behalf of Purchaser is authorized to do so.

(c)     Agreement Binding.   This Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with the terms

10

hereof, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights and by general principles of equity (whether applied in a proceeding at law or in equity).

(d)     The representations and warranties set forth in this Section 5.3 shall survive the Closing.

# ARTICLE VI
# RISK OF LOSS

**Section 6.1**     <u>Casualty and Property Insurance</u>.  If any casualty or other event shall occur prior to the Closing Date causing loss or damage to the Premises or any portion thereof (other than as set forth in Section 6.2 below) and the reasonably estimated costs of restoration is equal to or greater than the sum of $1,000,000, Purchaser shall have the option upon written notice to Seller of either (i) terminating this Agreement (ii) or proceeding with the Closing in which event this Agreement shall remain in full force and effect and Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to the proceeds of any claims and insurance policies Seller may have received or be entitled to receive as a result of such loss or damage.  Purchaser shall exercise its option herein set forth within 30 days of the date that Seller gives written notice to Purchaser of the occurrence of such casualty or other event.  If Purchaser elects to terminate this Agreement as herein provided, Purchaser shall have the right to receive the prompt return of the Deposit, together with all accrued interest thereon, and upon the payment thereof to Purchaser, neither party shall have any further obligations to the other hereunder.  If any casualty or other event shall occur prior to the Closing Date causing loss or damage to the Premises or any portion thereof (other than as set forth in Section 6.2 below) and the reasonably estimated costs of restoration is less than the sum of $1,000,000, Seller and Purchaser shall proceed with the Closing as described in clause (ii) above.  With respect to any such casualty or other event, the provisions of this Section 6.1 shall be construed as an express provision in lieu of the provisions of Section 5-1311 of the General Obligations Law of the State of New York ("<u>Section 5-1311</u>"), which the parties agree shall be inapplicable to any such casualty or other event.

**Section 6.2**     <u>Condemnation</u>.  The provisions of Section 5-1311 shall apply to the sale and purchase provided for in this Agreement solely with respect to a taking by eminent domain affecting the Property or any portion thereof.  For purposes of this Section 6.2, the term "material part" as used in Section 5-1311, shall mean a taking which is reasonably likely to impair Purchaser's ability to develop the entire Property into a luxury residential condominium building (any such taking, a "<u>Material Taking</u>"), and the term "immaterial part" as used in Section 5-1311, shall mean a taking which is not a Material Taking.

**Section 6.3**     <u>Survival</u>.  The provisions of this Article VI shall survive the Closing.

# ARTICLE VII
# COMMISSIONS

**Section 7.1**     <u>Brokerage Commissions</u>.  The parties (i) represent and warrant that they have not dealt with any real estate broker in connection with this transaction who has claimed or may have the right to claim a commission in connection with this transaction other

11

than Capin & Associates, Inc. (the "Broker"); and (ii) shall indemnify and defend each other against any costs, claims or expenses, including attorney's fees and disbursements, arising out of the breach on their respective parts of the foregoing representation and warranty. Purchaser shall pay Broker any commission earned pursuant to a separate agreement to be made between Purchaser and Broker. The representations, warranties and obligations of the parties in this Section 7.1 shall survive the Closing.

ARTICLE VIII
DISCLAIMERS AND WAIVERS

**Section 8.1** No Reliance on Documents. Except as expressly stated herein, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered or given by Seller or its brokers (if any), agents or representatives to Purchaser in connection with the transaction contemplated hereby. Purchaser acknowledges and agrees that all materials, data and information delivered or given by Seller to Purchaser in connection with the transaction contemplated hereby are provided to Purchaser as a convenience only and that any reliance on or use of such materials, data or information by Purchaser shall be at the sole risk of Purchaser, except as otherwise expressly stated herein. Except as expressly stated herein, neither Seller, nor any affiliate of Seller, nor the person or entity which prepared any report or reports delivered by Seller to Purchaser, shall have any liability to Purchaser for any inaccuracy in or omission from any such reports.

**Section 8.2** AS-IS SALE; DISCLAIMERS. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY RELATED DOCUMENT, PURCHASER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO (a) the habitability, merchantability or fitness for a particular purpose or as to the current or future physical or structural condition or value of the Property or its suitability for rehabilitation or renovation; (b) the current or future condition and operating state of any and all machinery or equipment in the Property; (c) the income, expenses, use, operation or any other matter or thing affecting or relating to the Property or title thereto or the transactions contemplated hereby; (d) the current or future real estate tax liability, assessment or valuation of the Property; (e) the potential qualification of the Property for any and all benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (f) the compliance of the Property in its current or any future state with local, state or federal laws, ordinances or governmental regulations; or (g) the environmental condition of the Property or the compliance of the Property with Environmental Laws or any Release or absence of Hazardous Materials, in, on, above, beneath at, to or from the Property.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY RELATED DOCUMENT, PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS." PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, AND PURCHASER EXPRESSLY WAIVES, ANY

12

EXPRESS, IMPLIED OR STATUTORY WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO MADE OR FURNISHED BY SELLER, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR ANY RELATED DOCUMENT. PURCHASER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PROPERTY IS BEING SOLD "AS-IS."

Section 8.3     Release. Purchaser expressly waives, releases and discharges Seller, and any entity or person which at any time directly or indirectly controlled or was controlled by Seller, from any and all suits, claims, demands, cause of action, damages (including, but not limited to, consequential damages), losses, costs and expenses of any kind, whether known or unknown, relating to or arising at any time out of the Property, and based on (a) any Environmental Law; (b) the Release of any Hazardous Materials; or (c) any environmental conditions whatsoever in, on, above, beneath, at, to, under or in the vicinity of the Property.

Section 8.4     Survival of Disclaimers. The provisions of this Article VIII shall survive the Closing or any earlier termination of this Agreement.

ARTICLE IX
ESCROW AGENT

Section 9.1     Deposit. Escrow Agent will hold the Deposit in escrow in an interest-bearing account of the type generally used by Escrow Agent for the holding of escrow funds. If this Agreement is terminated by Purchaser or Seller under Article 4, due to Purchaser's or Seller's failure to meet their respective obligations under Article 4, the Deposit will be paid by Escrow Agent to the party entitled thereto, but in the event the Seller is entitled to the Deposit, the Escrow Agent will release the Deposit directly to the Creditor for the Seller's behalf. If the Closing occurs, the Deposit will be released in accordance with the provisions of Section 1,4, and Purchaser shall receive a credit against the Purchase Price in the initial amount of the Deposit.

Section 9.2     Escrow Agent Liability. Escrow Agent shall not be liable to any party for any act or omission, except for bad faith, gross negligence or willful misconduct, and the parties agree to indemnify Escrow Agent and hold Escrow Agent harmless from any and all claims, damages, losses or expenses arising in connection herewith. The parties acknowledge that Escrow Agent is acting solely as stakeholder for their mutual convenience. In the event Escrow Agent receives written notice of a dispute between the parties with respect to the Deposit, Escrow Agent shall not be bound to release and deliver the Deposit to either party but may either (a) continue to hold the Deposit until otherwise directed in a writing signed by all parties hereto or (b) deposit the Deposit with the clerk of any court of competent jurisdiction. Upon such deposit, Escrow Agent will be released from all duties and responsibilities hereunder. Escrow Agent shall have the right to consult with separate counsel of its own choosing and shall not be liable for any action taken, suffered or omitted by it in accordance with the advice of such

13

counsel. Escrow Agent shall be fully protected in acting in accordance with any written instructions given to it hereunder and believed by it to have been signed by the proper parties.

**Section 9.3** <u>Legal Proceedings</u>. Escrow Agent shall not be required to defend any legal proceeding which may be instituted against it with respect to the Deposit, the Property or the subject matter of this Agreement unless Escrow Agent is requested to do so by Purchaser or Seller and is indemnified to its satisfaction against the cost and expense of such defense. Escrow Agent shall not be required to institute legal proceedings of any kind and shall have no responsibility for the genuineness or validity of any document or other item deposited with it or the collectability of any check delivered in connection with this Agreement.

**Section 9.4** <u>Survival</u>. The provisions of this Article IX shall survive the Closing or any earlier termination of this Agreement.

ARTICLE X
MISCELLANEOUS

**Section 10.1** <u>Acceptance of Deed</u>. Except to with respect to the Closing Surviving Provisions, the acceptance of the Deed by Purchaser shall be deemed full compliance by Seller of all of the Seller's obligations under this Agreement

**Section 10.2** <u>Assignment</u>. The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto. Purchaser may assign its rights under this Agreement without Seller's consent. In no event shall any assignment of this Agreement release or discharge Purchaser from any liability or obligation occurring hereunder.

**Section 10.3** <u>TIME OF THE ESSENCE</u>. **TIME IS OF THE ESSENCE WITH RESPECT TO ALL TIME PERIODS AND DATES FOR PERFORMANCE SET FORTH IN THIS AGREEMENT.** In the event the date on or by which Purchaser or Seller is required to take any action under the terms of this Agreement is not a Business Day, the action shall be taken on or by, as applicable, the next succeeding Business Day.

**Section 10.4** <u>Notices</u>. Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, or (c) legible facsimile or other electronic transmission, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith. Notices shall be deemed given upon receipt or refusal to accept delivery, or in the case of the facsimile or other electronic transmission, on the date such transmission is received. Any notice received or refused on a day that is not a Business Day or after 5:00 p.m. local time on any day shall be deemed to have been delivered on the following Business Day. The terms and provisions of this Section 10.4 shall survive the Closing. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

NYI-4323934v2
AA\116676v12

| | |
|---|---|
| If to Seller: | 556 Holding LLC |
| | 556 West 22nd Street |
| | New York, New York 10001 |
| | Attention: Dorothea Keeser |
| | Telephone No.: (212) 255-0719 |
| | Facsimile No.: (212) 255-2368 |
| | |
| with copies to: | Jones Day |
| | 222 East 41st Street |
| | New York, New York 10017-6702 |
| | Attention: Thomas Bark, Esq. |
| | Susanna Fodor, Esq. |
| | Telephone No.: (212) 326-7815 |
| | Facsimile No.: (212) 755-7306 |
| | |
| If to Purchaser: | Albanese Development Corporation |
| | 1050 Franklin Avenue |
| | Garden City, New York 11530 |
| | Attention: Christopher V. Albanese |
| | Telephone No.: (516) 746-6000 |
| | Facsimile No.: (516) 746-0580 |
| | |
| with copies to: | Albanese & Albanese LLP |
| | 1050 Franklin Avenue |
| | Garden City, New York 11530 |
| | Attention: Arthur L. Colozzi, Esq. |
| | Telephone No.: (516) 248-7000 |
| | Facsimile No.: (516) 747-7777 |
| | |
| If to Escrow Agent: | Stewart Title Insurance Company |
| | 300 East 42nd Street, Floor 10 |
| | New York, NY 10017 |
| | Attention: Paul Bugoni, Esq. |
| | Telephone No.: (800) 433-0014 |
| | Facsimile No.: (646) 525-3589 |

**Section 10.5**      Modifications.  This Agreement cannot be changed orally, and any waiver, discharge or modification shall be effective only if it is in writing and is signed by the party or parties against whom enforcement of such waiver, discharge or modification is sought.

**Section 10.6**      Entire Agreement.  This Agreement, including the exhibits and schedules hereto, contains the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

**Section 10.7**      Further Assurances.  Each party agrees that it will execute and deliver such other documents and take such other action, whether prior or subsequent to the

NYI-4323934v2
AA\116676v12

Closing, as may be reasonably requested by the other party to consummate the transaction contemplated by this Agreement. The provisions of this Section 10.7 shall survive the Closing.

      **Section 10.8**    <u>Counterparts</u>. This Agreement may be executed in counterparts, all such executed counterparts shall constitute the same agreement, and the signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

      **Section 10.9**    <u>Severability</u>. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any party hereunder.

      **Section 10.10**    <u>Applicable Law</u>. This Agreement and the Related Documents shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflicts of law principles. This Section 10.10 shall survive the Closing or any earlier termination of this Agreement.

      **Section 10.11**    <u>Third-Party Beneficiary</u>. Except with respect to the obligations to make payments to Creditor contained in Sections 1.4 and 9.1 and to DCB in Section 1.4, this Agreement and the Related Documents are and will be for the benefit of Seller, Purchaser and Escrow Agent only and, subject to the provisions of Section 10.2 above, are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or the Related Documents.

      **Section 10.12**    <u>Captions</u>. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section hereof.

      **Section 10.13**    <u>Construction</u>. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that any normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

      **Section 10.14**    <u>Recordation</u>. The Seller agrees to cooperate with Purchaser to enable Purchaser to record a memorandum or notice of this Agreement and shall within four (4) days after the Effective Date execute and deliver to Purchaser such memorandum or notice in recordable form and such other documents required in connection therewith by the New York City Register in order to record the same. The memorandum or notice shall contain such information as is required by the New York Real Property Law and shall be in such form as is reasonably acceptable to Seller and Purchaser.

      **Section 10.15**    <u>Waiver of Jury Trial</u>. Seller and Purchaser hereby waive trial by jury in any action, proceeding or counterclaim brought by any party against another party on any matter arising out of or in any way connected with this Agreement. The terms and provisions of this Section 10.15 shall survive the Closing or any earlier termination of this Agreement.

NYI-4323934v2
AA\116676v12

**Section 10.16**     Attorneys' Fees.  In the event any dispute between the parties hereto regarding this Agreement or any Related Documents should result in litigation, the prevailing party in such litigation shall be reimbursed for all reasonable costs, including, without limitation, reasonable attorneys' fees.  The terms of this Section 10.16 shall survive the Closing or any earlier termination of this Agreement.

**Section 10.17**     Confidentiality.  Each party agrees that, except as otherwise set forth in this Agreement or required by law or legal process, until Closing, it shall keep the contents of this Agreement and any information related to the transaction contemplated hereby confidential (except that Purchaser and Seller may disclose such data and information to their respective employees, lenders, consultants, accountants and attorneys, provided that such persons agree to treat such data and information confidentially).  The provisions of this Section 10.17 shall survive the Closing or any earlier termination of this Agreement.

**Section 10.18**     Default.  If Seller shall fail or refuse to close title and otherwise consummate the transactions contemplated hereby and perform its obligations as required by the terms of this Agreement, then Purchaser shall have the right to require specific performance.  If Purchaser shall default in the performance of its obligation under this Agreement to purchase the Property, the sole remedy of Seller shall be to terminate this Agreement and retain the proceeds of the Deposit and any interest and other income thereon as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

**Section 10.19**     Amended and Restated Agreement.  This Agreement amends and restates that certain Purchase and Sale Agreement, dated as of October 14, 2010, between Seller and Purchaser.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

NYI-4323934v2
AA\116676v12

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:

556 HOLDING LLC, a New York limited liability company

By:   KDMJ Realty Inc., a New York Corporation, its managing member

By: _Dorothea Keeser_
Name: Dorothea Keeser
Title:  President

PURCHASER:

Albanese Development Corporation, a New York corporation

By: _Christopher V. Albanese_
Name:  Christopher V. Albanese
Title:   Principal

AGREED TO AND ACCEPTED
ESCROW AGENT:
Stewart Title Insurance Company

By: _____
Name: _____
Title: _____

[Signature Page]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:

556 HOLDING LLC, a New York limited liability company

By:    KDMJ Realty Inc., a New York Corporation, its managing member

By: _____
Name: Dorothea Keeser
Title:   President

PURCHASER:

Albanese Development Corporation, a New York corporation

By: _____
Name:  Christopher V. Albanese
Title:   Principal

AGREED TO AND ACCEPTED
ESCROW AGENT:
Stewart Title Insurance Company

By: _____
Name: _Harold S Boxer_
Title: _VP + Sr Agency Counsel_

[Signature Page]

## EXHIBIT A

### Legal Description of the Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 22nd Street with the easterly side of 11th Avenue as said easterly side of 11th Avenue is shown on the State of New York Appropriation Map recorded in Reel 2836 page 631 and as described in the Notice of Appropriation recorded in Reel 2836 page 628; and

RUNNING THENCE easterly along the southerly side of West 22nd Street, 100 feet;

THENCE southerly and parallel with the said easterly side of 11th Avenue, 98 feet 8 inches to the center line of the block;

THENCE westerly parallel with the southerly side of West 22nd Street and along the center line of the block, 95 feet 3 inches to the said side of 11th Avenue;

THENCE northwesterly along the said easterly side of 11th Avenue, the following two (2) courses and distances:

(1)     On a line forming an angle on its northerly side with the preceding course of 110 degrees 27 minutes 29 seconds, a distance of 13.59 feet; and

(2)     On a line forming an angle on its easterly side with the preceding course of 159 degrees 32 minutes 31 seconds, a distance of 86.07 feet to the corner aforesaid, the point of BEGINNING.

# EXHIBIT B

Form of Lease Agreement

[SEE ATTACHED]

AGREEMENT OF LEASE

BETWEEN

[PURCHASER],

AS LANDLORD

AND

556 HOLDING LLC

AS TENANT

DATED:  AS OF NOVEMBER __, 2010

PREMISES:

556 WEST 22nd STREET (a/k/a 154 11th AVENUE)
NEW YORK , NEW YORK 11801

# TABLE OF CONTENTS

**Page**

ARTICLE 1  PREMISES AND TERM OF LEASE..................................................................1

ARTICLE 2  DEFINITIONS.................................................................................................1

ARTICLE 3  RENT ..............................................................................................................3

ARTICLE 4  TAXES AND OTHER CHARGES  (Impositions).......................................3

ARTICLE 5  DELAY DAMAGES.......................................................................................5

ARTICLE 6  LATE CHARGE/DEFAULT RATE................................................................7

ARTICLE 7  INSURANCE..................................................................................................7

ARTICLE 8  USE OF FIRE INSURANCE PROCEEDS ...................................................8

ARTICLE 9  INTENTIONALLY OMITTED.....................................................................9

ARTICLE 10  INTENTIONALLY OMITTED....................................................................9

ARTICLE 11  ASSIGNMENT, SUBLETTING, ETC.........................................................9

ARTICLE 12  INTENTIONALLY OMITTED....................................................................9

ARTICLE 13  REPAIRS ....................................................................................................10

ARTICLE 14  CHANGES AND ALTERATIONS AND ADDITIONS............................11

ARTICLE 15  REQUIREMENT OF PUBLIC AUTHORITIES AND OF INSURANCE
UNDERWRITERS AND POLICIES .........................................................13

ARTICLE 16  FIXTURES AND ARTICLES OF PERSONAL PROPERTY............................13

ARTICLE 17  DISCHARGE OF LIENS.............................................................................14

ARTICLE 18  NO REPRESENTATIONS BY LANDLORD.............................................15

ARTICLE 19  LANDLORD NOT LIABLE FOR INJURY OR DAMAGE....................15

ARTICLE 20  INDEMNIFICATION OF LANDLORD....................................................15

ARTICLE 21  LANDLORD'S RIGHT OF INSPECTION AND ACCESS................................16

ARTICLE 22  LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS.................17

ARTICLE 23  NO ABATEMENT OF RENT......................................................................18

ARTICLE 24  PERMITTED USE: NO UNLAWFUL OCCUPANCY.......................................18

ARTICLE 25  DEFAULTS, CONDITIONAL LIMITATIONS, REMEDIES, ETC. .................19

ARTICLE 26  NOTICES.....................................................................................................23

ARTICLE 27  CONDEMNATION.....................................................................................24

ARTICLE 28  BROKER......................................................................................................24

ARTICLE 29  SIGNS ........................................................................................................25

ARTICLE 30  INTENTIONALLY OMITTED..................................................................25

ARTICLE 31  CERTIFICATES BY LANDLORD AND TENANT ...........................................25

ARTICLE 32  LANDLORD'S CONSENTS ..............................................................................26

ARTICLE 33  SURRENDER AT END OF TERM; HOLDOVER ...........................................26

ARTICLE 34  NO ORAL AGREEMENTS ...............................................................................26

ARTICLE 35  QUIET ENJOYMENT .......................................................................................27

ARTICLE 36  SUBORDINATION ...........................................................................................27

ARTICLE 37  INVALIDITY OF CERTAIN PROVISIONS .....................................................27

ARTICLE 38  MISCELLANEOUS ..........................................................................................27

EXHIBIT A

# AGREEMENT OF LEASE

Agreement of Lease (this "Lease") made as of this ____day of November 2010, between **[PURCHASER \*]**, a _____, having an office at c/o Albanese Development Corporation, 1050 Franklin Avenue, Garden City, New York 11530 (the "Landlord"), and **556 HOLDING LLC**, a New York limited liability company, having an address at 556 West 22nd Street, New York, New York 10011, (the "Tenant").

## ARTICLE 1

## PREMISES AND TERM OF LEASE

In consideration of the covenants and agreements hereinafter set forth to be kept and performed, Landlord does hereby demise and lease to Tenant, and Tenant does hereby hire and take from Landlord, the building commonly known by the street address 556 West 22nd Street (a/k/a 154 11th Avenue), New York, New York (the "Premises"), subject to all existing liens, charges, encumbrances and matters of record and upon the terms and conditions hereinafter set forth.

The term of this Lease shall commence on November _____, 2010, (the "Commencement Date") and shall end on December 31, 2011 (the "Expiration Date"), unless such term shall be sooner terminated as hereinafter provided. Effective as of the Expiration Date or as of any earlier date upon which this Lease terminates in accordance with its terms, as the case may be, Tenant, all Other Occupants (hereinafter defined) and all other persons and entities claiming through or under Tenant, shall be deemed to have unconditionally and irrevocably surrendered their respective right to remain in possession and/or occupancy of the Premises.

## ARTICLE 2

## DEFINITIONS

The terms defined in this Article shall, for all purposes of this Lease and all agreements supplemental hereto, have the meanings herein specified.

(a)     **"Default"** shall mean any condition or event which constitutes or would constitute, after notice or lapse of time, or both, an Event of Default.

(b)     **"Designated Occupant"** shall mean any person or entity deriving any real property interest in the Premises from Tenant as of October 14, 2010.

(c)     **"Environmental Requirement"** shall collectively mean all present and future laws, statutes, ordinances, rules, regulations, orders, codes, licenses, permits, decrees, judgments, directives or the equivalent in effect at any time during the term of this Lease, of or by any Governmental Authority having jurisdiction over the Premises and relating to or addressing the protection of the environment or human health.

(d)     **"Equipment"** shall mean and include, but shall not be limited to, all machinery, engines, dynamos, boilers, elevators, radiators, air conditioning compressors, ducts,

pipes, conduits and fittings.

(e) **"Event of Default"** shall have the meaning provided in Section 25.01.

(f) **"Governmental Authority"** shall mean the federal government, or any state or other political subdivision thereof, or any agency, court or body of the federal government, or any state or other political subdivision thereof, exercising executive, legislative, judicial, regulatory or administrative functions.

(g) **"Hazardous Material"** shall mean any material or substance that, whether by its nature or use, is now or shall, at any time during the term of this Lease, be defined as a hazardous waste, hazardous substance, pollutant or contaminant under any Environmental Requirement, or which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, or otherwise hazardous and which is now or shall, at any time during the term of this Lease, be regulated under any Environmental Requirement, or which is or contains solvents, petroleum, gasoline, diesel fuel or another petroleum hydrocarbon product.

(h) **"Impositions"** shall have the meaning provided in Section 4.01.

(i) **"Improvements"** shall mean the building, Equipment (as defined in subsection (d) above), fixtures and appurtenances of every kind and description now existing or at any time hereafter erected, constructed, affixed or attached to or placed in or upon the Premises and any and all alterations, renewals and replacements thereof, additions thereto and substitutes therefor.

(j) **"Landlord"** shall mean only the owner of the Premises at the time in question, so that with respect to any sale(s) or transfer(s) of the Premises, the seller or transferor shall be and hereby is entirely freed and relieved of all agreements, covenants and obligations of Landlord hereunder and it shall be deemed and construed, without further agreement between the parties or their successors in interest or between the parties and the purchaser or transferee on any such sale or transfer, that such purchaser or transferee has assumed and agreed to carry out any and all agreements, covenants and obligations of Landlord hereunder accruing from and after the date of the respective sale or transfer.

(k) "**Mortgage**" shall mean any mortgage or deed of trust, created by Landlord and constituting a lien on the Premises.

(l) **"Other Occupants"** shall have the meaning provided in Section 5.01.

(m) **"Rental"** shall have the meaning provided in Section 3.03.

(n) **"Tenant"** shall mean 556 Holding LLC.

(o) **"Unavoidable Delays"** shall mean delays due to strikes, lockouts, acts of God, inability to obtain labor or materials due to governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other similar causes beyond the control of Tenant.

## ARTICLE 3

## RENT

**Section 3.01.** Tenant shall not pay any fixed monthly or annual rent for the Premises. However, Tenant shall pay all costs, expenses and obligations of every kind and nature whatsoever (whether now existing or hereafter arising, or whether beyond the contemplation of the parties,) arising out of or in connection with the use and occupancy of the Premises in accordance with this Lease and Landlord shall not have any expenses whatsoever in connection with the use and occupancy of the Premises.

**Section 3.02.** Tenant shall reimburse Landlord, upon demand, for all reasonable costs and expenses, including reasonable attorney's fees and disbursements, paid or incurred by Landlord, in curing any Default of Tenant or arising out of any indemnity given herein by Tenant to Landlord.

**Section 3.03.** Except for Delay Damages (hereinafter defined), all amounts payable by Tenant pursuant to this Lease (including, but not limited to amounts payable under this Article) shall be deemed to constitute rent under this Lease, and hereinafter are referred to collectively as "Rental". Except as otherwise provided herein, all Rental and all other sums, costs, expenses, charges and payments that Tenant assumes or agrees to pay under this Lease, shall be paid as provided in this Lease and, without notice or demand (except as may be specifically provided to the contrary in this Lease) and without abatement, deduction, counterclaim or set-off.

## ARTICLE 4

## TAXES AND OTHER CHARGES

## (Impositions)

**Section 4.01.** Tenant covenants and agrees to pay, as hereinafter provided, the following items, costs and expenses in connection with the Premises:

(a)       all charges for public and private utilities used at the Premises (including, without limitation, gas, electricity, light, heat, air-conditioning, power, telephone, internet, data and communication services) during the term of this Lease; and,

(b)       all general and special real estate taxes (including without limitation, any personal property taxes, sales taxes, use taxes, excise taxes, and the like); assessments; water and sewer rents rates and charges; levies; license and permit fees; fines and penalties and other governmental charges and any interest or costs with respect thereto, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever which at any time prior to or during the term of this Lease may be assessed, levied, confirmed, imposed upon, charged, grow or become due and payable out of or in respect of, or in connection with, or become a lien on, the Premises, or the sidewalks or streets in front of or adjoining the Premises, or any vault, passageway or space in, over or under such sidewalk or street, or any other appurtenances of the Premises, or any personal property, equipment or other facility used in the operation thereof, or the rent or income received therefrom, or any use or occupancy thereof, or the transaction

evidenced by this Lease, or the Rental payable hereunder, or any document to which Tenant is a party creating or transferring an interest or estate in the Premises (all of the items described in the this subsection are referred to collectively as "Impositions").

**Section 4.02.**  Tenant shall pay each Imposition or installment thereof, not later than thirty (30) days prior to the respective due date thereof, or thirty (30) days prior to the day that any fine, penalty, interest or cost may be added thereto or imposed by law for the non-payment thereof, as the case me be.  However, notwithstanding the preceding sentence, if any Imposition may, at the option of the taxpayer or the party upon whom the particular Imposition is imposed by law, be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Tenant may exercise the option to pay the same in such installments, provided such installment payments are not prohibited by the terms of any Mortgage.

**Section 4.03.**  Nothing herein contained shall require Tenant to pay municipal, state or federal income, inheritance, estate, succession, transfer or gift taxes of Landlord, or any corporate or other franchise tax imposed upon Landlord or any successor of Landlord.  However, notwithstanding the preceding sentence, if at any time during the term of this Lease, the method of taxation prevailing at the commencement of the term hereof shall be altered so that any new tax, assessment, levy (including but not limited to any municipal, state or federal levy), Imposition or charge, or any part thereof, shall be measured by or be based, in whole or in part, upon the Premises or this Lease and shall be imposed upon Landlord, then all such taxes, assessments, levies, Impositions or charges, or the part thereof to the extent that they are so measured or based, shall be deemed to be included within the term "Impositions" for the purposes of this Lease, to the extent that such Impositions would be payable if the Premises were the only property of Landlord subject to such Impositions, and Tenant shall pay and discharge the same in the manner provided in this Lease with respect to the payment of Impositions.

**Section 4.04.**  Any Imposition, other than an Imposition that is payable in installments, that relates to a fiscal period of the taxing authority, a portion of which occurs during the term of this Lease and a portion of which occurs after the end of the term of this Lease, shall (whether or not such Imposition shall be assessed, levied, confirmed, imposed upon or in respect of, or become a lien upon the Premises, or shall become payable, during the term of this Lease) be apportioned between Landlord and Tenant. The apportionment shall be made on a per diem basis (based upon the number of days in the applicable fiscal period for the particular Imposition), so that Tenant shall pay the per diem amount of the particular Imposition for each day of the applicable fiscal period up to and including the last day of the term of this Lease and Landlord shall pay the balance thereof commencing as of the day following the last day of the term of this Lease, provided, however, that Tenant shall not be entitled to receive any apportionment and shall be responsible for payment of the entire Imposition if there be a Default hereunder.

**Section 4.05.**  Tenant shall not have the right to contest the amount or validity, in whole or in part, of any Imposition.  However, if Landlord does not elect to contest the general real estate taxes for the 2011/2012 New York City fiscal year, then subject to Landlord's reasonable consent, Landlord shall contest, the amount or validity, in whole or in part, of the general real estate taxes for the 2011/2012 New York City fiscal year if: (i) Tenant gives written notice to Landlord requesting that Landlord contest said real estate taxes and said notice is delivered to Landlord not less than twenty (20) days prior to the last day provided by law, rule or regulation for the filing of such

protest with the City of New York; and (ii) at Landlord's option, Tenant either advances or reimburses to Landlord, within seven (7) days following Landlord's written request, from time to time, all out-of-pocket costs, expenses and disbursements that Landlord incurred or is required to pay in connection with the filing and/or prosecution of such protest, and the filing and/or prosecution, in Landlord's sole and absolute discretion, of any judicial tax certiorari proceedings and related appeals (collectively, "Proceedings") including, but not limited to, all costs and expenses in connection with appraisals and expert witnesses. Tenant shall cooperate timely with Landlord in any Proceedings brought by Landlord on its own or at Tenant's request. Upon the termination or conclusion of any Proceedings, it shall be the obligation of Tenant to pay the amount of such Imposition or part thereof as finally determined in such Proceedings, the payment of which may have been deferred during the prosecution of such Proceedings (provided, however, that if payment is not deferred during the prosecution of such Proceedings, Tenant shall pay the particular Imposition within the time period prescribed in Section 4.02 hereof) . If the Proceedings result in a deduction of the Impositions or a refund, Landlord shall pay over to Tenant any refund  or the portion thereof that is attributable to the fiscal period in which Tenant paid such Impositions, less all costs and expenses incurred by Landlord (and not previously reimbursed or advanced to Landlord by Tenant) in connection with such Proceedings, including, but not limited to, attorneys' fees and disbursements. If Landlord commences any Proceedings at Tenant's request and if Landlord's costs and expenses in connection with such Proceedings exceed the amount of any refund, attributable to the fiscal period in which Tenant paid or was required to pay such Impositions, then Tenant shall reimburse Landlord for all costs and expenses incurred by Landlord in connection with all such Proceedings and this obligation shall survive the Expiration Date or the sooner termination of this Lease. Tenant's obligation to pay the amount of such Imposition that was deferred during the prosecution of such Proceedings shall survive the Expiration Date or the sooner termination of this Lease. Notwithstanding anything to the contrary contained in this Lease, if, at Tenant's request, Landlord files a protest with the City of New York with regard to the general real estate taxes for the 2011/2012 New York City fiscal year, then, without regard to the outcome of the protest, Landlord shall not be under any obligation to pursue any further actions or proceedings in connection therewith, and the commencement and prosecution of any further proceedings, including any judicial tax certiorari proceedings and related appeals. shall at be subject to Landlord's sole and absolute discretion.

**Section 4.06.**  Any bill, certificate, statement or other document (collectively, "Statement") issued by the appropriate governmental official designated by law to make or issue the same or to receive payment of any Imposition or issued on behalf of any such governmental official by a person authorized to issue any such Statement, stating or reflecting that the particular Imposition has not been paid, in whole or in part, shall be prima facie evidence that such Imposition, or such unpaid portion thereof, as the case may be, is due and unpaid as of the date of such Statement.

## ARTICLE 5

## DELAY DAMAGES

**Section 5.01.**  Tenant acknowledges that Landlord intends to substantially renovate or demolish the Premises at the end of the term of this Lease and that Landlord will suffer substantial damages if Tenant or any Designated Occupant or any other person or entity occupying or having

the right to occupy or claiming the right to occupy all or any portion of the Premises, including, but not limited to, Dorothea Keeser with respect to her occupancy of a caretaker apartment at the Premises (the "Caretaker Apartment") pursuant to the Caretaker's Apartment Declaration, dated February 12, 2001, that was recorded in the New York County Office of the Register of The City of New York on February 14, 2001 in Reel 3239, page 522 (the Designated Occupants and all such other persons and entities are hereinafter referred to collectively as "Other Occupants") fail to vacate and surrender possession of the Premises in accordance with the provisions of this Lease by the end of the term of this Lease. To secure Tenant's performance of its obligations under this Lease, including, but not limited to, the obligation to vacate and surrender possession and to cause all Other Occupants to vacate and surrender possession of the Premises by the end of the term of this Lease: (i) a portion of the purchase price in the amount of Four Million Three Hundred Fifty Thousand and 00/100 Dollars ($4,350,000.00) (the "Post-Closing Payment") that would otherwise be payable by Landlord to Tenant under that certain Purchase and Sale Agreement, made as of October 14, 2010, between Tenant, as "Seller" and Albanese Development Corporation, as "Purchaser" (with respect to which, Albanese Development Corporation assigned all of its right, title and interest to the Landlord named in this Lease) (the "Purchase and Sale Agreement"), shall not be paid to Tenant at the Closing (as said term is defined in the Purchase and Sale Agreement) and shall be deferred and paid to Tenant upon Tenant's compliance with Tenant's obligations under this Lease to vacate and surrender possession and cause all Other Occupants to vacate and surrender possession of the Premises to Landlord in accordance with the terms of this Lease; and (ii) Tenant shall pay to Landlord, as liquidated damages for the use and occupancy of the Premises during the period that Tenant or any Other Occupants hold over and remain in possession of the Premises beyond the end of the term of the Lease and to compensate Landlord for Landlord's other damages in connection therewith, the amount of $5,500 per day (the "Per Diem Amount") for each day that Tenant or any Other Occupant fails to vacate and surrender possession of the Premises to Landlord by the end of the term of this Lease and in accordance with the provisions of this Lease (the aggregate amount payable by Tenant by reason of any such failure is herein referred to as "Delay Damages"), it being agreed that the exact amount of Landlord's damages in the event that Tenant or any Other Occupant fails to vacate and surrender possession of the Premises by the end of the term of this Lease and in accordance with the provisions of this Lease, might be difficult or impossible to ascertain and that the Delay Damages are fair and reasonable and are not a penalty. Landlord may offset against the Post-Closing Payment, the amount of any Delay Damages payable by Tenant pursuant to this Section and any other amounts payable by Tenant to Landlord pursuant to the provisions of this Lease (the amount of such offset is herein referred to as the "Offset Amount"). The payment of any Delay Damages by offset or otherwise shall not serve to, or be deemed to, stay, extend, reinstate or renew this Lease or authorize or permit the use and/or occupancy of the Premises or any portion thereof by Tenant or any Other Occupants. Tenant's obligation to pay to Landlord the amount of any Delay Damages payable by Tenant pursuant to this Section shall survive the Expiration Date or the sooner termination of this Lease.

Section 5.02. Nothing herein contained shall be deemed to permit Tenant or any Other Occupant to retain possession of the Premises after the expiration or earlier termination of this Lease. The acceptance by Landlord of any payments from Tenant after the expiration or earlier termination of this Lease shall not preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding (such being an "agreement expressly providing otherwise" within the meaning of Section 232-c of the Real Property Law of the State of New York), or from

commencing and prosecuting any actions or proceedings in the United States Bankruptcy Court, Southern District of New York (hereinafter, "United States Bankruptcy Court"), nor shall any such acceptance be deemed anything other than on acceptance of payment on account of the amounts to be paid by Tenant in accordance with the provisions of this Article.

## ARTICLE 6

## LATE CHARGE/DEFAULT RATE

If payment of any amount required to be paid by Tenant to Landlord under this Lease, is not paid within five (5) days from the date that the particular amount is due and payable under this Lease, then said amount shall bear interest, from the due date thereof to the date that said amount is paid to Landlord, at a rate equal to the higher of: (i) eighteen (18%) percent per annum or (ii) two (2%) percent above the so-called prime or base rate established, from time to time, by Citibank, N.A. as its interest rate for unsecured loans, but in no event greater than the highest lawful rate from time to time in effect (the "Default Rate"). No failure by Landlord to insist upon the strict performance by Tenant of Tenant's obligations to pay interest in accordance with this provision shall constitute a waiver by Landlord of its right to enforce the provisions of this Article in any other instance thereafter occurring. The provisions of this Article 6 shall not be construed in any way to extend the grace periods or notice periods provided for in this Lease.

## ARTICLE 7

## INSURANCE

**Section 7.01.** During the term of this Lease, Tenant shall be required to continue and maintain, at Tenant's cost and expense, the commercial general liability insurance and other coverages described in, and having the limits of liability set forth in, the Certificate of Liability Insurance attached hereto as part of Exhibit A. The insurance required by this Section shall be issued by an insurance company licensed to do business in the State of New York, shall name each of Landlord and any parties that Landlord may designate, from time to time, as an additional insured or as a mortgagee, as the case may be, shall contain a waiver by the insurance carrier of any right of subrogation against Landlord or any other party insured under the policies, and shall provide that no cancellation of the policies shall be effective unless ten (10) days prior written notice has been given for non-payment of the insurance premiums, or thirty (30) days prior written notice has been given for any other event, to Landlord and all other parties insured under the policies. Tenant shall deliver duplicates of the policies or certificates evidencing the same, to Landlord on the Commencement Date together with proof satisfactory to Landlord that the full premiums have been paid by Tenant. New or renewal policies replacing any policies expiring during the term of this Lease shall be delivered to Landlord at least thirty (30) days before the date of expiration, together with proof satisfactory to Landlord that the full premiums have been paid by Tenant. Upon Tenant's default in paying the premiums or other charges for the insurance required by this Section, Landlord, in addition to all other rights and remedies provided to Landlord under this Lease, may procure the insurance and/or pay the premiums for the account of Tenant and Tenant shall reimburse Landlord for the amount of the premiums paid by Landlord within ten (10) days from the date of Landlord's written demand accompanied by evidence of the premiums paid by Landlord. Premiums on policies shall not be financed in any manner, provided, however, that

Tenant may pay premiums in annual installments so long as same does not constitute a default under any Mortgage.

**Section 7.02.** Tenant shall reimburse Landlord for the costs and expenses incurred by Landlord, from time to time, to obtain and maintain the property insurance that Landlord obtains and maintains with respect to the Premises, provided, however, the amount of the reimbursement shall not exceed the premium that would be charged for insurance coverage substantially equivalent to the insurance coverage described in the Certificate of Property Insurance attached hereto as part of Exhibit A. All reimbursements payable by Tenant to Landlord in accordance with this Section shall be paid to Landlord within ten (10) days from the date of Landlord's written demand for same accompanied by proof of the premium paid by Landlord.

**Section 7.03.** Tenant and Landlord shall cooperate in connection with the collection of any insurance moneys that may be due in the event of loss and Tenant shall execute and deliver to Landlord such proofs of loss and other instruments which may be required for the purpose of obtaining the recovery of any such insurance moneys.

# ARTICLE 8

## USE OF FIRE INSURANCE PROCEEDS

(a)     If the Premises are destroyed or damaged in whole or in part by fire or other casualty and the reasonably estimated costs of restoration exceeds the sum of $500,000, Landlord shall have the right in its sole and absolute discretion to elect to either (i) restore, repair and rebuild the Premises or (ii) terminate this Lease, in which event, Landlord shall have no obligation to restore, repair or rebuild the Premises or any portion thereof or to pay any of the costs or expenses thereof and Tenant shall have no claim against Landlord in connection with Landlord's election to terminate this Lease pursuant to this provision. If the Premises is damaged in part by fire or other casualty and the reasonably estimated costs of restoration is equal to or less than the sum of $500,000, Landlord shall use the property insurance proceeds to restore, repair and rebuild the Premises. If Landlord elects to terminate this Lease in accordance this Section, Landlord shall do so by giving written notice thereof to Tenant stating that this Lease and the term hereby demised shall expire and terminate on the date specified in such notice. Upon the date specified in such notice, this Lease and the term hereby demised and all rights of the Tenant under this Lease shall expire and terminate as if that date were the date herein definitely fixed for the end of the term of this Lease, and by said date, Tenant shall quit and surrender the Premises and shall cause all Other Occupants to quit and surrender the Premises in accordance with the provisions of this Lease and Tenant shall remain liable as provided in this Lease. Tenant shall give Landlord prompt notice of any damage or destruction to the Premises by fire or other casualty.

(b)     The provisions of this Article shall be deemed an express agreement governing any case of damage or destruction of the Premises by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, providing for such a contingency in the absence of an express agreement, and/or any other law of like import, now or hereafter in force, shall not have any application in such case, is hereby waived by Tenant and the provisions of this Article shall govern and control in lieu thereof.

## ARTICLE 9

## INTENTIONALLY OMITTED

## ARTICLE 10

## INTENTIONALLY OMITTED

## ARTICLE 11

## ASSIGNMENT, SUBLETTING, ETC.

**Section 11.01.** Tenant shall not voluntarily, involuntarily, by operation of law or otherwise: (i) assign, sell, transfer or otherwise dispose of, in whole or in part, this Lease or the estate created hereby, or (ii) mortgage, pledge, encumber or otherwise hypothecate this Lease in any manner whatsoever. Notwithstanding anything to the contrary contained in this Section, any Designated Occupant may remain in possession of the Premises or a portion thereof, until the end of the term of this Lease and, subject to Landlord's prior written consent that shall not be unreasonably withheld or delayed, Tenant may sublet, license or grant or enter into other forms of occupancy agreements for all or any portion of the Premises for museum or museum related and other legal uses, provided that the term of each respective sublease, license or other form of occupancy agreement does not extend beyond the Expiration Date. Also, notwithstanding anything to the contrary contained in this Section, to facilitate the presentation from time to time, of special events of short duration, Tenant may, without Landlord's prior written consent, enter into bona fide license agreements for all or any portion of the Premises for museum or museum related or other legal uses on condition that: (i) each such license agreement provides that: (a) it shall terminate upon the earlier of: (x) twenty (20) days after the date of the commencement of licensee's right to occupy all or any portion of the Premises; or (y) the Expiration Date or the sooner termination of this Lease; and (b) it may not be assigned by the licensee; and (ii) Tenant delivers a fully executed counterpart of each such license agreement to Owner at least five (5) days prior to the date that the licensee's right to occupy all or any portion of the Premises commences.

**Section 11.02.** Any attempted sale, transfer assignment, sublet or other disposition of this Lease or Tenant's estate hereby granted in violation of this Article shall be void and of no force or effect and Landlord shall be entitled to collect from Tenant all damages, costs, expenses incurred by Landlord arising out of a breach of this Article. Tenant's obligation to pay to Landlord said damages, costs, expenses shall survive the Expiration Date or the sooner termination of this Lease.

## ARTICLE 12

## INTENTIONALLY OMITTED

# ARTICLE 13

## REPAIRS

**Section 13.01.** Throughout the term of this Lease, Tenant, at its sole cost and expense, shall take good care of the Premises, including, without limiting the generality of the foregoing, all equipment, fixtures and articles of personal property therein or thereon and all sidewalks, grounds, vaults, sidewalks, railings, gutters, alleys and curbs in front of or adjacent to the Premises and will put, keep and maintain the same in good and safe order and condition, and make all repairs therein and thereon, interior and exterior, structural and nonstructural, ordinary and extraordinary, and unforeseen and foreseen, necessary to keep the same in good and safe order and condition, howsoever the necessity or desirability therefor may occur, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise. Tenant shall not commit or suffer, and shall use all reasonable precaution to prevent, waste, damage, or injury to the Premises. When used in this Section, the term "repairs" shall include all necessary replacements, renewals, alterations and additions. All repairs made by Tenant shall be equal in quality and class to the original work. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be obligated to make any repairs to the Premises for any damages thereto caused by Landlord or Landlord's members, managers, partners, officers, directors, employees, agents, architects, engineers, appraisers, lenders, prospective lenders, investors, representatives and contractors (including, but not limited to any environmental consultants of Landlord) (collectively, "Landlord's Representatives") and said repairs shall be the obligation of Landlord and shall be undertaken promptly and at Landlord's sole cost and expense.

**Section 13.02.** Tenant shall also, at its own cost and expense: (i) keep clean and free from dirt, snow, ice, rubbish, obstructions and encumbrances, the sidewalks, areas, vaults, sidewalks, railings, gutters, alleys and curbs in front of or adjacent to the Premises; and (ii) maintain the Premises free and clear of, and promptly remove and cure all violations issued or noted by any Governmental Authority with respect to the Premises that arise from or in connection with the use of the Premises by Tenant or by any Other Occupant and/or their respective employees, agents, invitees, licensees, guests or contractors or the use or occupancy of the Caretaker Apartment (collectively, "Violations"). Tenant shall promptly pay all fines, penalties and other governmental charges and any interest or costs in connection with said Violations and deliver evidence of said payment to Landlord upon Landlord's request. The obligation of Tenant to pay the amounts provided for in this Section shall survive the Expiration Date or the sooner termination of this Lease. Notwithstanding anything to the contrary contained in this Lease: (i) if Tenant cannot cure any Violation issued or noted by any Governmental Authority with respect to the Caretaker Apartment within the applicable period of time provided by law, then by the expiration of said time period, Tenant shall cause Dorethea Kesser and all other occupants of the Caretaker Apartment to permanently vacate and surrender possession of the Caretaker Apartment and Tenant shall permanently maintain the Caretaker Apartment as vacant and unoccupied; and, (ii) Tenant shall not be obligated to correct any Violations caused by any condition created by Landlord or any of Landlord's Representatives or pay any fines, penalties and other governmental charges and any interest or costs in connection therewith and the correction of said Violations shall be the obligation

of Landlord and shall be undertaken promptly at Landlord's sole cost and expense.

**Section 13.03.** Except as may be expressly provided in this Lease to the contrary: (X) Landlord shall: (i) not be required to furnish any services, utilities or facilities whatsoever to the Premises; and (ii) not have any duty or obligation to make any alteration, change, improvement, replacement or repair to, the Premises or to demolish any buildings or improvements now or hereafter erected on the land on which the Premises are located; and (Y) Tenant assumes the full and sole responsibility for the condition, operation, repair, alteration, improvement, replacement, maintenance and management of the Premises.

# ARTICLE 14

# CHANGES AND ALTERATIONS AND ADDITIONS

Tenant shall not make any alterations, improvements or additions to the Premises (collectively, "Alterations") without Landlord's prior written consent, that shall not be unreasonably withheld or delayed. If Landlord consents to the making of any Alterations, Tenant shall comply with the following requirements:

(a)     No Alterations shall be undertaken until Tenant shall have obtained and paid for all required permits, consents and authorizations of all New York City municipal and governmental subdivisions, departments, commissions, boards and officers having jurisdiction over the Premises (collectively, "NYC Authorities"). Landlord shall not unreasonably refuse to join in the application for such permits or authorizations. A duplicate original of all required permits and authorizations shall be delivered to Landlord prior to the commencement of any Alterations.

(b)     All Alterations shall be made promptly (Unavoidable Delays excepted) and in good and workmanlike manner and in compliance with all applicable permits and authorizations and with all applicable laws, ordinances, orders, rules, regulations and requirements of all NYC Authorities and in accordance with the orders, rules, regulations and requirements of any Board of Fire Underwriters having jurisdiction over the Premises or any similar body exercising similar functions.

(c)     The cost of any Alterations shall be paid in cash or its equivalent, so that the Premises shall at all times be free of liens for labor and materials supplied or properly claimed to have been supplied to the Premises.

(d)     Prior to commencement of any Alterations: (i) Tenant shall give notice to Landlord of Tenant's intention to enter into the Construction Contract and requesting that Landlord advise Tenant of the names of the parties, in addition to Landlord, that shall be named as an additional insured in the commercial general liability insurance policy that the Contractor shall obtain and maintain throughout the performance of the Alterations; and (ii) Tenant and the contractor selected by Tenant to perform the particular Alterations (the "Contractor") shall enter into a written contact for the construction of the Alterations (the "Construction Contract"). The Construction Contract shall: (i) require the Contractor to obtain and maintain throughout the performance of the Alterations, a commercial general liability policy that shall: (a) name each of Landlord and any parties that Landlord may, from time to time, designate in writing to Tenant, as an

additional insured; (b) provide for at least the same coverages and limits of liability that are described in the Certificate of Liability Insurance attached hereto as part of Exhibit A; and, (c) otherwise comply with the provisions and requirements set forth in Article 7 hereof; and (ii) provide that to the fullest extent permitted by law, that the Contractor shall indemnify, defend and hold harmless Landlord and each other party designated by Landlord as an additional insured, and their respective consultants, agents, employees, officers, directors, managers, members, shareholders and partners (collectively, the "Indemnitees"), from and against any and all claims, damages, losses and expenses, including but not limited to attorneys' fees and disbursements, arising out of or resulting from the performance of the Alterations, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Alterations itself), including the loss of use resulting therefrom, to the extent caused, in whole or in part, by the wrongful or negligent acts or omissions of the Contractor, any of its subcontractors or anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by any Indemnitee.

(e)    No work in connection with the performance of any Alterations shall be commenced until Tenant shall have delivered to Landlord insurance policies or certificates therefor issued by responsible insurers acceptable to Landlord, together with evidence that all premiums in connection therewith have been paid in full for Workmen's Compensation insurance covering all persons employed in connection with the performance of the Alterations and with respect to whom death or bodily injury claims could be asserted against Landlord, Tenant or the Premises.

(f)    If under the provisions of any fire, liability or other insurance policy or policies then covering the Premises or any part thereof, any consent to such Alterations by said insurance company or companies issuing such policy or policies shall be required to continue and keep such policy or policies in full force and effect, Tenant shall, prior to commencement of work in connection with the Alterations, obtain such consents and pay any additional premiums or charges therefor that may be imposed by said insurance company or companies.

(g)    At least ten (10) days before the commencement of any work in connection with the proposed Alterations, Tenant shall furnish to Landlord the following:

(i)    A cash deposit in the amount of the estimated cost of the Alterations or other security reasonably acceptable to Landlord, guaranteeing completion thereof within a reasonable time, free and clear of all liens, encumbrances, chattel mortgages, conditional bills of sale and other charges, and in accordance with the plans and specifications for the Alterations approved by Landlord, if said plans and specifications are required by applicable laws, rules, orders, ordinances, regulations, statutes and requirements of any federal, state and New York City authorities and their respective departments and bureaus having jurisdiction over the Premises or, if such plans and specifications are not required, in accordance with such written description of the nature and scope of the Alterations and the materials and equipment to be used in connection therewith as shall be reasonably acceptable to Landlord;

(ii)    Complete plans and specifications for the proposed Alterations if said plans and specifications are required by applicable laws, rules, orders, ordinances, regulations, statutes and requirements of any federal, state and New York City authorities and their respective

departments and bureaus having jurisdiction over the Premises or, if such plans and specifications are not required, a written description of the nature and scope of the Alterations and the materials and equipment to be used in connection therewith as shall be reasonably acceptable to Landlord;

(iii)  A fully executed counterpart of the Construction Contract together with duplicates of the policies or certificates evidencing the insurance described in subsections (d) and (e) of this Article.

(h)  All Alterations shall be carried out under the supervision of an architect or engineer licensed by the State of New York and selected by Tenant and reasonably approved in writing by Landlord. The estimates of cost made by such architect or engineer shall be binding upon both parties for all purposes of this Section. Following completion of the Alterations, Tenant shall, at its sole cost and expense, promptly: (i) obtain and deliver to Landlord, all temporary and permanent certificates of occupancy that are required in connection with the Alterations by all municipal and governmental subdivisions, departments, commissions, boards and officers having jurisdiction over the Premises; and (ii) deliver a copy of "as built" plans to Landlord.

## ARTICLE 15

## REQUIREMENT OF PUBLIC AUTHORITIES AND
## OF INSURANCE UNDERWRITERS AND POLICIES

During the term of this Lease and subject to the uses permitted under Section 11.01 of this Lease, Tenant shall, at its own cost and expense, promptly comply with all existing and future laws, rules, orders, ordinances, regulations, statutes and requirements of all federal, state and New York City authorities and their respective departments and bureaus having jurisdiction over the Premises and of any applicable Fire Rating Bureau or other body exercising similar functions, affecting or applicable to, or in connection with, the use and/or occupancy of the Premises by Tenant and/or any Other Occupants or their respective employees, agents, representatives, invitees, licensees, guests or contractors or requiring the removal of any encroachment that was neither a permitted exception under the Purchase and Sale Agreement nor created by Landlord or Landlord's Representatives, or affecting the safety of the Premises or the health or safety of Tenant and/or any Other Occupants or their respective employees, agents, representatives, invitees, licensees, guests or contractors or the occupancy of the Premises (whether or not the same involve or require any structural change or additions in or to the Premises, and irrespective of whether or not such changes or additions be required on account of any particular use to which the Premises, or any part thereof, may be put). Tenant shall also comply with any and all provisions and requirements of any fire, casualty, property, liability or other insurance policy required to be carried by Tenant under this Lease or carried by Landlord with respect to the Premises.

## ARTICLE 16

## FIXTURES AND ARTICLES OF PERSONAL PROPERTY

Tenant shall  not remove any Equipment or fixtures from the Premises without the prior written consent of Landlord.  Notwithstanding anything to the contrary contained herein, during the term of this Lease, Tenant may, from time to time, remove Tenant's personal property, removable

trade fixtures and goods and merchandise from the Premises without the prior written consent of Landlord.

## ARTICLE 17

## DISCHARGE OF LIENS

**Section 17.01.** Tenant shall not create or permit to be created any lien, encumbrance or charge upon the Premises or any part thereof or the income therefrom, and Tenant shall not suffer any other matter or thing whereby the estate, rights and interest of Landlord in the Premises or any part thereof might be impaired unless specifically permitted by this Lease or caused by Landlord or Landlord's Representatives.

**Section 17.02.** If any mechanic's, laborer's or materialman's lien shall at any time be filed against the Premises or any part thereof, Tenant shall cause the same to be discharged of record within thirty (30) days after notice of the filing thereof, or such shorter period as may be required under any Mortgage. If Tenant shall fail to cause such lien to be discharged within the applicable period, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in any such event Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of any judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Landlord together with all costs and expenses incurred by Landlord in connection therewith, together with interest thereon at the Default Rate from the respective dates of Landlord's making of the payment or incurring of the costs and expenses, shall constitute additional rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand. The obligation of Tenant to pay Landlord the amounts provided for in this Section shall survive the Expiration Date or the sooner termination of this Lease.

**Section 17.03.** Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to, or repair of, the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for, or permit the rendering of, any services or the furnishing of materials that would give rise to the filing of any lien against the Premises or any part thereof. Notice is hereby given that: (i) Landlord shall not be liable for any work performed or to be performed at the Premises for or on behalf of Tenant or any Other Occupants, or for any materials furnished or to be furnished at, to, or for the Premises, for or on behalf of Tenant or and/or any Other Occupants, and; (ii) no mechanic's or other lien for such work or materials shall attach to or affect the estate or interest of Landlord in and to the Premises.

**Section 17.04.** Except as may be expressly authorized by this Lease, Tenant shall have no power to do any act or make any contract or agreement that may create or be the foundation or basis for any lien, mortgage or other encumbrance upon the reversion or other estate of Landlord, or of any interest of Landlord in the Premises.

**Section 17.05.** Tenant covenants and agrees that it will not create or permit to be created any condition or do or permit to be done any act or thing which may be prohibited by the terms of any Mortgage, and that at its sole cost and expense it will comply with all of the terms, covenants and conditions thereof.

<h2 style="text-align:center">ARTICLE 18</h2>

<h3 style="text-align:center">NO REPRESENTATIONS BY LANDLORD</h3>

Tenant accepts the Premises in the existing "as is" condition and state of repair. Tenant acknowledges and agrees that: (i) no representations, statement or warranties, express or implied, have been made by or on behalf of Landlord in respect of: (a) the Premises; (b) the condition thereof; or (c) the use or occupancy of the Premises or any portion thereof that is permitted in accordance with applicable law, including, but not limited to, the use or occupancy of any Caretaker Apartment at the Premises for any purpose whatsoever; and (ii) Landlord shall in no event whatsoever be liable for any latent or patent defects in the Premises.

<h2 style="text-align:center">ARTICLE 19</h2>

<h3 style="text-align:center">LANDLORD NOT LIABLE FOR INJURY OR DAMAGE</h3>

Landlord shall not, in any event whatsoever, be liable for any injury or damage to any property or to any person, that occurs on, in or about the Premises and its appurtenances, nor for any injury or damage to the Premises or to any property belonging to Tenant, any Other Occupant or any other person or entity which may be caused by any fire, breakage, leakage or defect or by water, rain or snow that may leak into, issue or flow from any part of the Premises or by the use, misuse or abuse of any of the elevators, hatches, openings, installations, stairways, hallways, Equipment or Improvements or which may arise from any other cause, condition or circumstance whatsoever, except to the extent caused by the gross negligence of Landlord.

<h2 style="text-align:center">ARTICLE 20</h2>

<h3 style="text-align:center">INDEMNIFICATION OF LANDLORD</h3>

In addition to any other indemnification in favor of Landlord specifically provided in this Lease, Tenant shall indemnify and save harmless Landlord and Landlord's representatives against and from all liabilities, suits, obligations, fines, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys and other professional fees and disbursements, which may be imposed upon or incurred by or asserted against Landlord by reason of any of the following occurring during the term of this Lease (except to the extent that the following were caused by or due to the negligence of Landlord or Landlord's Representatives):

      (a)      any work or thing done in, on or about the Premises or any part thereof;

      (b)      any use, non-use, possession, occupation, alteration, repair, condition, operation, maintenance or management of the Premises or any part thereof or of any sidewalk, curb, vault, passageway or space adjacent thereto;

(c)     any tortuous or unlawful act on the part of Tenant, any Other Occupants or any of their respective employees, agents, invitees, licensees, guests, representatives or contractors;

(d)     any accident, injury (including death) or damage to any person or property occurring in, on or about the Premises or any part thereof or in, on or about any sidewalk, curb, vault, passageway or space adjacent thereto;

(e)     any failure on the part of Tenant or any Other Occupant to perform or comply with any of the covenants, provisions, agreements, terms or conditions contained in this Lease or in any sublease, license or other agreement to be performed by or complied with by Tenant or any Other Occupant;

(f)     any liability which may be asserted against Landlord or any lien or claim which may be alleged to have arisen against or imposed upon the Premises under any federal, state or local laws or regulations; and

(g)     any failure on the part of Tenant or any Other Occupant to keep, observe and perform any of the terms, covenants, agreements, provisions, conditions or limitations contained in any Mortgage, insurance policy or in any subleases or other contracts and agreements affecting the Premises, on their respective part to be kept, observed or performed.

The provisions of this Article and all other indemnity provisions elsewhere contained in this Lease shall survive the Expiration Date or the sooner termination of this Lease with respect to liability and/or claims accruing prior to the end of the term of this Lease.

## ARTICLE 21

## LANDLORD'S RIGHT OF INSPECTION AND ACCESS

**Section 21.01.** Landlord and Landlord's Representatives shall be permitted to enter and to have access to the Premises at all reasonable times, upon at least two (2) days prior notice, for the purpose of (i) examining and inspecting the same, (ii) taking measurements thereof, (iii) performing any environmental testing and/or remediation, (iv) making any necessary repairs thereto that Landlord is obligated to perform or has the right to perform under this Lease, (v) performing any work in the Premises that may be necessary by reason of Tenant's failure to perform any maintenance, repairs or other work or Tenant's failure to comply with Tenant's obligations under this Lease, and (vi) performing any necessary investigations, tests, or complying with any requirements of any Governmental Authority that Landlord is obligated to comply with. In addition, Landlord and Landlord's Representatives shall be permitted to enter the Premises in an emergency at any time and to have access to the basement at the Premises at all reasonable times, upon at least two (2) days prior notice, for the purpose of taking soil borings and/or performing any other environmental testing and/or sampling and for performing any environmental remediation work that may be required in Landlord's judgment or that may be required by any Governmental Authority or any lender, prospective lender, or investor. Landlord and Landlord's Representatives shall conduct such access to the Premises in a manner so as not to unreasonably interfere with the occupancy of Tenant or the Other Occupants at the Premises and shall be permitted to take all necessary materials, machinery and equipment into the Premises without the same constituting an

eviction. Tenant shall not be entitled to any abatement of Rental or any other amount nor to any damages by reason of loss or interruption of business or otherwise while Landlord and/or Landlord's Representatives are present at the Premises and/or performing any of the activities at the Premises that they are permitted to perform in accordance with this Lease. Landlord shall protect, defend, indemnify and save harmless Tenant from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses, imposed upon, incurred by or asserted against Tenant by reason of any negligent act or omission of Landlord or any of Landlord's Representatives performed or omitted in connection with any such access to the Premises herein permitted, including, without limitation, any court costs and reasonable litigation expenses. Landlord shall, prior to entering the Premises pursuant to this Section, provide to Tenant a certificate of insurance evidencing that Landlord maintains commercial general liability insurance in type, form and amount comparable to the coverages set forth in the Certificate of Liability Insurance attached hereto as part of Exhibit A.

**Section 21.02.** Nothing in this Article or elsewhere in this Lease shall imply any duty upon the part of Landlord to undertake any inspection or perform any work to be performed by Tenant; and performance thereof by Landlord shall not constitute a waiver of Tenant's default in failing to perform the same.

**Section 21.03.** Landlord shall also have the right to enter the Premises at all reasonable times during usual business hours for the purpose of showing same to prospective purchasers, tenants, occupants or mortgagees thereof.

## ARTICLE 22

## LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS

If Tenant shall at any time fail to pay any Imposition in accordance with the provisions hereof, or to obtain, pay for, maintain or deliver any of the insurance policies provided for in this Lease, or shall fail to make any other payment or perform any other act on its part to be made or performed under this Lease, then Landlord, without waiving or releasing Tenant from any obligation of Tenant contained in this Lease, may (but shall be under no obligation to); (i) pay any Imposition payable by Tenant pursuant to the provisions hereof, or, (ii) obtain, pay for and maintain any of the insurance policies provided for herein, or, (iii) make any other payment or perform any other act on Tenant's part to be made or performed as in this Lease provided. Landlord may enter upon the Premises in connection with undertaking or performing any of the foregoing acts and may take all such action thereon as may be necessary therefor.

All reasonable sums so paid by Landlord and all costs and expenses incurred by Landlord in connection with the performance of any such act, together with interest thereon at the Default Rate from the respective dates of Landlord's making of each such payment or incurring each such cost and expense, shall be paid by Tenant to Landlord on demand, upon presentation by Landlord of a written invoice or statement therefore. Any payment or performance by Landlord pursuant to the foregoing provisions of this Article shall not be, nor be deemed to be, a waiver or release of the breach or default of Tenant with respect thereto or of the right of Landlord to terminate this Lease, institute summary proceedings and/or take such other action as may be permissible hereunder in the event of breach or default by Tenant. Landlord shall not be limited, in the proof of any damages

which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force insurance as aforesaid, to the amount of the insurance premium or premiums not paid, but Landlord shall also be entitled to recover as damages for such breach, the uninsured amount of any loss and damages, costs and expenses of suit, including reasonable attorneys' fees, suffered or incurred by reason of damage to or destruction of the Premises.

## ARTICLE 23

## NO ABATEMENT OF RENT

There shall be no abatement, diminution or reduction of Rental or of the other obligations of Tenant hereunder under any circumstances.

## ARTICLE 24

## PERMITTED USE: NO UNLAWFUL OCCUPANCY

**Section 24.01.** Tenant and any Other Occupants shall only be permitted to use and occupy the Premises for an art museum, for museum related events and for any other lawful purpose.

**Section 24.02.** Notwithstanding the provisions of Section 24.01, Tenant shall not use or occupy, nor permit or suffer the Premises or any part thereof, to be used or occupied for any unlawful or illegal business, use or purpose, or in a manner which would cause structural injury to the Building, or for any business, use or purpose that in Landlord's sole discretion, is disreputable or hazardous, or in such manner as to constitute a nuisance of any kind, or in violation of any present or future governmental laws, ordinances, requirements, orders, directions, rules or regulations. Tenant shall, immediately upon the discovery of any such unlawful, illegal, disreputable or hazardous use, take all necessary steps, legal and equitable, to compel the discontinuance of such use and to remove from possession of the Premises any Other Occupants or other persons or entities guilty of, or responsible for, such unlawful, illegal, disreputable or hazardous use.

**Section 24.03.** Tenant will not suffer any act to be done or any condition to exist on the Premises or any portion thereof which may be hazardous or which may in law constitute a nuisance, public or private, or which may make void or voidable any insurance then in force with respect to the Premises.

**Section 24.04**. Tenant shall not suffer or permit the Premises or any portion thereof to be used by the public as such, without restriction or in such manner as might reasonably tend to impair title to the Premises or any portion thereof, or in such manner as might reasonably make possible a claim or claims of adverse usage or adverse possession by the public, as such, or of the implied dedication of the Premises or any portion thereof as public or quasi-public use.

**Section 24.05.** Tenant shall not use, store, maintain or permit any Hazardous Material to be used, stored, maintained or located on, in, or about the Premises in a manner that violates any Environmental Requirement. If Tenant receives any notice or advice from any Governmental Authority or any other source whatsoever with respect to any Hazardous Material on, from or

affecting the Premises, Tenant shall immediately notify Landlord thereof in writing. Tenant shall protect, defend, indemnify and save harmless Landlord from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses, imposed upon, incurred by or asserted against Landlord by reason of Tenant's failure to comply with the provisions of this Section, including, without limitation, the costs and expenses of any remedial action, reasonable legal and consultant fees, investigation and laboratory fees, court costs and reasonable litigation expenses. Any amounts payable by Tenant pursuant to this Section shall be paid to Landlord, as additional rent, within thirty (30) days following Landlord's demand. The obligation of Tenant to indemnify Landlord pursuant to this Article shall survive the Expiration Date or the sooner termination of this Lease.

## ARTICLE 25

## DEFAULTS, CONDITIONAL LIMITATIONS, REMEDIES, ETC.

**Section 25.01.** Each of the following events shall be an "Event of Default" hereunder:

(a)     Failure of Tenant to pay the Rental or to make any other payment of money, costs or expenses herein agreed to be paid by Tenant, when due, and the continuance of such failure for a period of five (5) days after written notice from Landlord specifying such failure;

(b)     Failure of Tenant to observe or perform one or more of the other terms, provisions covenants or agreements of this Lease and the continuance of such failure for a period of ten (10) days after written notice by Landlord specifying such failure (unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot by their nature reasonably be performed, done or removed, as the case may be, within such ten (10) day period, in which case no default shall be deemed to exist so long as Tenant shall have commenced curing the same within such ten (10) day period and shall diligently, continuously and in good faith prosecute the same to completion within thirty (30) days of such notice);

(c)     The filing of an application by Tenant in which Tenant consents to the appointment of a receiver, trustee or liquidator of itself or of all of its assets; or the filing by Tenant of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they become due; or the making by Tenant of a general assignment for the benefit of creditors; or the filing by Tenant of an answer admitting the material allegations of or consenting to or defaulting in answering a petition filed against it in any bankruptcy proceeding;

(d)     The entry of an order, judgment or decree by any court of competent jurisdiction  adjudging Tenant a bankrupt or appointing a receiver, trustee or liquidator for Tenant or its assets or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the Premises shall be taken or occupied by a party other than Tenant or any Other Occupants;

(e)     If this Lease or the estate of Tenant hereunder shall be transferred to, assigned to, or subleased to, or shall pass to or devolve upon, any person or party in violation of the terms of this Lease or if the Premises become vacant or deserted; or

(f)     If a levy under execution or attachment shall be made against Tenant or its property and such execution or attachment shall not be vacated or removed by court order, bonding or otherwise within a period of thirty (30) days.

**Section 25.02.**  If an Event of Default shall occur, Landlord, at any time thereafter, may at its option, give written notice to Tenant stating that this Lease and the term hereby demised shall expire and terminate on the date specified in such notice, and upon the date specified in such notice, this Lease and the term hereby demised and all rights of the Tenant under this Lease shall expire and terminate as if that date were the date herein definitely fixed for the end of the term of this Lease, and by said date Tenant shall quit and surrender the Premises and shall cause all Other Occupants to quit and surrender the Premises in accordance with the provisions of this Lease and Tenant shall remain liable as provided in this Lease.

**Section 25.03.**  If any Event of Default shall occur, Landlord may without notice re-enter and repossess the Premises either by summary dispossess or eviction proceedings, or by any actions or proceedings commenced in the United States Bankruptcy Court or by any other suitable and permissible means (including, but not limited to, any lawful means that are or may be designated or characterized as "self help") action or proceeding at law and repossess the Premises and may remove Tenant and all Other Occupants therefrom, and Tenant shall nevertheless remain liable in accordance with this Lease as hereinafter provided for the remainder of the term hereof, subject, however, to the survival of Tenant's obligations as provided in this Lease.  If Landlord shall so re-enter, Landlord may, at its option (but shall not be obligated to), repair and alter the Premises in such manner as Landlord may deem reasonably necessary or advisable, and/or let or relet the Premises or any parts thereof for the whole or any part of the remainder of the term hereof or for a longer period, in Landlord's name or as agent of Tenant, and out of any rent or other sums collected or received as a result of such reletting Landlord shall: first, pay to itself the cost and expense of retaking, repossessing, repairing and/or altering the Premises, and the cost and expense of removing all Other Occupants and persons and property therefrom; second, pay to itself the cost and expense sustained in securing any new tenants, and if Landlord shall maintain and operate the Premises the cost and expense of operating and maintaining the Premises; and, third, pay to itself any balance remaining on account of the liability of Tenant to Landlord. No re-entry by Landlord, whether had or taken under summary proceedings, any actions or proceedings in the United States Bankruptcy Court or otherwise, shall absolve or discharge Tenant from liability hereunder.  Landlord shall in no way be responsible or liable for any failure to relet the Premises or any part therefor, or for any failure to collect any rent or other sums due on any such reletting. Should any rent so collected by Landlord after the aforementioned payments be insufficient to fully pay to Landlord a sum equal to all such Rental and other payments, charges, cost and expenses to be paid  by Tenant to Landlord in accordance with this Lease, then the deficiency shall, at Landlord's option, be paid by Tenant to Landlord on demand (and such obligation shall survive the Expiration Date or the sooner termination of this Lease) or, at Landlord's option, may be offset, in whole or in part, against the Post-Closing Payment.

**Section 25.04.**  The Rental hereunder and all costs, reasonable attorneys' fees and other expenses which may be incurred by Landlord in enforcing the provisions of this Lease or on account of any default or delinquency of Tenant in carrying out the provisions of this Lease, shall be and they hereby are declared to constitute a valid lien upon the interest of Tenant in this Lease

and in the Premises.

**Section 25.05.** Actions or suits for the recovery of such deficiency or damages, or for a sum equal to any Rental, Impositions and other charges hereunder, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the term hereof would have expired by limitation had there been no such default by Tenant or termination of this Lease.

**Section 25.06.** Nothing contained in this Article shall limit or prejudice the right of Landlord to prove and obtain, as liquidated damages, in any bankruptcy, insolvency, receivership, reorganization or dissolution proceedings, an amount equal to the maximum allowed by a statute or rule of law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount be greater, equal to or less than the amount of the damages referred to in any of the preceding sections of this Article.

**Section 25.07.** No receipt of moneys by Landlord from Tenant after termination of this Lease, or after the giving of any notice of termination of this Lease, shall reinstate, continue or extend the term of this Lease or affect any notice of termination given to Tenant, or operate as a waiver of the right of Landlord to enforce the payment of Rental, Impositions or any other sum or sums of money and other charges, cost or expenses herein reserved and/or agreed to be paid by Tenant then due or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper remedy. Except as may otherwise be expressly provided herein, it is hereby agreed that after the service of notice to terminate this Lease or the commencement of any action, suit or summary proceedings, or after commencement of any actions or proceedings in the United States Bankruptcy Court, or after issuance or entry of an order or judgment for the possession of the Premises, Landlord may demand, receive and collect any moneys due or thereafter falling due without in any manner affecting such notice, action, proceeding, suit, order or judgment, all such moneys collected being deemed payments on account of the use and occupation of said Premises or, at the election of Landlord, on account of Tenant's liability hereunder.

**Section 25.08.** Tenant hereby expressly waives: (i) the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end; (ii) for and on behalf of itself, the Other Occupants and all other persons or entities claiming through or under Tenant, any and all rights of redemption provided by any law or statute now in force or hereafter enacted or otherwise, or re-entry or repossession or to restore the operation of this Lease in case Tenant shall be evicted or dispossessed for any cause by a judgment or warrant of any court or judge, or in case of re-entry or repossession by Landlord or in case of the expiration or termination of this Lease. Landlord and Tenant hereby waive and will waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of said premises, or any claim of injury or damage. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease are not restricted to their technical legal meaning.

**Section 25.09.** No failure by Landlord to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy upon a

breach thereof, and no acceptance of full or partial rent during the continuance of any such breach and no payment by Tenant of any amount that is payable by Tenant under this Lease, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by Tenant, and no breach thereof, shall be, or be deemed to be, waived, altered or modified except by a written instrument executed by Landlord. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**Section 25.10.** In the event of any breach or threatened breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease.

**Section 25.11.** Each right and remedy of Landlord provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise by Landlord, in whole or in part, of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or equity or by statute or otherwise, shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

**Section 25.12.** Tenant shall pay to the Landlord, as Rental, all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in any action or proceeding to which Landlord may be made a party by reason of any act or omission of the Tenant or any Other Occupant or Tenant's failure to comply with Tenant's obligations under this Lease. If Landlord prevails in any action or proceeding brought by Landlord against Tenant to enforce any of the covenants and provisions of this Lease that Tenant is obligated to perform and/or comply with, then Tenant shall also pay to Landlord, as Rental, all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in any said action or proceeding. All such costs, expenses, and attorneys' fees may be included in, and form a part of, any judgment entered in any action or proceeding brought by Landlord against Tenant in connection with this Lease. All costs, expenses and other amounts paid or obligations incurred by Landlord as aforesaid, together with interest at the Default Rate, shall be paid by Tenant to Landlord within five (5) days from the date of Landlord's demand accompanied by a written statement itemizing the particular costs and expenses and other amounts for which payment is demanded from Tenant.

**Section 25.13.** Landlord shall pay to the Tenant all costs and expenses, including reasonable attorneys' fees, incurred by Tenant in any plenary action or proceeding to which Tenant may be made a party by reason of any act or omission of Landlord or Landlord's failure to comply with Landlord's obligations under this Lease. If Tenant prevails in any plenary action brought by Tenant against Landlord to enforce any of the covenants and provisions of this Lease that Landlord is obligated to perform and/or comply with, then Landlord shall also pay to Tenant, all costs and expenses, including reasonable attorneys' fees, incurred by Tenant in said plenary action. All such costs, expenses, and attorneys' fees may be included in, and form a part of, any judgment entered in said action brought by Tenant against Landlord in connection with this Lease. All costs, expenses

and other amounts paid or obligations incurred by Tenant, together with interest at the Default Rate, shall be paid by Landlord to Tenant within five (5) days from the date of Tenant's demand accompanied by a written statement itemizing the particular costs and expenses and other amounts for which payment is demanded from Landlord.

## ARTICLE 26

## NOTICES

Any notice, letter, request, consent or other communication pursuant to this Lease shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, or (c) legible facsimile or other electronic transmission, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith. Notices shall be deemed given upon receipt or refusal to accept delivery, or in the case of the facsimile or other electronic transmission, on the date such transmission is received. Any notice received or refused on a day that is not a Business Day (hereinafter defined) or after 5:00 p.m. local time on any day shall be deemed to have been delivered on the following Business Day. The terms and provisions of this Section shall survive the Expiration Date or the sooner termination of this Lease. The term "Business Day" shall mean any day other than a Saturday, Sunday or holiday of a bank in New York. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Lease shall be as follows:

|  |  |
|---|---|
| If to Tenant: | 556 Holding LLC<br>556 West 22nd Street<br>New York, New York<br>Attention: Dorothea Keeser<br>Telephone No.: (212) 255-0719<br>Facsimile No.: (212) 255-2368 |
| with copies to: | Jones Day<br>222 East 41st Street<br>New York, New York 10017-6702<br>Attention: Thomas Bark, Esq.<br>Telephone No.: (212) 326-7815<br>Facsimile No.: (212) 755-7306 |
| If to Landlord: | Albanese Development Corporation<br>1050 Franklin Avenue<br>Garden City, New York 11530<br>Attention: Christopher V. Albanese<br>Telephone No.: (516) 746-6000<br>Facsimile No.: (516) 746-0580 |

with copies to:        Albanese & Albanese LLP
1050 Franklin Avenue
Garden City, New York 11530
Attention: Arthur L. Colozzi, Esq.
Telephone No.: (516) 248-7000
Facsimile No.: (516) 747-7777

## ARTICLE 27

## CONDEMNATION

**Section 27.01.** If all or any portion of the Premises shall be taken, whether permanently or temporarily, for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain or by agreement between Landlord, Tenant and those authorized to exercise such right, such that Tenant is unable to continue its business at the Premises, this Lease and the term hereby granted, shall terminate and expire on the date of such taking and the rent and any other sum or sums of money and other charges herein reserved and provided to be paid by the Tenant shall be apportioned and paid to the date of such taking. Landlord shall have no obligation to repair, alter, replace, restore or rebuild the Premises or any portion thereof or to pay any of the costs or expenses thereof and Tenant shall have no claim against Landlord for its election not to do so.

If all or any portion of the Premises shall be taken or condemned as provided in this Article, Tenant waives all claims for any value for its leasehold, its interest in this Lease and any Improvements and Landlord shall be entitled to collect the entire award from the condemnor, and Tenant agrees to execute any and all documents that may be required in order to facilitate collection by the Landlord of any and all such awards.

**Section 27.02.** For the purpose of this Article, the Premises or a part thereof, as the case may be, shall be deemed to have been taken or condemned on the date on which actual possession of the Premises or a part thereof, as the case may be, is acquired by any lawful power or authority or the date on which title vests therein, whichever is earlier.

## ARTICLE 28

## BROKER

Each party represents and warrants to the other that its has not dealt with any broker in connection with the negotiation and execution of this Lease and that it does not know of any broker who has claimed or may have the right to claim a commission in connection with this Lease. Tenant shall indemnify and defend Landlord against any and all costs, claims or expenses, including, but not limited to, legal fees and disbursements, arising out of the breach by Tenant of any of the representations and warranties made to Landlord pursuant to this Article. Landlord shall indemnify and defend Tenant against any and all costs, claims or expenses, including reasonable legal fees and disbursements, arising out of the breach by Landlord of any of the representations and warranties made to Tenant pursuant to this Article. The respective obligations of Landlord and

Tenant under this Article shall survive the Expiration Date or the sooner termination of this Lease.

## ARTICLE 29

## SIGNS

**Section 29.01.** Tenant shall have the right to retain, in their current location, any exterior signs that were affixed to the Premises as of the date of the Purchase and Sale Agreement. Tenant shall not install or affix to the Premises any new, replacement or additional exterior signs without Landlord's prior written consent in all respects. Tenant shall, at Tenant's sole cost and expense, with respect to all exterior signs installed and maintained by Tenant: (i) comply with any applicable laws, rules and regulations relative to the installation and/or maintenance of said signs; (ii) obtain and pay for all governmental licenses, permits and approvals required in connection with said signs; (iii) at all times, maintain and keep said signs clean and in good condition and repair; and, (iv) by the Expiration Date or by the date of any earlier termination of this Lease, remove all exterior signs installed by Tenant and repair any damage to the Premises that was caused by the installation, maintenance and/or removal of said signs. If Landlord shall deem it necessary to remove any of said signs in order to perform any maintenance to the Premises or to make any repair, alteration or improvement at the Premises or in, about or upon all or any portion of the area where any sign is located, Landlord shall have the right to do so, provided that Landlord removes and reinstalls the applicable sign(s) at its sole cost and expense.

**Section 29.02.** Throughout the term of this Lease: (i) Landlord shall have the right to install and maintain a sign or plaque on the exterior of the Premises that indicates that the Premises are owed and managed by Albanese Development Corporation; and (ii) Landlord and its brokers and agents shall have the right to install and maintain exterior signs at the Premises that advertise that the Premises are "For Rent", or available for "Build to Suit" or that contain other similar or customary advertising posted by landlords. All signs and plaques installed in accordance with this Section shall be installed in a location and shall have such dimensions, colors, materials and content as Landlord shall determine in its sole discretion.

## ARTICLE 30

## INTENTIONALLY OMITTED

## ARTICLE 31

## CERTIFICATES BY LANDLORD AND TENANT

Tenant agrees at any time and from time to time upon not less than ten (10) days' prior notice by Landlord or any mortgagee to execute, acknowledge and deliver to Landlord or such mortgagee or any other party specified by Landlord or by such mortgagee a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the net rent, Impositions and other charges have been paid in advance, if any,

and stating whether or not to the best knowledge of the signer of such certificate, Landlord is in default in performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which the signer may have knowledge.

## ARTICLE 32

## LANDLORD'S CONSENTS

The granting of any consent by Landlord to Tenant to perform any act of Tenant requiring Landlord's consent under the terms of this Lease, or the failure on the part of Landlord to object to any such action taken by Tenant without Landlord's consent, shall not be deemed a waiver by Landlord of its rights to require such consent for any further or similar act by Tenant, and Tenant hereby expressly covenants and warrants that as to all matters requiring Landlord's consent under the terms of this Lease, Tenant shall secure such consent for each and every occurrence of any event requiring such consent, and Tenant shall not claim or assert any waiver on the part of Landlord of the requirement that Tenant secure such consent.

## ARTICLE 33

## SURRENDER AT END OF TERM; HOLDOVER

**Section 33.01**. On the last day of the term hereof or upon any earlier termination of this Lease, or upon a re-entry by Landlord upon the Premises pursuant to the provisions of this Lease, Tenant shall vacate, surrender and deliver the Premises to Landlord together with all Equipment and fixtures: (i) broom clean, in good order, condition and repair, reasonable wear and tear excepted; and (ii) free and clear of all Other Occupants, any other occupancies, Tenant's personal property and removable trade fixtures, goods and merchandise and of all liens and encumbrances other than those that were a permitted exception under the Purchase and Sale Agreement or created by Landlord, without any payment or allowance whatever by Landlord. Tenant hereby waives any notice now or hereafter required by law with respect to vacating and surrendering the Premises on any such termination date.

**Section 33.02**. Tenant expressly waives, for itself and for any person or entity claiming through or under Tenant, any rights which Tenant or any such person or entity may have under the provisions of Article 63 and Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover or other summary proceedings or any other actions or proceedings that Landlord may institute against Tenant in connection with this Lease or Tenant's occupancy of the Premises, including, but not limited to, any actions or proceedings in the United Stated Bankruptcy Court.

## ARTICLE 34

## NO ORAL AGREEMENTS

This Lease contains all the promises, agreements, conditions, inducements and understandings between Landlord and Tenant relative to the Tenant's use and occupancy of the Premises and there are no promises, agreements, conditions, understandings, inducements,

warranties or representations, oral or written, expressed or implied, between them other than as set forth in this Lease.

## ARTICLE 35

## QUIET ENJOYMENT

Landlord covenants that if and so long as an Event of Default has not occurred, Tenant shall and may (subject, however, to the exceptions, reservations, terms, provisions and conditions of this Lease) peaceably and quietly enjoy the Premises for the term hereby granted.

## ARTICLE 36

## SUBORDINATION

This Lease shall be subject and subordinate to all underlying leases and to all mortgages now or hereafter placed upon or affecting the Premises and to all renewals, modifications, amendments, consolidations, replacements and extensions of any such underlying leases or mortgages. This provision shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or any mortgagee. In confirmation thereof, within ten (10) days of a request by Landlord, from time to time, Tenant shall execute and deliver to Landlord or the party designated by Landlord, any certificate that Landlord may request. In addition, Tenant shall within ten (10) days of a request by Landlord or any lender providing financing to Landlord, execute and deliver to Landlord, a subordination, non-disturbance and attornment agreement with respect to this Lease among Landlord, Tenant and Landlord's lender, in form and substance reasonably requested by Landlord's lender.

## ARTICLE 37

## INVALIDITY OF CERTAIN PROVISIONS

If any term or provision of this Lease or the application thereof to any person, entity or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons, entities or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## ARTICLE 38

## MISCELLANEOUS

**Section 38.01**. The liability of the Landlord hereunder for damages or otherwise shall be limited to the Premises and the reversionary interest in the Premises including, without limitation, the proceeds of any insurance policies covering or relating to the Premises, any proceeds receivable in connection with any sale of the Premises, including, without limitation, any awards payable in connection with any condemnation of the Premises or any part thereof, and any other rights, privileges, licenses, franchises, claims, causes of action or other interests, sums or receivables

appurtenant to the Premises, and the Landlord shall have no personal liability beyond the aforesaid interest of Landlord in the Premises.

**Section 38.02.** The captions of this Lease are for convenience of reference only and in no way define, limit or describe the scope or intent of this Lease or in any way affect this Lease.

**Section 38.03.** The table of contents preceding this Lease is for the purpose of convenience of reference only and is not to be deemed or construed in any way as part of this Lease or as supplemental thereto or amendatory thereof.

**Section 38.04.** Nothing in this Lease shall be construed to create a joint venture or partnership between Landlord and Tenant.

**Section 38.05.** The use herein of the neuter pronoun in any reference to Landlord or Tenant shall be deemed to include any individual Landlord or Tenant, and the use herein of the words "successors and assigns" or "successors or assigns" of Landlord or Tenant shall be deemed to include the heirs, legal representatives and assigns of any individual Landlord or Tenant.

**Section 38.06.** This Lease cannot be changed or terminated orally, but only by an instrument in writing executed by the party against whom enforcement of any waiver, change, modification or discharge is sought. Tenant hereby expressly warrants and represents that it shall not record this Lease or a memorandum of this Lease.

**Section 38.07.** This Lease shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York (without giving effect to New York's principles of conflicts of law). Tenant hereby: (i) submits to personal jurisdiction in the Courts of the State of New York and in the United States Bankruptcy Court, in any action or proceeding arising out of this Lease and hereby waives all defenses of forum non conveniens; (ii) agrees that notwithstanding anything to the contrary contained in this Lease, any action or proceeding instituted by Landlord to recover possession of the Premises may, at Landlord's option, be instituted in the Courts of the State of New York and/or in the United States Bankruptcy Court; and (iii) agrees that any action or proceeding instituted by Landlord in the Courts of the State of New York, shall, at Landlord's election, be brought in New York County, New York. Tenant hereby waives any right to object to, or to contest the jurisdiction of, the United States Bankruptcy Court, in connection with any actions or proceedings arising out of this Lease, including any action or proceeding by Landlord to recover possession of the Premises and Tenant hereby waives any right to make any motion or to institute any other actions or proceedings to remove any actions or proceedings instituted by Landlord in the United States Bankruptcy Court to the Courts of the State of New York or to consolidate any such actions or proceedings instituted by Landlord in the United States Bankruptcy Court with any other action or proceeding commenced by Tenant in the Courts of the State of New York. The provisions of this Section shall survive the Expiration Date or the sooner termination of this Lease.

**Section 38.08.** If Landlord commences any proceeding or action for possession, including a summary proceeding for possession of the Premises and/or any actions or proceeding in the United States Bankruptcy Court, Tenant will not interpose any counterclaim of whatever nature or description in any such action or proceeding, except for mandatory counterclaims, and Tenant shall

not interpose or assert in any summary proceeding instituted in the Courts of the State of New York, any cause of action, claim, challenge, contest or defense in connection with, related to, or arising from the Per Diem Amount, Delay Damages, the Purchase and Sale Agreement and/or this Lease. The provisions of this Section shall survive the Expiration Date or the sooner termination of this Lease.

**Section 38.09.** Any cause of action, claim, challenge, contest or defense that Tenant has or may have in connection with, related to, or arising from this Lease, shall only be asserted or interposed in a plenary action instituted in the Supreme Court of the State of New York and any such action, claim, challenge, contest or defense that is asserted or interposed by Tenant in said plenary action shall not serve to, or be deemed to, stay, extend, reinstate or renew this Lease or authorize or permit the use and/or occupancy of the Premises or any portion thereof by Tenant or any Other Occupants, provided, however, that any cause of action, claim, challenge, contest or defense that Tenant has or may have in connection with, related to, or arising from the Per Diem Amount, Delay Damages and/or the Purchase and Sale Agreement shall only be asserted or interposed in a proceeding instituted in the United States Bankruptcy Court and any such action, claim, challenge, contest or defense that is asserted or interposed by Tenant in said proceeding shall not serve to, or be deemed to, stay, extend, reinstate or renew this Lease or authorize or permit the use and/or occupancy of the Premises or any portion thereof by Tenant or any Other Occupants. The provisions of this Section shall survive the Expiration Date or the sooner termination of this Lease

**Section 38.10.** Tenant hereby warrants, represents, agrees and acknowledges that: (i) Tenant was represented by the firm of Jones Day in connection with the negotiation and execution of the Purchase and Sale Agreement and this Lease and has entered into the Purchase and Sale Agreement and this Lease with the advice of its counsel; (ii) the Per Diem Amount was negotiated at arms length between Landlord and Tenant and is fair and reasonable and not a penalty; (iii) Tenant's agreement to the Per Diem Amount was a material inducement for Landlord to enter into the Purchase and Sale Agreement and this Lease; and (iv) Tenant hereby, unconditionally and irrevocably waives, releases and relinquishes any and all rights that Tenant may now or hereafter have to contest or challenge in any action or proceeding in connection with this Lease and/or the Purchase and Sale Agreement, the validity, enforceability, fairness, or reasonableness of the Per Diem Amount and that the foregoing waiver, release and relinquishment is informed and freely made. The provisions of this Section shall survive the Expiration Date or the sooner termination of this Lease.

**Section 38.11.** The agreements, terms, covenants and conditions herein shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and (except as otherwise provided herein) and permitted assigns.

**Section 38.12.** If in this Lease it is provided that Landlord's consent or approval as to any matter will not be unreasonably withheld or delayed, and it is established by a court or body having final jurisdiction thereover that Landlord was unreasonable and/or delayed, then the only effect of such finding shall be that Landlord shall be deemed to have given its consent or approval.

**Section 38.13** If there are any inconsistencies between any of the terms and provisions of this Lease and the terms and provisions of the Purchase and Sale Agreement, including any

handwritten modifications thereto, then the terms and provisions of this Lease shall prevail and take precedence.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

Witnessed or Attested:                    [PURCHASER]


                                          By:_____
                                             Name:
                                             Title:


Witnessed or Attested:


                                          556 HOLDING LLC, a New York limited liability company

                                          By: KDMJ Realty Inc., a New York Corporation, its managing member

                                          By: _____
                                          Name: Dorothea Keeser
                                          Title:   President

# CERTIFICATE OF PROPERTY INSURANCE

| | DATE 08/16/2010 |

**ACORD**

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| INTEGRO INSURANCE BROKERS<br>1 STATE STREET PLAZA, 9TH FL<br>NEW YORK, NY 10004<br>ATTN: CARMEL FAUCI | **COMPANIES AFFORDING COVERAGE** |
| | COMPANY A: THE TRAVELERS INDEMNITY CO. OF AMERICA |
| **INSURED** | COMPANY B |
| CHELSEA ART MUSEUM<br>KDMI REALTY 556 HOLDING LLC<br>556 W 22ND STREET<br>NEW YORK, NY 10011 | COMPANY C |
| | COMPANY D |

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|
| A | X PROPERTY | 660-4372L541TIA10 | 05/31/2010 | 05/31/2011 | X | BUILDING | $ 14,000,000 RC |
| | CAUSES OF LOSS | | | | X | PERSONAL PROPERTY | $ 250,000 |
| | BASIC | | | | | BUSINESS INCOME | $ |
| | BROAD | | | | | EXTRA EXPENSE | $ |
| | SPECIAL | | | | | BLANKET BUILDING | $ |
| | EARTHQUAKE | | | | | BLANKET PERS PROP | $ |
| | FLOOD | | | | | BLANKET BLDG & PP | $ |
| | | | | | X | DEDUCTIBLE | $ 10,000 |
| | | | | | | | $ |
| | INLAND MARINE | | | | | | $ |
| | TYPE OF POLICY | | | | | | $ |
| | | | | | | | $ |
| | CAUSES OF LOSS | | | | | | $ |
| | NAMED PERILS | | | | | | $ |
| | OTHER | | | | | | $ |
| | CRIME | | | | | | $ |
| | TYPE OF POLICY | | | | | | $ |
| | BOILER & MACHINERY | | | | | | $ |
| | | | | | | | $ |
| | OTHER | | | | | | |

**LOCATION OF PREMISES/DESCRIPTION OF PROPERTY**

**SPECIAL CONDITIONS/OTHER COVERAGES**
MORTGAGEE/LOSS PAYEE UNDER PROPERTY POLICY # 660-4372L541TIA10: HRC FUND IV REIT LLC, ISAOA

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| HRC FUND IV REIT LLC<br>AND ITS SUCCESSORS &/OR ASSIGNS<br>250 PARK AVENUE SOUTH, FL 3<br>NEW YORK, NY 10003 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL ___30___ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 24 (1/95)

© ACORD CORPORATION 1995

# CERTIFICATE OF LIABILITY INSURANCE

ACORD®

DATE (MM/DD/YYYY): 08/16/2010

| PRODUCER | THIS CERTIFICATION IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

INTEGRO INSURANCE BROKERS
1 STATE STREET PLAZA, 9TH FL
NEW YORK, NY 10004
ATTN: CARMEL FAUCI

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: THE TRAVELERS INDEMNITY CO. OF AM | |
| INSURER B: THE TRAVELERS INDEMNITY CO | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

**INSURED**
CHELSEA ART MUSEUM
KDMJ REALTY 556 HOLDING LLC
556 W 22ND STREET
NEW YORK, NY 10011

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY ☐ CLAIMS MADE ☐ OCCUR | B604372L541TIA10 | 05/31/2010 | 05/31/2011 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | X | **AUTOMOBILE LIABILITY** ☐ ANY AUTO ☐ ALL OWNED AUTOS X SCHEDULED AUTOS ☐ HIRED AUTOS X NON-OWNED AUTOS X COMP. S0 DED X COLLISION $100 DED | BA4710L0611DSEL | 05/31/2010 | 05/31/2011 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN AUTO ONLY: EA ACC | $ |
| | | | | | | AGG | $ |
| B | X | **EXCESS/UMBRELLA LIABILITY** X OCCUR ☐ CLAIMS MADE ☐ DEDUCTIBLE ☐ RETENTION $ | | | | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| A | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | IHUB7071Y01410 | 05/31/2010 | 05/31/2011 | ☐ WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| | | **OTHER:** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| AS ADDITIONAL INSURED HRC FUND IV REIT LLC AND ITS SUCCESSORS 7/OR ASSIGNS 250 PARK AVENUE SOUTH, FL 3 NEW YORK, NY 10003 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

Clear All

## EXHIBIT C

### Permitted Exceptions

1.　　Notice of Appropriation Route 9A Reconstruction Project recorded March 15, 1999 in Reel 2836 page 628.

2.　　Title by Filing, Acquisition of Property Route 9A Map No. 13 Parcel No. 15 recorded March 15, 1999 in Reel 2836 page 631.

3.　　Caretaker's Apartment Declaration made by Dorothea Keeser dated February 12, 2001, recorded February 14, 2001 in Reel 3239 page 522.

4.　　The rights of Seller and any Designated Occupants to remain in possession of the Property pursuant to the terms of the Lease Agreement.

## EXHIBIT D

### Form of Deed With Covenant Against Grantor's Acts

THIS INDENTURE, made as of the ___ day of [       ], Two Thousand and Ten

BETWEEN **556 HOLDING LLC**, a New York limited liability company, having an address at 556 West 22nd Street, New York, New York 10001, party of the first part, and **[Purchaser]**, a New York limited liability company, having an address at c/o Albanese Development Corporation, 1050 Franklin Avenue, Garden City, New York 11530, party of the second part

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL, that certain plot, piece or parcel of land, situate, lying and being in the City, County and State of New York, being more fully bounded and described as set forth on Schedule A annexed hereto and forming a part hereof.

Said premises being known as and by the street address 556 West 22nd Street (a/k/a 154 11th Avenue), New York, New York.

Being and intended to be the same premises conveyed to the party of the first part by deed dated and record in the New York County Clerk's Office on              in Liber       at Page          .

TOGETHER with strips, gores and easements, if any, next to and adjoining the above-described premises.

SUBJECT to the encumbrances and exceptions set forth on Schedule B, annexed hereto and forming a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the premises have been encumbered in any way except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of the indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF

556 Holding, a New York limited liability company

By: KDMJ Realty, Inc., a New York corporation, its managing member

By: _____
Name:  Dorothea Keeser
Title:    President

STATE OF NEW YORK        )
                                        ss:

COUNTY OF NEW YORK  )

On the [   ] day of [       ] in the year [       ] before me, the undersigned a notary public in and for said state, personally appeared Dorothea Keeser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


My commission expires:

_____

BARGAIN AND SALE DEED
WITHOUT COVENANT


556 HOLDING LLC

TO

[Purchaser]

SECTION 3
BLOCK 693
LOT 64
COUNTY OR TOWN     New York
STREET ADDRESS     556 West 22nd Street
     New York, New York  10001

TAX BILLING ADDRESS  556 West 22nd Street
     New York, New York  10001


RETURN BY MAIL TO:

Arthur L. Colozzi, Esq.
ALBANESE & ALBANESE LLP
1050 Franklin Avenue
Garden City, NY 11530

Schedule A

Legal Description of the Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 22nd Street with the easterly side of 11th Avenue as said easterly side of 11th Avenue is shown on the State of New York Appropriation Map recorded in Reel 2836 page 631 and as described in the Notice of Appropriation recorded in Reel 2836 page 628; and

RUNNING THENCE easterly along the southerly side of West 22nd Street, 100 feet;

THENCE southerly and parallel with the said easterly side of 11th Avenue, 98 feet 8 inches to the center line of the block;

THENCE westerly parallel with the southerly side of West 22nd Street and along the center line of the block, 95 feet 3 inches to the said side of 11th Avenue;

THENCE northwesterly along the said easterly side of 11th Avenue, the following two (2) courses and distances:

(1)     On a line forming an angle on its northerly side with the preceding course of 110 degrees 27 minutes 29 seconds, a distance of 13.59 feet; and

(2)     On a line forming an angle on its easterly side with the preceding course of 159 degrees 32 minutes 31 seconds, a distance of 86.07 feet to the corner aforesaid, the point of BEGINNING.

Schedule B

1.      Notice of Appropriation Route 9A Reconstruction Project recorded March 15, 1999 in Reel 2836 page 628.

2.      Title by Filing, Acquisition of Property Route 9A Map No. 13 Parcel No. 15 recorded March 15, 1999 in Reel 2836 page 631.

3.      Caretaker's Apartment Declaration made by Dorothea Keeser dated February 12, 2001, recorded February 14, 2001 in Reel 3239 page 522.

4.      The rights of Seller and any Designated Occupants to remain in possession of the Property pursuant to the terms of the Lease Agreement.

## EXHIBIT E

## FOREIGN INVESTORS REAL PROPERTY
## TAX ACT CERTIFICATION AND AFFIDAVIT

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform [Purchaser], a New York limited liability company (the "Transferee") that withholding tax is not required upon disposition of a U.S. real property interest by 556 HOLDING, LLC, a New York limited liability company (the "Transferor"), the undersigned hereby certifies the following on behalf of the Transferor:

Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and any regulations, promulgated in connection therewith);

The U.S. employer identification number of Transferor is _____.

Transferor has an address at 556 West 22nd Street, New York, New York 10001.

The address of the subject property is 556 West 22nd Street, New York, New York 10001.

Transferor understands that this Certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have the authority to sign this document on behalf of Transferor.

[          ], 2010.

                              556 HOLDING LLC

                              By: KDMJ Realty, Inc., a New York
                              corporation, its managing member


                              By:_____

                              Name: Dorothea Keeser
                              Title:  President

# TABLE OF CONTENTS

**Page**

ARTICLE I        PURCHASE AND SALE ........................................................................ 1

      Section 1.1       Agreement of Purchase and Sale ........................................ 1

      Section 1.2       Certain Definitions ................................................................ 1

      Section 1.3       Purchase Price ...................................................................... 3

      Section 1.4       Payment of Purchase Price.................................................. 3

      Section 1.5       Deposit .................................................................................. 3

      Section 1.6       Designation of Certifying Person........................................ 3

      Section 1.7       Occupancy after the Closing ............................................... 4

      Section 1.8       Bankruptcy Provisions ........................................................ 4

ARTICLE II        TITLE AND SURVEY ....................................................................... 4

      Section 2.1       Title ....................................................................................... 4

      Section 2.2       Disclaimer Regarding Title Matters.................................... 5

      Section 2.3       Conveyance of Title ............................................................ 5

      Section 2.4       Assignment of Existing Mortgage ...................................... 5

ARTICLE III       5

ACCESS TO PROPERTY, ETC .................................................................................... 5

      Section 3.1       Access ................................................................................... 5

      Section 3.2       Insurance .............................................................................. 5

      Section 3.3       Indemnity ............................................................................. 5

ARTICLE IV       CLOSING; CLOSING ADJUSTMENTS AND COSTS;
                          CONDITIONS ................................................................................... 6

      Section 4.1       Time and Place..................................................................... 6

      Section 4.2       Seller's Obligations at Closing ........................................... 6

      Section 4.3       Purchaser's Obligations at Closing ..................................... 6

      Section 4.4       Closing Statement ................................................................ 7

      Section 4.5       Conditions Precedent to Obligation of Purchaser.............. 7

      Section 4.6       Conditions Precedent to Obligation of Seller .................... 8

ARTICLE V        REPRESENTATIONS, WARRANTIES AND COVENANTS .................... 8

      Section 5.1       Representations and Warranties of Seller ........................... 8

      Section 5.2       Knowledge Defined ............................................................. 8

      Section 5.3       Representations and Warranties of Purchaser..................... 9

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| ARTICLE VI | RISK OF LOSS | | 9 |
| Section 6.1 | Casualty and Property Insurance | | 9 |
| Section 6.2 | Condemnation | | 10 |
| Section 6.3 | Survival | | 10 |
| ARTICLE VII | COMMISSIONS | | 10 |
| Section 7.1 | Brokerage Commissions | | 10 |
| ARTICLE VIII | DISCLAIMERS AND WAIVERS | | 10 |
| Section 8.1 | No Reliance on Documents | | 10 |
| Section 8.2 | AS-IS SALE; DISCLAIMERS | | 10 |
| Section 8.3 | Release | | 11 |
| Section 8.4 | Survival of Disclaimers | | 11 |
| ARTICLE IX | ESCROW AGENT | | 11 |
| Section 9.1 | Deposit | | 11 |
| Section 9.2 | Escrow Agent Liability | | 12 |
| Section 9.3 | Legal Proceedings | | 12 |
| Section 9.4 | Survival | | 12 |
| ARTICLE X | MISCELLANEOUS | | 12 |
| Section 10.1 | Acceptance of Deed | | 12 |
| Section 10.2 | Assignment | | 12 |
| Section 10.3 | TIME OF THE ESSENCE | | 12 |
| Section 10.4 | Notices | | 12 |
| Section 10.5 | Modifications | | 13 |
| Section 10.6 | Entire Agreement | | 14 |
| Section 10.7 | Further Assurances | | 14 |
| Section 10.8 | Counterparts | | 14 |
| Section 10.9 | Severability | | 14 |
| Section 10.10 | Applicable Law | | 14 |
| Section 10.11 | Third-Party Beneficiary | | 14 |
| Section 10.12 | Captions | | 14 |
| Section 10.13 | Construction | | 14 |
| Section 10.14 | Recordation | | 14 |

# TABLE OF CONTENTS
(continued)

Section 10.15    Waiver of Jury Trial ....................................................................... 15

Section 10.16    Attorneys' Fees .............................................................................. 15

Section 10.17    Confidentiality ............................................................................... 15

Section 10.18    Default ............................................................................................ 15